Kimberly L. Adams (*pro hac vice*)
kadams@levinlaw.com
Kathryn L. Avila (*pro hac vice*)
kavila@levinlaw.com
Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: 850-435-7056
Facsimile: 850-436-6056

Lori E. Andrus (SBN 205816)
lori@andrusanderson.com
Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
Audrey Siegel (SBN 286771)
audrey.siegel@andrusanderson.com
Andrus Anderson LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

*Attorneys for Plaintiff B.M.*

*[Additional Counsel Listed on Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| B.M., an individual, | ) Case No.: |
| | ) |
| Plaintiff, | ) FIRST AMENDED COMPLAINT |
| | ) |
| vs. | ) DEMAND FOR JURY TRIAL |
| | ) |
| WYNDHAM HOTELS & RESORTS, INC.; | ) |
| CHOICE HOTELS INTERNATIONAL, INC.; | ) |
| G6 HOSPITALITY, LLC, | ) |
| | ) |
| Defendant(s) | ) |
| | ) |

FIRST AMENDED COMPLAINT - 1

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff B.M., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.  For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry continue to neglect the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2.  Defendants Wyndham Hotels & Resorts, Inc. (hereinafter "Wyndham"), Choice Hotels International, Inc. (hereinafter "Choice" or "Choice Hotels"), and G6 Hospitality, LLC (hereinafter "G6")[1] know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendant Hotels have instead chosen to ignore and facilitate the sex trafficking on their properties, enjoying the monetary profit and other benefits stemming from rooms rented for this explicit and apparent purpose.

3.  This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials B.M., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.  B.M. was trafficked for commercial sex as a minor in Santa Clara County, California.  As a minor, B.M. was sold via commercial sex transactions at the Defendants' hotel properties where force, fraud, and coercion were used while Defendants profited.

5.  B.M. was advertised for sex on www.backpage.com whereby the  hotels in Santa Clara County, California, including the Super 8, Clarion Inn, and Motel 6, enabled, facilitated, and otherwise harbored  B.M. for the purpose of sex trafficking.

6.  As a direct and proximate result of Wyndham, Choice, and G6's failure to act, mandate, establish, execute, and/or modify anti-trafficking efforts on their hotel properties, B.M. was sex trafficked, sexually exploited, and victimized repeatedly at Wyndham, Choice, and G6 brand hotels.

---

[1] Collectively, Wyndham, Choice, and G6 may be referred to as "Defendant Hotels."

7. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Defendants who enabled, harbored, held, facilitated, or otherwise benefited, or any combination of the foregoing, from a sex trafficking venture in which B.M. was trafficked for sex, sexually exploited, and victimized.

8. The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be engaging in sex trafficking in violation of the TVPRA. Defendants turned a blind-eye to more than a decade of direct knowledge regarding anti-trafficking and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## PARTIES

9. Plaintiff B.M. is a natural person who resides in Fresno County, California.

    a. Plaintiff B.M. was a minor when she was first sold throughout Santa Clara County for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).

    b. Due to the sensitive, private, and potentially retaliatory nature of the allegations, Plaintiff B.M. requests that this Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter. [2]

    c. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure. of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v.*

FIRST AMENDED COMPLAINT - 3

protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[5]

d. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

f. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

10. Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It is a Delaware corporation and can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a. Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains

*Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir.); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

[6] *Supra* n. 2 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation.

b. Super 8® by Wyndham ("Super 8®") is a Wyndham Hotels and Resorts, Inc. brand property.

c. Defendant Wyndham and the Super 8® by Wyndham are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Super 8® by Wyndham Defendant hotel where the Plaintiff was trafficked for sex. Defendant Wyndham and the Super 8® by Wyndham each share the common policies and practices complained of herein.

d. Defendant Wyndham and the Super 8® jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

e. As an integrated enterprise and/or joint employer, Defendant Wyndham and the Super 8® are separately and jointly responsible for compliance with all applicable laws.

f. As an integrated enterprise and/or joint employer, Defendant Wyndham and the Super 8® are jointly and severally liable for any damages caused by their employees.

g. Upon information and belief, Defendant Wyndham controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Super 8® hotel where B.M. was trafficked.

h. Through its relationship with the staff at the Super 8® where B.M. was trafficked and the perpetrator who trafficked B.M. at Super 8® hotels, Defendant Wyndham knowingly benefited or received something of value from its facilitation of, or

participation in, a venture which it knew or should have known had engaged in sex trafficking.

 i. Wyndham benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was sex trafficked.

 j. Wyndham owned, supervised, and/or operated the Super 8® located at 1860 The Alameda, San Jose, California.

11. Defendant Choice Hotels International, Inc. ("Choice Hotels") is one of the largest hotel brands in the world. It is a Delaware corporation and can be served by its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

 a. Clarion Inn® is a Choice Hotels brand property.

 b. Defendant Choice and the Clarion Inn® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Clarion Inn® hotel where the Plaintiff was trafficked for sex. Defendant Choice and the Clarion Inn® each share the common policies and practices complained of herein.

 c. Defendant Choice and the Clarion Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

 d. As an integrated enterprise and/or joint employer, Defendant Choice and the Clarion Inn® are separately and jointly responsible for compliance with all applicable laws.

 e. As an integrated enterprise and/or joint employer, Defendant Choice and the Clarion Inn® are jointly and severally liable for any damages caused by employees.

 f. Upon information and belief, Defendant Choice controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Choice, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor

customer reviews and responses, and other systems related to the daily operations at the Clarion Inn® hotel where B.M. was trafficked.

g. Defendant Choice Hotels maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.

h. Through its relationship with the staff at the Clarion Inn® hotel where Plaintiff was trafficked and the perpetrator who trafficked Plaintiff at the Clarion Inn®, Defendant Choice Hotels knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

i. Choice Hotels benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

j. Choice Hotels owns, supervises, and/or operates the Clarion Inn® located at 3200 Monterey Road, San Jose, California.

12. Defendant G6 Hospitality, LLC ("G6") is one of the largest motel brands in the world. It is a Delaware limited liability company. G6 may be served with service of process by serving its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

a. Motel 6 South ("Motel 6®") is a G6 brand property.

b. The Motel 6 brand operates in forty-nine (49) states. The brand's assets are strategically located throughout the United States – close to airports, freeways, and other thoroughfares. In 2015, G6 was rated among the top ten (10) hospitality companies.

c. As an integrated enterprise and/or joint employer, Defendant G6 and the Motel® are separately and jointly responsible for compliance with all applicable laws.

d. As an integrated enterprise and/or joint employer, Defendant G6 and the Motel 6® are jointly and severally liable for any damages caused by their employees.

e. Upon information and belief, Defendant G6 controls a uniform and required reservation and marketing system, credit processing system, training and policy on

brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by G6, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Motel 6 hotel where B.M. was trafficked.

    f.   Through its relationship with the staff at the Motel 6® where B.M. was trafficked and the perpetrator who trafficked B.M. at Motel 6® hotels, Defendant G6 knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

    g.   G6 benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

    h.   G6 owns, supervises, and/or operates the Motel 6® located at 2560 Fontaine Road, San Jose, California 95121.

13.    Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

14.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000).

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

### SEX TRAFFICKING UNDER FEDERAL LAW

16.    The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

17.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

18.    To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

19.    Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity

### FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION
### IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project[7]*

---

[7]*Recommendations for Hotels and Motels*, THE POLARIS PROJECT,

20.    Human trafficking is the world's fastest growing crime.[8] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of *all* illegal drugs.[9]

21.    Sex traffickers, or "pimps," use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

22.    The hospitality industry plays a crucial role in the sex trade.[10] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

23.    According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[11] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

24.    Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

25.    Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e., those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in

https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[8] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[9] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[11] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

hotels, including the Ritz Carlton and the Plaza.[12]

26.    The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[13]

27.    Due to the failure of the hospitality industry to address the issue, hotels are *the* venue of choice for sex trafficking.[14] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

28.    Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has a duty to train and equip staff on how to identify, report, and prevent sexual exploitation where it is most likely to occur. [15]

29.    But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[16]

30.    Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or

---

[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[14] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

[15] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

[16] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[17]

31.    From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. Proper training and implementation of reasonable security and cybersecurity measures are the bare minimum necessary for hospitality companies to address regular sex trafficking occurring under their flag.

32.    There are many signs of sex trafficking, some of which may be obvious, or under a properly trained staff, would require action. These signs include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[18]

33.    Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[19] Thus, hospitality companies have acknowledged their obligation to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

34.    In 2011, Wyndham Hotels trained only *some* of its employees to look for signs of

[17] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[18] *Id*. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[19] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

trafficking.[20]

35.   Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[21]

36.   The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

37.   At the General Assembly of the United Nations ("UN") convened in New York, New York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[22]

38.   In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[23]

39.   The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

40.   ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including: not renting by the hour, not permitting cash payments, blocking "Internet access to popular

[20] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

[21] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[22] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.

[23] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacany_Report.pdf.

websites for online sex ads," and monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests."[24]

41.    In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[25]

42.    Starting in  2010, www.backpage.com became the leader in the advertisement of "adult services," generating annual revenue of approximately $150,000,000.00 and approximately $3,100,000.00 from sex ads in just one week.[26] Between January 2013 and March 2015, ninety-nine percent (99%) of global income related to or arising from www.backpage.com was derived from the website's "adult section," including advertisements sexually exploiting children, and www.backpage.com has been called the "World's Top Online Brothel."[27]

43.    During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[28]

44.    Statistics released in 2014 by the International Labor Organization ("ILO") showed that

---

[24] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, available at https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.

[25] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.

[26] *See e.g.* http://www.chicagotribune.com/business/ct-backpage-raided-ceo-carl-ferrer-arrested-20161006-story.html; https://www.nytimes.com/2016/10/07/us/carl-ferrer-backpage-ceo-is-arrested.html?_r=0; and https://www.washingtonpost.com/news/morning-mix/wp/2016/10/07/ceo-of-backpage-called-worlds-top-online-brothel-arrested-on-pimping-charges/?utm_term=.bbcf8b9dcb10.

[27] *Id.*

[28] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

---

approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[29] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[30]

45.    A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[31] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[32]

46.    The United States Senate Permanent Subcommittee on Investigations issued a staff report in January 2017 (hereinafter "Senate Report") entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking" that summarizes the role ww.backpage.com has played in the burgeoning criminal industry of sex trafficking, in which www.backpage.com does not deny that the website is used for criminal activity, including the sex trafficking of children.[33]

47.    According to the January 2017 Senate Report, Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public (excluding reports by Backpage itself).[34]

48.    One of the principle findings of the Senate Report is that Backpage knows that it facilitates prostitution and child sex trafficking: "Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick

---

[29] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[30] *Id.* at 15.
[31] Sarkisian, *supra* n.13, at 4.
[32] *Id.* at 5.
[33] *See* http://www.portman.senate.gov/public/index.cfm/files/serve?File_id=5D0C71AE-A090-4F30-A5F5-7CFFC08AFD 48. Additionally, a copy of the full Senate Report plus its appendix can be accessed online at: https://www.hsgac.senate.gov/subcommittees/investigations/reports.
[34] *Id.*

on a pig" by sanitizing them…[and] the company has often refused to act swiftly in response to complaints about particular underage users—preferring in some cases to interpret these complaints as the tactics of a competing escort."[35]

49.    In April 2018, Carl Ferrer, the chief executive of Backpage.com, plead Backpage guilty to human trafficking of a teenaged girl, and money laundering by concealing the proceeds from facilitating criminal activity.[36]

50.    In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[37]

51.    The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[38] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[39]

52.    Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[40]

53.    Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[41] In fact, some scholars estimate that hotels

[35] *See id.*

[36] *See* Jackman, *Backpage CEO Carl Ferrer pleads guilty in three states, agrees to testify against other website officials*, The Washington Post (April 13, 2018) *available at* https://www.washingtonpost.com/news/true-crime/wp/2018/04/13/backpage-ceo-carl-ferrer-pleads-guilty-in-three-states-agrees-to-testify-against-other-website-officials/.

[37] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.

[38] *Id.* at 389.

[39] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.

[40] Sarkisian, *supra* n.13.

[41] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation.

and motels account for over ninety percent (90%) of commercial exploitation of children.[42] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[43]

54.    Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[44] The hotel industry is enabling instead of preventing the sexual exploitation of children.[45]

55.   The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Indeed, hotel staff are often the only outside witnesses to the victims' abuse. But traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

56.    In 2012, an anti-trafficking coalition alerted Defendants Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.

57.    Choice Hotels claims it has supported the anti-trafficking group Polaris since 2010 and in a partnership with ECPAT (End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes) developed a training module in 2010 for hotel management and staff.

58.    Further, campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiatives as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's

Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[42] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).
[43] U.S. Dep't of State, *supra* n.37, at 387.
[44] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.
[45] *See* http://www.ecpatusa.org/wp-content/uploads/2016/05/Regional-Report-North-America.pdf.

Blue Campaign.[46] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[47]

59. Defendants agree that human trafficking is a problem globally, but not one brand admits that human trafficking is a problem in their businesses at their brand locations.

60. Defendants' "solution" to the problem of human trafficking is always the same—to give lip service about more employee training, and to identify some red flags related to trafficking. But this employee training has never really occurred *en masse*. For instance, according to the reporting in ECPAT's reports, the actual number of employees trained is abysmal. Moreover, although the training may provide some information in identifying trafficking, it provides no clear message on training that will serve to actively address or prevent human trafficking.

61. Reports by the Polaris Project were received and reviewed by the executives, directors and managers of Wyndham, Choice Hotels, and G6.

62. To curry more favor with the public, Defendants together, most often through state and national associations like the American Hotel & Lodging Association ("AHLA")[48]—where Defendants are all members[49]—advertise policies, practices, and procedures that indicate a unified commitment to fighting human trafficking.[50]

---

[46] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[47] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[48] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. See American Hotel & Lodging Association, Who We Are, available at https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

[49] *See* American Hotel & Lodging Association, Our Members, *available at* https://www.ahla.com/our-members.

[50] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking."

---

FIRST AMENDED COMPLAINT - 18

63.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly failed to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely towards profit and the bottom line.

### A.   THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

64.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

65.     The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

66.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand-wide central reservation system, 800 number, revenue management tools, property management software, IT support, customer support, data on customer reviews, world-class loyalty programs, and a website.  Thus, booking, room reservations, and internet data collection are controlled by the corporate parent brand.[51]

67.     The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

68.     Per the franchise agreement, the parent brand may enforce these standards through periodic

http:/www.ahla.com/uploadedFiles/_Common/pdf/Trafficking_Principles_Industry_Update.pdf) (note that AHLA's Industry Principles article has since been removed from its website).

[51] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

69. At the time of the incidents alleged herein:

       a. Defendant Wyndham owned and controlled the Super 8® brand.

       b. Defendant Choice owned and controlled the Clarion Inn® brand.

       c. Defendant G6 owned and controlled the Motel 6® brand.

70. Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

71. Defendants magnify their influence and control over the hospitality industry through their membership and activity in trade associations such as AHLA.

72. All Defendants are members of AHLA, and Defendants Wyndham and G6 have served on executive committees or as board members in AHLA,[52] or other state and national associations since at least 2008.[53]

73. The AHLA serves as a forum for Defendants to discuss efforts related to human trafficking and as a voice from which the Defendants can address the issue with the public.

74. Through national hotel industry trade associations, Defendants disseminated very specific talking points to provide to the government, law enforcement, the public, and the media. These talking points amounted to nothing but spin whereby defendants tote themselves as heroes. These were more than advertising campaigns. They were part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away from the brands and assure them that the hotel industry, and Defendants specifically, were meaningfully addressing the industry-wide problem of human trafficking. By representing to the public and to legislators "the industry's ongoing commitment and work to end human trafficking"[54] the Defendants assumed the responsibility of meaningfully

---

[52] *See* https://www.ahla.com/press-release/ahla-announces-2020-officers-board-executive-committee-amid-record-membership.
[53] *See* American Hotel & Lodging Association, Partner State Associations, *available at* https://www.ahla.com/psa.
[54] *See* https://www.ahla.com/issues/human-trafficking.

addressing human trafficking at their branded properties.

75. Upon information and belief, between at least 2008 to 2016 Defendant Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

76. Upon information and belief, between at least 2008 to 2016 Defendant Choice Hotels held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

77. Upon information and belief, between at least 2008 to 2016, Defendant G6 held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

78. Upon information and belief, between at least 2008 to 2016 Defendants held meetings through its trade organizations in which sex trafficking in its hotels was discussed.

79. Upon information and belief, during at least the 2008 to 2016 time period, emails were exchanged by employees of Defendants' respective brands that related to sex trafficking in hotels including Defendants' hotels.

80. As industry leaders, Defendants each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

81. Hotel Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access. In short, Defendants refused to communicate to traffickers "your business and your money

are not welcome here."

82. Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all trafficking ventures occur at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from human trafficking ventures.

83. Defendants' coordinated efforts created an industry standard of giving lip service to tackling human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties. While it would be challenging and expensive (both business expenses and lost revenues from traffickers) to implement effective policies, it is apparent that an effective policy would create a long term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

**B. THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS**

84. Defendants Wyndham, Choice, and G6 ("Defendant Hotels") have been on notice of repeated incidences of sex trafficking occurring at their Super 8, Clarion Inn, and Motel 6 brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

85. Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[55]

---

[55] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

86. WYNDHAM HOTELS AND RESORTS, INC. ("WYNDHAM"):

   a. For years Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Super 8® branded properties, yet Defendant Wyndham has failed to take action to prevent sex trafficking at Super 8® brand properties and still persists in failing to take necessary action to prevent sex trafficking on its properties. Defendant Wyndham's inattention in this regard enabled and contributed to the sex trafficking the Plaintiff suffered at the Super 8® hotels.

   b. There are numerous examples across place and time of Defendant Wyndham's knowledge of sex trafficking on its branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

   c. Upon information and belief, Plaintiff alleges that Wyndham implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

   d. In 2011, Defendant Wyndham's predecessor entity Wyndham Worldwide Corporation, signed the Code, but as evidenced by the widespread sex trafficking which continued to occur at Defendant Wyndham's branded properties, Defendant Wyndham did not practice what it preached. Defendant Wyndham's adoption of the Code appears to have been nothing more than a strategic maneuver through which it sought a shield against liability, but not a sword against human trafficking.

   e. Despite Defendant Wyndham's anti-trafficking stance, Defendant Wyndham failed to implement and enforce any of its own policy or policies including with respect to the Super 8® hotels. Defendant Wyndham knew or should have known that the Super 8® was located in an area known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when B.M. was trafficked. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Defendant Wyndham failed to take adequate measures to prevent the misconduct.

f.  Defendant Wyndham voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnerships with ECPAT and Polaris, and its activities with the AHLA and other trade organizations. However, Wyndham failed to implement its own policies and those recommended to it by the above mentioned advocacy organizations which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of B.M.[56]

g.  Defendant Wyndham owns, supervises, or operates the Super 8® hotel. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff B.M. from being sex trafficked.

h.  Defendant Wyndham knew of sex trafficking occurring on its branded hotel properties. Wyndham and Super 8® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham and Super 8® knew that all of this violent and criminal activity was occurring at their branded properties and therefore knew that sex trafficking was occurring at their branded properties. Yet Wyndham and Super 8® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Super 8®. Specifically, Wyndham and Super 8® facilitated the trafficking through their practices, policies, and procedures. Wyndham and Super 8® failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham and Super 8® could continue to profit from the business that trafficking brings, including business from out-of-state.

i.  Defendant Wyndham should have known of sex trafficking occurring on its branded hotel properties. Wyndham and Super 8® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance

---

[56] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham and Super 8 knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew or should have known that sex trafficking was occurring at their branded properties. Yet, Wyndham and Super 8® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Super 8®. Specifically, Wyndham and Super 8® facilitated the trafficking through their practices, policies, and procedures. Wyndham and Super 8® failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham and Super 8® could continue to profit from the business that trafficking brings, including business from out-of-state.

j. Wyndham knew or should have known that the Super 8®, hotel where Plaintiff B.M. was trafficked was located in an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff B.M. was trafficked.

k. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

l. Wyndham was in an agency relationship with Super 8® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Super 8® hotels by Defendant Wyndham's operations, including the means and methods of how Super 8® branded hotels conducted daily business through one or more of the following actions:

    i.    providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

    ii.    providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    iii.    providing new hire orientation on human rights and corporate responsibility;

iv.  providing training and education to Super 8® branded hotels through webinars, seminars, conferences, and online portals;

v.  providing and controlling customer review and response platforms;

vi.  hosting online bookings on Defendant Wyndham's domain;

vii.  requiring Super 8® branded hotels to use Defendant Wyndham's customer rewards program;

viii.  requiring Super 8® branded hotels to use Defendant Wyndham's property management software;

ix.  requiring Super 8® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.  providing IT support for all property management systems, owned, operated and required by Wyndham;

xi.  setting employee wages;

xii.  making employment decisions;

xiii.  advertising for employment;

xiv.  sharing profits;

xv.  standardized training methods for employees;

xvi.  building and maintaining the facility in a manner specified by the owner;

xvii.  standardized or strict rules of operation;

xviii.  regular inspection of the facility and operation by owner;

xix.  fixing prices; or

xx.  other actions that deprive Super 8® branded hotels of independence in business operations.

m.  Upon information and belief, Defendant Wyndham tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Wyndham's management and control and included all of the indicia of B.M.'s

trafficking. This data included the details of B.M.'s check-in, the internet activity associated with her reservation, including Backpage.com advertisements listing the hotel's address, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

n.  An apparent agency also exists between Defendant Wyndham and Super 8® hotels. Defendant Wyndham held out Super 8® branded hotels to the public as possessing authority to act on its behalf.

o.  Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Super 8® branded hotels, Defendant Wyndham breached its duties in the following ways:

  i.  did not adequately distribute information to assist employees in identifying human trafficking;

  ii.  failed to mandate a process for escalating human trafficking concerns within the organization;

  iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

  iv.  failed to provide new hire orientation on human rights and corporate responsibility;

  v.  failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

  vi.  failed to develop and hold or require ongoing training sessions on human trafficking;

  vii.  failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

  viii.  failed to evaluate universal reservation systems for suspicious booking

activities;

  ix.  failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

  x.  failed to ban cash or prepaid credit cards as payment; and

  xi.  failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

p.  Upon information and belief, Defendant Wyndham requires its branded hotel properties to use a property management system, which is linked to Defendant Wyndham's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

q.  Defendant Wyndham uses a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[57]

r.  Defendant Wyndham requires its hotels to carry a certain level of Wi-Fi internet access or security for hotel guests, through a limited number of vendors that Defendant Wyndham specifies and requires.[58]

s.  In 2016, Defendant Wyndham approved two internet vendors.[59]  In 2020, Defendant Wyndham approved six:  Deep Blue Communications, Safety NetAccess, Air2Data High Speed Wireless, ITG Networks, Allbridge, and Wyndham HCS.[60]

---

[57] *See* Wyndham Privacy Notice, *available at* https://www.wyndhamhotels.com/about-us/privacy-notice-more-info?lightbox=/content/whg-ecomm-responsive/en-us/whg/about-us/privacy-notice-more-info.display.html, last accessed August 26, 2020.

[58] *See* 2020 Technology Guide, Q1 2020, published by Wyndham Strategic Sourcing. Brand Standards described in this document and set by Wyndham in 2016 state that "Wi-Fi must be installed and offered complimentary in all guestrooms/suites, lobby, business center, meeting room space and public areas."

[59] *See* Q3 2016 eNews Sourcing News & Best Practices by Wyndham Hotel Group.

[60] *See* https://web.archive.org/web/20200427225133/http://transfer.nxtbook.com/nxtbooks/mcneill/vendor_2011winter/offline/mcneill_vendor_2011winter.pdf.

t.  Upon information and belief, Defendant Wyndham requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Wyndham the ability to access and harvest that internet data.[61]

u.  Upon information and belief, Defendant Wyndham retains and/or can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

v.  This access may have included branded hotels' guest information registration, including names, date of booking, and length of stay.

w.  Upon information and belief, Defendant Wyndham can therefore see unusual or suspicious bookings, for instances, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when in the case of B.M., reservations for extended stays were requested.

x.  Upon information and belief, Defendant Wyndham has the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites.[62]

y.  Upon information and belief, Defendant Wyndham can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

z.  Upon information and belief, and contrary to ECPAT best practices, Defendant Wyndham failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

aa. Upon information and belief, Defendant Wyndham has the ability to see disproportionately male clientele registering for short hotel stays while accessing

---

[61] *See* Top 10 Hotel Wi-Fi Features, published by Deep Blue Communications in November 2014. One of Wyndham's longest running certified wireless internet vendors, Deep Blue Communications, includes in its marketing materials that (emphasis added) "**customized landing pages** protect both the guests and hotel from the hassle of disputed charges, and **protect the hotel from guests who may use the Internet for illegal purposes**."

[62] *See*, *e.g.*, https://money.cnn.com/2016/07/15/news/companies/starbucks-mcdonalds-wifi-porn/index.html; https://endsexualexploitation.org/articles/filterpublicwifi_starbucks_library_congress/.

backpage.com and other sex buyer advertisements and websites extended to the Super 8 Motel where Plaintiff was trafficked for sex.

bb. Despite access to information comprising clear sex trafficking indicators, Defendant Wyndham continued to permit and profit from hotel guests who rented hotel rooms to buy sex, including those who bought Plaintiff.

cc. Upon information and belief, Defendant Wyndham monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

dd. Upon information and belief, Defendant Wyndham provides a platform for brand property employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Wyndham controls and houses this collective data from all branded properties.

ee. Thus, for several years, Defendant Wyndham has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Super 8® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff B.M. at the Super 8® hotel that forms the basis of this complaint.

    i. In 2008, a man was spotted outside a Super 8 motel with a minor while a federal vice task force was working a sting. In 2010, the pimp was sentenced to 12.5 years in prison for sex trafficking of a minor.[63]

    ii. In February 2010, an undercover sting resulted in three (3) arrests at the Super 8 Motel where males were hiring females for sex off of Backpage.com.

    iii. In August 2016, three people were arrested at the Super 8 Jackson Hole as a result of an undercover sting.[64]

---

[63] *'Y2K Pimp' Gets 12 Years for Recruiting Minor on MySpace*, WIRED (Nov. 8, 2010), https://www.wired.com/2010/11/epps/.
[64] *Prostitution bust at Super 8 Motel*, JACKSON HOLE NEWS & GUIDE (Aug. 23, 2016), https://www.jhnewsandguide.com/news/cops_courts/article_2eca6a4a-85e0-5bfb-950f-86adcb5bbb55.html.

iv. Defendant Wyndham has been aware of sex trafficking on Super 8® brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Super 8® brand properties and Defendant Wyndham's inattentiveness, for example:

• The Super 8 located at 31-62 14th Street Long Island City, New York 11106 received this review in October 2008: "If you are wanting to stay at a motel that promotes prostitution then this is the place for you…"[65]

• The Super 8 located at 1832 ½ W Lucas Street Florence, South Carolina 29501 received this review in April 2010: "…This is truly a prostitution ring. Not worth bringing your children to. You could hear women in high heels walking up and down the stairs, vehicles pulling in and out, knocking on hotel rooms upstairs and downstairs. So much activity, it's literally dangerous…"[66]

• In September 2012, a reviewer described the Super 8 in Manassas, Virginia as follows: "This place is a dump! I left 1 day early because of bug bites. Saw people hanging out on the balcony at night. Also saw a man leave from a 1st floor room with a prostitute. So much for being family friendly."[67]

• The Super 8 located at 340 W Illinois Avenue I-55 Exit 12C Memphis, Tennessee 38106 received this review in August 2018: "Please don't stay here… The people in the next room had men coming in and out all night…"[68]

[65] Review of Super 8 by Wyndham Long Island City (Oct. 4, 2008), *available at* https://www.tripadvisor.com/ShowUserReviews-g48080-d248683-r20611520-Super_8_by_Wyndham_Long_Island_City_LGA_Hotel-Long_Island_City_Queens_New_York.html.
[66] Review of Super 8 by Wyndham Florence (Apr. 18, 2010), *available at* https://www.tripadvisor.com/ShowUserReviews-g54229-d97167-r61797195-Super_8_by_Wyndham_Florence-Florence_South_Carolina.html.
[67] Review of Super 8 by Wyndham Manassas (Sept. 26, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g60895-d110534-r141365522-Super_8_by_Wyndham_Manassas-Manassas_Prince_William_County_Virginia.html.
[68] Review of Super 8 by Wyndham Memphis/Dwtn/Graceland Area (Aug. 31, 2018), *available at* https://www.tripadvisor.com/ShowUserReviews-g55197-d105222-r612562242-Super_8_by_Wyndham_Memphis_Dwtn_Graceland_Area-Memphis_Tennessee.html.

ff. Additionally, Defendant Wyndham has been aware of sex trafficking at the Super 8® brand property where B.M. was trafficked through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking at the Super 8® Hotel Rose Garden in San Jose, CA and Defendant Wyndham's inattentiveness, for example:

    i. The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in July 2012: "UNSAFE: I know prostitutes when I see them, and there were a few working the parking lot. And some dudes were really watching us closely and if they weren't gang members, they sure looked the part. I know it sounds judgmental, but that was the reality."[69]

    ii. The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in October 2014: " . . . The place also smelled, had prostitutes, drug deals in the parking lot, and partyers. . . DO NOT GO HERE."[70]

    iii. The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in July 2015: ". . . Not to judge people by their appearance, but I am fairly certain that there were prostitutes in the lobby at breakfast time. Again, the place is not safe, it smells, and it is not worth your safety! DO NOT STAY HERE!"[71]

gg. Despite evidence of prostitution and sex trafficking occurring for years at the Super 8® Hotel Rose Garden in San Jose, CA where B.M. was trafficked Wyndham has failed to meaningfully address it and escort ads continue to advertise this location for commercial sex.[72]

---

[69] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (July 31, 2012), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or280-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

[70] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (Oct. 07, 2014), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or170-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

[71] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (September, 2015), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or110-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

[72] *See* Escort Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (Jan. 12, 2020) *available at* https://escortfish.ch/ad/view/cumm-whore-incall-in-san-jose/26013198;

hh. Upon information and belief, Defendant Wyndham monitors customer reviews and complaints for all brand properties.

ii. Upon information and belief, the branded properties depend on Defendant Wyndham for notification of negative customer reviews.

jj. Upon information and belief, Defendant Wyndham, not the branded properties, house and control the data regarding customer reviews.

87. CHOICE HOTELS INTERNATIONAL, INC. ("CHOICE")

a. Choice Hotels failed to implement and enforce any of its own policy or policies and protect Plaintiff from being sex trafficked.

b. Defendant Choice voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Choice failed to implement its own policies and those recommended to it by the above mentioned advocacy organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of B.M.[73]

c. Upon information and belief, Plaintiff alleges that Choice implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d. Defendant Choice knew sex trafficking was occurring on its branded hotel properties. Choice and Clarion Inn knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Choice and Clarion Inn knew that all of this violent and criminal activity was occurring at their branded

Escort Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (May 12, 2020) available at https://escortfish.ch/ad/view/linda24/28072570;  Escort Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (July 02, 2020) *available at* https://us.escortsaffair.com/sanjose/detail/5efec34316327377085a4462.
[73] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

properties therefore they knew that sex trafficking was occurring at their branded properties. Yet Choice and Clarion Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Clarion Inn. Specifically, Choice and Clarion Inn facilitated the trafficking through its practices, policies, and procedures. Choice and Clarion Inn failed to take appropriate action to prevent the trafficking of individuals for sex so that Choice and Clarion Inn could continue to profit from the business that trafficking brings, including business from out-of-state.

e.  Defendant Choice should have known of sex trafficking occurring on its branded hotel properties. Choice and Clarion Inn knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion.  Choice and Clarion Inn knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew or should have known that sex trafficking was occurring at their branded properties. Yet Choice and Clarion Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Clarion Inn. Specifically, Choice and Clarion Inn facilitated the trafficking through its practices, policies, and procedures. Choice and Clarion Inn failed to take appropriate action to prevent the trafficking of individuals for sex so that Choice and Clarion Inn could continue to profit from the business that trafficking brings, including business from out-of-state.

f.  Choice Hotels knew or should have known that Clarion Inn® hotels where Plaintiff was trafficked were in areas known for high incidences of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff was trafficked.[74]

---

[74] *See e.g.*, Andrew Michaels, *Howard police arrest Baltimore man at Laurel motel in latest human trafficking case*, THE BALTIMORE SUN (Aug. 2, 2017), https://www.baltimoresun.com/maryland/laurel/ph-ho-cf-dorchy-human-trafficking-0810-20170802-story.html.

g.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Choice Hotels has repeatedly failed to stop these actions.

h.  Choice Hotels was in an agency relationship with Clarion Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Choice's exercise of an ongoing and systemic right of control over Clarion Inn® hotels by Defendant Choice's operations, including the means and methods of how Clarion Inn® branded hotels conducted daily business through one or more of the following actions:

   i.    providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

   ii.   providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

   iii.  providing new hire orientation on human rights and corporate responsibility;

   iv.   providing training and education to Clarion Inn® branded hotels through webinars, seminars, conferences, and online portals;

   v.    providing and controlling customer review and response platforms;

   vi.   hosting online bookings on Defendant Choice's domain;

   vii.  requiring Clarion Inn® branded hotels to use Defendant Choice's customer rewards program;

   viii. requiring Clarion Inn® branded hotels to use Defendant Choice's property management software;

   ix.   requiring Clarion Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

   x.    providing IT support for all property management systems, owned, operated and required by Choice;

   xi.   setting employee wages;

   xii.  making employment decisions;

   xiii. advertising for employment;

xiv.   sharing profits;

xv.    standardized training methods for employees;

xvi.   building and maintaining the facility in a manner specified by the owner;

xvii.  standardized or strict rules of operation;

xviii. regular inspection of the facility and operation by owner;

xix.   fixing prices; or

xx.    other actions that deprive Clarion Inn® branded hotels of independence in business operations.

i.  Upon information and belief, Defendant Choice tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendants management and control and included all of the indicia of B.M. 's trafficking. This data included the details of B.M.'s check-in, the internet activity associated with her reservation, including Backpage.com advertisements listing the hotel's address, her location at the hotel which included the notable fact that she rarely if ever left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

j.  An apparent agency also exists between Defendant Choice Hotels and Clarion Inn® hotels. Defendant Choice Hotels held out Clarion Inn® branded hotels to the public as possessing authority to act on its behalf.

k.  Given Defendant Choice Hotels' public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Clarion Inn® branded hotels, Defendant Choice Hotels breached its duties in the following ways:

   i.   did not adequately distribute information to assist employees in identifying human trafficking;

   ii.  failed to mandate a process for escalating human trafficking concerns within the organization;

   iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

   iv. failed to provide new hire orientation on human rights and corporate responsibility;

   v. failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

   vi. failed to develop and hold or require ongoing training sessions on human trafficking;

   vii. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

   viii. failed to evaluate universal reservation systems for suspicious booking activities;

   ix. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

   x. failed to ban cash or prepaid credit cards as payment; and

   xi. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

l. Defendant Choice Hotels requires its hotels use a limited number of qualified vendors to purchase certain services.[75]

m. Upon information and belief, Defendant Choice Hotels requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Choice Hotels specifies and requires.[76]

---

[75] *See* https://web.archive.org/web/20200427221712/https://thepointsguy.com/2014/11/free-hotel-wifi-how-to-get-online-while-youre-on-property/ (Choice Hotels has stringent requirements for its preferred vendors).

[76] *See* https://web.archive.org/web/20200427221712/https://thepointsguy.com/2014/11/free-hotel-wifi-how-to-get-online-while-youre-on-property/

n. In 2015, Defendant Choice approved Blueprint RF as a qualified internet service provider for its branded properties.[77]

o. Upon information and belief, Defendant Choice Hotels requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Choice Hotels access to the internet data.

p. Defendant Choice Hotels states in its privacy policy that it maintains a centralized reservation system, which collects contact and credit card information from customers, and collects other information from customers, including: geo-location data, "name, address, telephone number, e-mail address, room preference, credit card details, day and month of your birth date," and internet usage data, "which may include your browser type and operating system, the various Choice web pages you view, Internet Protocol addresses, unique device identifiers, and sites visited before viewing our websites."[78]

q. Defendant Choice Hotels collects this data from sources including the consumers themselves, social networks, and Choice Hotels properties (whether franchised or not), and may disclose it to assist with law enforcement or other investigations.[79]

r. Upon information and belief, Defendant Choice Hotels retains and/or can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

s. This access may include branded properties' guest information registration, including names, date of booking, and length of stay.

t. Upon information and belief, Defendant Choice Hotels can see through its central reservation system when clientele at its branded properties is disproportionately male

---

[77] *See* https://web.archive.org/web/20200427224123/https://www.hospitalityupgrade.com/_news/NewsArticles/Blueprint-RF-Named-a-Choice-Hotels-Preferred-Vendor.asp/

[78] *See* Choice Hotels Privacy Policy, *available at* https://www.choicehotels.com/legal/privacy-policy, last accessed August 26, 2020.

[79] *See* Choice Hotels Privacy Policy, *available at* https://www.choicehotels.com/legal/privacy-policy, last accessed August 26, 2020.

for same-day bookings for one-night stays.

u. Upon information and belief, Defendant Choice Hotels has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[80]

v. Upon information and belief, Defendant Choice Hotels can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

w. Upon information and belief, and contrary to ECPAT best practices, Defendant Choice Hotels failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

x. Upon information and belief, Defendant Choice Hotels ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Clarion Inn where Plaintiff was trafficked for sex.

y. Despite access to information comprising clear sex trafficking indicators, Defendant Choice Hotels continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

z. Upon information and belief, Defendant Choice Hotels monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

aa. Upon information and belief, Defendant Choice provides a platform for branded property employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Choice controls and houses this collective data from all branded properties.

bb. Thus, for several years, Defendant Choice Hotels has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Clarion Inn® branded properties throughout the country. This same

---

[80] *See* Slideshow from Liveport in 2011, showing dashboard of Access Logs, with quote "we monitor your network" *available at* https://web.archive.org/web/20200428003032/https://www.slideshare.net/Liveport/2011-liveport-choice-hotels-international-convention-slideshow; *see also, e.g., supra* n. 62.

entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff at Clarion Inn® hotels that forms the basis of this complaint.

i. In May 2014, the City of Sacramento closed a Clarion Inn in order to remove a threat to public safety, which included criminal activity such as human trafficking.[81]

ii. In October 2014, a human trafficking case made its way through the Knox County judicial system after undercover detectives responded to a Backpage ad and made arrangements to meet a prostitute at the Clarion Inn.[82]

iii. In June 2015, two men were charged with sex trafficking after allegedly forcing a teenage girl into prostitution after responding to an advertisement and meeting the young girl at the Clarion hotel in Queens, New York.[83]

cc. Additionally, Defendant Choice has been aware of sex trafficking on Clarion Inn brand properties through publicly available websites such as www.facebook.com and www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Clarion Inn brand properties and Defendant Choice's inattentiveness, for example:

i. In June of 2007, a reviewer on Travelocity.com described their stay at the Clarion Inn in San Jose, California as follows: "Hotel is in a questionable area of town - we observed a number of ""working girls"" amidst the numerous liquor stores and nightclubs."[84]

ii. In August of 2017, a reviewer on Facebook.com described a stay at the Clarion

---

[81] Bill Lindelof, *Sacramento hotel closed after complaints of drugs, prostitution, robbery*, THE SACRAMENTO BEE (May 2015), https://www.sacbee.com/news/business/article20180466.html.

[82] Jamie Satterfield, *Sex trafficking case sent to Knox County grand jury*, KNOXVILLE NEWS SENTINEL (Oct. 2014), http://archive.knoxnews.com/news/crime-courts/sex-trafficking-case-sent-to-knox-county-grand-jury-ep-701240457-354070691.html/.

[83] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped at LIC Hotel*, LICpost.com (Jun. 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

[84] Review of Clarion Inn Silicon Valley (June 27, 2007), *available at* https://www.travelocity.com/San-Jose-Hotels-Clarion-Inn-Silicon-Valley.h7176.Hotel-Information.

Inn in San Jose, California as follows: "The surrounding area has constant traffic from prostitutes and druggies."[85]

  iii. The Clarion Inn in San Jose, California received this review in April 2019: "Ive stayed a few times even though the hotel isn't in a good neighborhood. There's homeless and street  walkers that walk up and down at night . . ."[86]

dd. Upon information and belief, Defendant Choice monitors customer reviews and complaints for all brand properties.

ee. Upon information and belief, the branded properties depend on Defendant Choice for notification of negative customer reviews.

ff. Upon information and belief, Defendant Choice, not the branded properties, house and control the data regarding customer reviews.

88. G6 HOSPITALITY, LLC ("G6"):

a. G6 failed to implement and enforce any of its own policy or policies and protect Plaintiff B.M. from being sex trafficked.

b. Defendant G6 voluntarily assumed the responsibility to implement sufficient policies to combat the known problem of sex trafficking at its branded properties through its activities with the AHLA and other trade organizations. However, G6 failed to implement its own policies and those recommended to it by the above mentioned trade organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of B.M. [87]

c. Upon information and belief, Plaintiff alleges that G6 implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

---

[85] Review of Clarion Inn Silicon Valley (August 1, 2017), *available at* https://www.facebook.com/pg/Clarion-Inn-Silicon-Valley-635660233171453/reviews/?referrer=page_recommendations_see_all&ref=page_internal.
[86] Review of Clarion Inn Silicon Valley (April 1, 2019), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d82208-Reviews-Clarion_Inn_Silicon_Valley-San_Jose_California.html.
[87] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

d. Defendant G6 knew of sex trafficking occurring on its branded hotel properties. G6 and Motel 6® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. G6 and Motel 6® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet G6 and Motel 6® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Motel 6®. Specifically, G6 and Motel 6® facilitated the trafficking through its practices, policies, and procedures. G6 and Motel 6® failed to take appropriate action to prevent the trafficking of individuals for sex so that G6 and Motel 6® could continue to profit from the business that trafficking brings, including business from out-of-state.

e. Defendant G6 should have known of sex trafficking occurring on its branded hotel properties. G6 and Motel 6® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. G6 and Motel 6® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew or should have known that sex trafficking was occurring at their branded properties. Yet, G6 and Motel 6® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Motel 6®. G6 and Motel 6® facilitated the trafficking through its practices, policies, and procedures. Specifically, G6 and Motel 6® failed to take appropriate action to prevent the trafficking of individuals for sex so that G6 and Motel 6® could continue to profit from the business that trafficking brings, including business from out-of-state.

f. G6 knew or should have known that the Motel 6® hotel where Plaintiff B.M. was trafficked was an area known for high incidence of crime and prone to sex trafficking

activity on and around the hotel premises, including when Plaintiff B.M. was trafficked.

g. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant G6 has repeatedly failed to stop these actions.

h. G6 was in an agency relationship with Motel 6® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant G6's exercise of an ongoing and systemic right of control over Motel 6® hotels by Defendant G6's operations, including the means and methods of how Motel 6® branded hotels conducted daily business through one or more of the following actions:

  i. providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

  ii. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

  iii. providing new hire orientation on human rights and corporate responsibility;

  iv. providing training and education to Motel 6® branded hotels through webinars, seminars, conferences, and online portals;

  v. providing and controlling customer review and response platforms;

  vi. hosting online bookings on Defendant G6's domain;

  vii. requiring Motel 6® branded hotels to use Defendant G6's customer rewards program;

  viii. requiring Motel 6® branded hotels to use Defendant G6's property management software;

  ix. requiring Motel 6® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

  x. providing IT support for all property management systems, owned, operated and required by G6;

  xi. setting employee wages;

  xii. making employment decisions;

xiii.  advertising for employment;

xiv.  sharing profits;

xv.  standardized training methods for employees;

xvi.  building and maintaining the facility in a manner specified by the owner;

xvii.  standardized or strict rules of operation;

xviii.  regular inspection of the facility and operation by owner;

xix.  fixing prices; or

xx.  other actions that deprive Motel 6® branded hotels of independence in business operations.

i.  Upon information and belief, Defendant G6 tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendants management and control and included all of the indicia of B.M.'s trafficking. This data included the details of B.M.'s check-in, the internet activity associated with her reservation, including Backpage.com advertisements listing the hotel's address, her location at the hotel which included the notable fact that she rarely if ever left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

j.  An apparent agency also exists between Defendant G6 and Motel 6® hotels. Defendant G6 held out Motel 6® branded hotels to the public as possessing authority to act on its behalf.

k.  Given Defendant G6's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Motel 6® branded hotels, Defendant G6 breached its duties in the following ways:

i.  did not adequately distribute information to assist employees in identifying human trafficking;

ii.  failed to mandate a process for escalating human trafficking concerns within the organization;

iii.   failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.   failed to provide new hire orientation on human rights and corporate responsibility;

v.   failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.   failed to develop and hold or require ongoing training sessions on human trafficking;

vii.   failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii.   failed to evaluate universal reservation systems for suspicious booking activities;

ix.   failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x.   failed to ban cash or prepaid credit cards as payment; and

xi.   failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

l.   There are countless examples across place and time of Defendant G6's knowledge of its Motel 6® branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims. The illicit, criminal misconduct is so rampant on Motel 6® branded properties that one online reviewer suggested on a travel website that Motel 6® "Should be called Motel Sex."[88]

---

[88] Review Of Motel 6 Rochester (Aug. 1, 2018), *available at* https://www.tripadvisor.com/ShowUserReviews-g43466-d242739-r601808847-Motel_6_Rochester-Rochester_Minnesota.html (last visited Feb. 28, 2019) (the reviewer was commenting in August 2018, on a Motel 6 located at 2107 West Frontage Road, Rochester, Minnesota 55901 and added,

m. Upon information and belief, Defendant G6 requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant G6 specifies and requires.

n. Upon information and belief, Defendant G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant G6 access to the internet data.

o. Defendant G6 (which uses the terms "G6" and "Motel 6" interchangeably within the document) states in its privacy policy that it collects the following categories of information from hotel guests:  name and contact information, customer information including addresses and government identification documents, purchase history and tendencies, biometric information, geolocation data, audio and video data (such as from "CCTV/security camera footage at our properties or offices," and internet usage data, defined as "internet or other electronic network activity information, including, but not limited to, browsing history, clickstream data, search history, and information regarding a resident's interaction with an internet website, application, or advertisement, including access logs and other activity information related to your use of any company websites, applications or other online services."[89]

p. Defendant G6 retains and can view internet access which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above. Since 2002, G6 has implemented a practice and procedure to retain network access logs, DNS logs,

"Prostitutes, drug dealers, and loud partiers are your neighbors including possibly one or two staff members. Complaints to the clerk do no good. The night clerk does not write it down and the day clerks accuse you of lying although I made it clear that I did not want anything in return for my complaints.").

[89] Motel 6 Privacy Policy, *available at* https://www.motel6.com/en/privacy.html#/ccpa, last accessed August 26, 2020.  The Policy states: "Categories are in bold. Examples of data that fall within that category are provided but we do not necessarily collect all of those types of data."  However, G6 does not tell consumers which kinds of data are excluded within each category.  *See also* Motel 6 Operations Manual (2015), *available at* https://web.archive.org/web/20200428015955/https:/extranet.g6franchising.com/LinkClick.aspx?fileticket=jnePNlQdyAI%3D&portalid=0 (last accessed August 27, 2020).

and Internet proxy logs on backup tape for one year. Daily backup tapes for network access logs, DNS logs, and Internet proxy logs are overwritten after one year.[90]

q.  This access includes branded property hotels' guest information registration, including names, date of booking, and length of stay.

r.  Motel 6®'s High Speed Internet Terms and Conditions provides that Motel 6® has "the right . . . to monitor, intercept, and disclose any transmissions over or using the facilities related to the Service, and to provide subscriber billing, account, or use records, and related information under certain circumstances."[91]

s.  Motel 6®'s policy further provides, "You agree that we may access your computer to investigate activity that may be in violation of these Terms and Conditions; or to comply with law. You agree not to use or attempt to use the Service, the Motel 6, or Studio 6 network or website, or your computer for any fraudulent, unlawful, harassing or abusive purpose."[92]

t.  More than half of Motel 6® hotel bookings occur on the same day as arrival, data which Motel 6® executives acknowledge monitoring so that they can make the reservation process easier.[93]

u.  Upon information and belief, Defendant G6 can therefore see when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays.

v.  Upon information and belief, Defendant G6 has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[94]

w.  Upon information and belief, Defendant G6 can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including

---

[90] *See M.L. v. Craigslist*, No. 3:19-cv-06153, Declaration of Johnie Perry, Dkt. 105-1 at ¶ 3 (W.D. Wash. May 29, 2020).

[91] Motel 6 - High Speed Internet Terms and Conditions, ¶ 9, *available at* https://www.motel6.com/hsi_tc/, last accessed July 2, 2020.

[92] Motel 6 - High Speed Internet Terms and Conditions, ¶ 9, *available at* https://www.motel6.com/hsi_tc/, last accessed July 2, 2020.

[93] Allison Schiff, Motel 6: 'Analytics Is Our North Star', AdExchanger (Sept. 7, 2017), https://adexchanger .com/analytics/motel-6-analytics-north-star/amp/.

[94] *See, e.g., supra* n. 62.

Plaintiff's advertisements on Backpage.com.

x.  Upon information and belief, and contrary to ECPAT best practices, Defendant G6 failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

y.  Upon information and belief, Defendant G6's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Motel 6 where Plaintiff was trafficked for sex.

z.  Despite access to information comprising clear sex trafficking indicators, Defendant G6 continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

aa. Defendant G6 reviews and monitors complaints at its branded hotel properties and charges properties a Guest Intervention Fee if the 12-month complaint rate is above a certain number.[95]

bb. Upon information and belief, Defendant G6 monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

cc. Upon information and belief, Defendant G6 provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant G6 controls and houses this collective data from all branded properties.

dd. The sex trafficking reports involving Defendant G6's branded properties are legion. Thus, for several years, Defendant G6 has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Motel 6® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff B.M. at Motel 6® hotels that forms the basis of this complaint.

---

[95] Motel 6 Operations Manual (2015), *available at* https://web.archive.org/web/20200428015955/https:/extranet.g6franchising.com/LinkClick.aspx?fileticket=jnePNlQdyAI%3D&portalid=0 (last accessed August 27, 2020).

i.    In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten (10) times per day.[96]

ii.    In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[97]

iii.    In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[98]

iv.    From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[99]

v.    Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[100]

vi.    The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[101]

vii.    The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel

[96] Amy Fine Collins, *Sex Trafficking Of Americans: The Girls Next Door*, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[97] *Five Toledoans Indicted On Sex Trafficking Charges*, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[98] Mark Reiter, *Two Toledoans Accused Of Juvenile Sex Trafficking*, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html.

[99] Complaint, *United States of America v. Samuel Nichols, et al.*, No. 1:15-cr-00756 (N.D. Ill. Dec. 29, 2015); *see also* Press Release, U.S. Dep't of Justice, *Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs* (Jan. 15, 2016), https://www.justice.gov/usao-ndil/file/813771/download.

[100] Press Release, U.S. Dep't of Justice, *Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims* (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[101] *FBI Investigates Human Trafficking At Madison Hotel*, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

6 in Anaheim, California.[102]

viii.   In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[103]

ix.   Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[104]

x.   The FBI busted a sex trafficking ring operating out of a Motel 6 in San Antonio, Texas in September 2013.[105]

xi.   In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013, and charged with sex trafficking of two young women.[106]

xii.   Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[107]

xiii.   In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[108]

---

[102] *Suspects Busted In Anaheim Sex Ring*, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784/.

[103] Danielle McLean, *What Drives Maine Sex Traffickers' Inhumanity*, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex-traffickers-inhumanity/.

[104] Anne Kramer, *Man Faces Prison Time For Sex Trafficking Baltimore Teen*, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[105] Stephanie Serna, *Sex Trafficking Ring Busted At Motel 6* (Sept. 17, 2013), https://www.ksat.com/news/sex- trafficking-ring-busted-at-motel-6.

[106] *UPDATE: Man Arrested For Sex Trafficking*, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[107] *Man, 25, Is Accused Of Trafficking Teens*, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/.

[108] Felix Cortez and Amy Larson, *Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel*, KSBW8 (May 9, 2014), https://www.ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after- victim-escapes-motel/1054172.

xiv.   In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[109]

xv.    A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[110]

xvi.   In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[111]

xvii.  A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[112]

xviii. In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[113]

xix.   Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[114]

---

[109] David Goodhue, *Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court*, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[110] *Las Vegas Man Charged With Human Trafficking In Rapid City*, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-city/21922915/.

[111] Stephen Peterson, *RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel* (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[112] Emilie Raguso, *Woman Charged In Berkeley Teen Sex Trafficking Case* (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

[113] Melissa Boughton, *Police Say Teen Starved, Beaten At North Charleston Hotel; Man Arrested In Sex-Trafficking Case* (Mar. 2, 2015), https://www.postandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston- motel-man/article_032153ee-fcb6-5333-9182-926a7f43dfbf.html.

[114] Lindsay Bramson, *Local Teen Saved From Sex Slavery; Two Charged*, KXAN Austin (Mar. 6,

xx.    In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[115]

xxi.    Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[116]

xxii.    Seven (7) people were indicted in January 2016, by a Colorado grand jury for sex trafficking children from 2014 through the summer of 2015, out of hotels in Denver, Colorado, including a Denver area Motel 6.[117]

xxiii.    In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[118]

xxiv.    A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[119]

xxv.    In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant

2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[115] Amanda Milkovits, *Massachusetts Man Accused Of Trafficking Teen In Warwick Motel*, NewportRI.com (Mar. 24, 2015), https://www.newportri.com/article/20150324/NEWS/150329666.

[116] Sarah Kaplan, *Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List To Police*, The Washington Post (Apr. 28, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand- over-guest-list-to-police/?utm_term=.a804ce3f32a8.

[117] Hsing Tseng, *Seven Indicted By Colorado Grand Jury In Child Sex Trafficking Ring Bust*, Fox 31 Denver (Jan. 6, 2016), https://kdvr.com/2016/01/06/7-indicted-by-colorado-grand-jury-in-child-sex-trafficking-ring-bust/.

[118] Andrea Fisher, *Woman Caught Up In Human Trafficking Ring Pleads Guilty* (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleads- guilty/89566374/.

[119] Diana Hefley, *County Investigating 45 Ongoing Human Sex Trafficking Cases*, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

with human trafficking and rape.[120]

    xxvi.    In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[121]

    xxvii.    In November 2015 a man was arrested at a Motel 6 in Ventura, California and was criminally charged with sex trafficking a fifteen (15) year old girl who was found with him.[122]

    xxviii.    In January 2016, a man who operated a criminal venture out of a Motel 6 in Frederick City, Maryland was charged with sex trafficking.[123]

    xxix.    Criminal charges were brought against a man who sex trafficked a fifteen (15) year old girl out of a Motel 6 in Beaumont, Texas in March 2016.[124]

    xxx.    On March 23, 2016, a victim of a sex trafficking ring died at a Motel 6 in Winchester, West Virginia.[125]

    xxxi.    The leader of a sophisticated and organized sex trafficking ring beat and raped one of his victims in April 2016, at a Motel 6 in Tinicum Township, Pennsylvania.[126]

---

[120] *Tuscaloosa Man Charged With Rape And Trafficking Mississippi Teen*, NewsMississippi (Nov. 7, 2014), https://newsms.fm/tuscaloosa-man-charged-human-trafficking-mississippi-teen/.

[121] Matt Fountain, *Four Accused Of Pimping Out 15-Year-Old Girl In SLO Will Will Stand Trial*, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

[122] *Fresno Man Sentenced To Prison For Pimping, Human Trafficking In Ventura County*, Ventura County Star (Apr. 26, 2016), https://www.vcstar.com/story/news/local/communities/ventura/2016/04/26/fresno-man-sentenced-to-prison-for-pimping-human-trafficking-in-ventura-county/88714698/.

[123] *Frederick Police Arrest Man On Human Trafficking Charges*, CBS13 Baltimore (Jan. 16, 2016), https://baltimore.cbslocal.com/2016/01/16/frederick-police-arrest-man-on-human-trafficking-charges/.

[124] Quentin Hope, *Women Accuse Defendant Of Sex Trafficking, Threatening To Kill Them*, KFDM.com (Sept. 11, 2018), https://kfdm.com/news/local/women-accuse-defendant-of.

[125] Ellie Williams, *Martinsburg Man Convicted On Sex Trafficking And Drug Charges*, LocalDVM.com (Jan. 17, 2019), https://www.localdvm.com/news/virginia/martinsburg-man-convicted-on-sex-trafficking-drug- charges/1708490814.

[126] Justin Heinze, *Man Behind Human Trafficking Ring In Chester County Sentenced*, Patch (Sept. 26, 2017), https://patch.com/pennsylvania/phoenixville/man-behind-human-trafficking-ring-chester-county-sentenced.

xxxii.  A federal court sentenced a man to ten (10) years in prison in November 2016, for sex trafficking a fifteen (15) year old girl in 2014 out of a Motel 6 in Hartford County, Connecticut.[127]

xxxiii.  Local law enforcement rescued a seventeen (17) year old runaway in December 2016, who was being sex trafficked from a Motel 6 in Gibbstown, New Jersey.[128]

xxxiv.  In February 2017, the leader of a child sex trafficking ring in Tulsa, Oklahoma, was busted at a local Motel 6 where federal authorities rescued a sixteen (16) year old survivor of sex trafficking.

xxxv.  A forty-five (45) year old man was charged with human trafficking after picking up a teenage boy from school and taking him to a Motel 6 in Cedar Park, Texas in approximately March 2017.[129]

xxxvi.  At a Motel 6 in Des Moines, Iowa a man sex trafficked a minor victim in June 2017.[130]

xxxvii.  In approximately June 2017, a seventeen (17) year old runaway was rescued by law enforcement from a Motel 6 in Las Vegas, Nevada out of which a sex trafficker was operating.[131]

xxxviii.  A seventeen (17) year old girl was sold for sex by traffickers at a Motel 6 in

[127] David Owens, *Hartford Man Sentenced To Prison For Sex Trafficking Of 15-Year-Old Girl*, Hartford Courant (Nov. 14, 2016), https://www.courant.com/news/connecticut/hc-sex-trafficking-teenager-prison-1115-20161114- story.html.

[128] Matt Gray, *Three Indicted On Charges Of Forcing Teen Into Prostitution*, NJ.com (Sept. 24, 2017), https://www.nj.com/gloucester-county/index.ssf/2017/09/post_139.html.

[129] *Little Elm Man Accused Of Trafficking Austin Teen*, KHOU11.com (Sept. 19, 2017), https://www.khou.com/article/news/local/texas/little-elm-man-accused-of-trafficking-austin-teen/285-476893013.

[130] Luke Nozicka, *Seven Des Moines Residents Charged With Sex Trafficking, Feds Say*, The Des Moines Register (Jun. 11, 2018), https://www.desmoinesregister.com/story/news/crime-and-courts/2018/06/11/7-des-moines- residents-charged-sex-trafficking-feds-des-moines-sexual-prostitution-iowa-texas/692264002/.

[131] Rachel Crosby, *Woman Accused Of Sex Trafficking Runaway On Las Vegas Strip*, Las Vegas Review-Journal (Jun. 2, 2017), https://www.reviewjournal.com/crime/sex-crimes/woman-accused-of-sex-trafficking-runaway-on- las-vegas-strip/.

Portland, Oregon in June 2017.[132]

xxxix. In August 2017, two (2) men operated out of a Motel 6 in Springfield, Virginia to sex traffic a sixteen (16) year old girl.[133]

xl. The City of Los Angeles settled a nuisance suit with G6 Hospitality, which operates Motel 6 hotels, in August 2017, for $250,000.00 in an effort to combat human trafficking at Motel 6 brand hotels.[134]

xli. In October 2017, the County Attorney's Office for Harris County, Texas sued a local Motel 6 after law enforcement identified the property as a criminal hotspot that had been attracting drug activity, human trafficking, and violent crime for years. The suit alleged the Motel 6 knowingly tolerated and failed to make reasonable efforts to abate the criminal activities on its property.[135]

xlii. Two (2) men were arrested in December 2017, for sex trafficking a minor female out of a Motel 6 in Destin, Florida.

xliii. In February 2018, a man engaged in sex trafficking of two (2) women at a Motel 6 near New Orleans, Louisiana.[136]

xliv. The Columbus City Attorney's Office issued ultimatums in February 2018, to several area hotels to clean up or shut down, including but not limited to, the Motel 6 at 7480 North High Street which, according to police, had been

---

[132] Nick Morgan, *Accused Human Traffickers Stopped In Medford*, Mail Tribune (Jul. 7, 2017), http://mailtribune.com/news/crime-courts-emergencies/accused-human-traffickers-stopped-in-medford.

[133] Emily Leayman, *16-Year-Old Forced To Be Prostitute At Springfield Motel: Report*, Patch (Feb. 6, 2018), https://patch.com/virginia/burke/16-year-old-forced-be-prostitute-springfield-motel-report.

[134] Michael Balsamo, *Motel 6 To Pay To Settle Human Trafficking Case*, APNews.com (Aug. 31, 2017), https://apnews.com/d13636fec55c42b88a08af18db6196fb.

[135] Mayra Cruz, *Harris County Sues Spring Area Motel Labeled Hot Spot For Crime*, Chron.com (Oct. 20, 2017), https://www.chron.com/neighborhood/spring/news/article/Harris-County-sues-Spring-area-motel-labeled- 12293254.php.

[136] Emily Lane, *Man Accused Of Trafficking Took Females To New Orleans To 'Make Some Money For Mardi Gras'*, Nola.com (Oct. 18, 2018), https://www.nola.com/crime/2018/10/man-accused-of-trafficking-took-females- to-new-orleans-to-make-some-money-for-mardi-gras-warrant.html.

the site of significant criminal activity and is nearby the Motel 6 Columbus.[137]

xlv.    Law enforcement responded to a 911 call from a seventeen (17) year old girl who was calling from the lobby of a Motel 6 in Claremont, California in February 2018. Upon arrival, officers discovered that the seventeen (17) year old caller and a fifteen (15) year old girl were both being sex trafficked at the hotel.[138]

xlvi.    In March 2018, police found a ten (10) year old girl wearing a dog collar with a twenty-three (23) year old man who had raped her at a Motel 6 in Lakeland, Florida.[139]

xlvii.    In Richfield, Minnesota a man was criminally charged in June 2018, for sex trafficking a fifteen (15) year old girl out of an area Motel 6.[140]

xlviii.    Police busted a human trafficking operation at a Motel 6 in Ann-Arbor, Michigan in July 2018.[141]

xlix.    A Motel 6 in Braintree, Massachusetts surrendered its operating license in September 2018, after significant criminal activity, including sex trafficking, was documented occurring on its property.[142]

l.    Not until September 2018, did Defendant G6 announce that "the company

---

[137] Maureen Kocot, *Columbus Cracks Down On Businesses With High Crime Rates*, 10 WBNS (Feb. 7, 2018), https://www.10tv.com/article/columbus-cracks-down-businesses-high-crime-rates.

[138] Serena Fangary, *Social Media, Sexual Assault, And Sex Trafficking*, Webb Canyon Chronicle (May 23, 2018), https://webbcanyonchronicle.com/2953/features/social-media-sexual-assault/.

[139] David Neal, *Florida Man, Burger King Manager Met His Online Girlfriend For A Hotel Sex Date, Cops Say She's 10.*, Miami Herald (Mar. 29, 2018), https://www.miamiherald.com/news/local/community/miami-dade/west- miami-dade/article207303799.html.

[140] *Man Charged With Sex Trafficking, Prostitution Of 15-Year-Old At Richfield Motel*, 5 ABC Eyewitness News (Jun. 19, 2018), https://kstp.com/news/man-charged-sex-trafficking-richfield-hotel/4955796/.

[141] Darcie Moran, *Man Charged With Human Trafficking At Ann Arbor-Area Hotel*, MLive.com (Dec. 7, 2018), https://www.mlive.com/news/ann-arbor/2018/12/man-charged-with-human-trafficking-at-ann-arbor-area-hotel.html.

[142] Daniel Libon, *Motel 6 Ends Fight To Reopen Braintree Location*, Patch (Sept. 19, 2018), https://patch.com/massachusetts/braintree/motel-6-ends-fight-reopen-braintree-location.

will introduce anti-human trafficking training to corporate, field and property team members...Additionally, the company developed its own training for all property team members to understand how to effectively intervene and identify potential trafficking situations to protect each other, guests and the community." Even after this announcement, sex trafficking at Motel 6 properties continued.

li. In November 2018, federal authorities arrested a man for sex trafficking a woman out of a Motel 6 in San Jose, California.[143]

lii. In December 2018, a husband and wife were arrested for sex trafficking women who were Chinese nationals out of a Motel 6 in Portsmouth, New Hampshire from approximately 2016 through 2017.[144]

liii. A fourteen (14) year old girl was held against her will at a Motel 6 in Raleigh, North Carolina and sex trafficked in or around January 2019.[145]

liv. Three victims of sex trafficking including a fourteen (14) year old girl were rescued from the Motel 6 in San Jose, CA, the same G6 brand property where B.M. was trafficked, in May 2019 and three men were arrested on sex trafficking and kidnapping charges.[146]

ee. Additionally, Defendant G6 has been aware of sex trafficking occurring on Motel 6 brand properties through publicly available online review websites such as www.yelp.com. Online reviews show the pervasiveness of customer reported sex

[143] *Alleged Pimp Arrested in San Jose for Sex-Trafficking Young Woman He Found on Instagram*, San Jose Inside (Nov. 9, 2018), https://www.sanjoseinside.com/2018/11/09/alleged-pimp-arrested-in-san-jose-for-sex-trafficking- young-woman-he-found-on-instagram/.

[144] Elizabeth Dinan, *Husband, Wife Charged In Sex Trafficking 'Scheme'*, Fosters.com (Dec. 14, 2018), https://www.fosters.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme.

[145] Amanda Lamb, *Third Man Arrested In Raleigh Alleged Child Trafficking*, WRAL.com, https://www.wral.com/third-man-arrested-in-raleigh-alleged-child-trafficking/18104963/ (last visited Feb. 28, 2019).

[146]Trio arrested in San Jose for allegedly human trafficking teens, young women, KTVU.com, https://www.ktvu.com/news/trio-arrested-in-san-jose-for-allegedly-human-trafficking-teens-young-women (last visited Aug. 26, 2020).

trafficking on Motel 6 brand properties and Defendant G6's inattentiveness, for example:

  i.   Regarding a July 2010 stay at a Motel 6 in Jonesboro, Georgia, a customer titled the review: "This [Motel 6] has a prostitution ring running out of the motel STAY AWAY!" He further wrote: "The owners of the hotel allow thugs to rent weekly rooms in the rear of the hotel. These thugs openly run prostitution rings in the hotel… Pimps [hurriedly] pushed young girls toward the back of the hotel yelling at them to 'get that money.'"[147]

  ii.  Regarding a November 2012, stay at a Motel 6 in Madison, Alabama a customer wrote: "[L]ocal police raided several rooms in the a.m. And arrested numerous 'guests' for what we later found out were drug, prostitution, and sex trafficking charges!! Like a movie. An extra $20 bucks gets you a better room, healthier conditions, and no 2 am swat team visit."[148]

  iii. Another guest of the Motel 6 located at 8995 Madison Boulevard, Madison, Alabama 35758 wrote an online review in April 2015, entitled, "We'll Leave the RED- Light on for You[,]" deriding the Motel 6 brand's advertising campaign, "We'll leave the light on for you®."[149] The guest went on to describe indicia of human trafficking which the security guard on site ignored and concluded: "I've since read other reviews that claimed prostitution, sex-trafficking, and drug use at this hotel; after my one night's stay, I have NO reason to question these claims."[150]

[147] Review of Motel 6 Jonesboro (Jul. 26, 2010), *available at* https://www.tripadvisor.com/ShowUserReviews-g35039-d86580-r72497067-Southside_Inn_Jonesboro-Jonesboro_Georgia.html.
[148] Review Of Motel 6 Huntsville-Madison (Dec. 26, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g30677-d244048-r201566882-Motel_6_Huntsville_Madison- Madison_Alabama.html (last visited Feb. 28, 2019).
[149] Review Of Motel 6 Huntsville-Madison (Apr. 29, 2015) https://www.tripadvisor.com/ShowUserReviews-g30677-d244048-r266732408-Motel_6_Huntsville_Madison-Madison_Alabama.html (last visited Mar. 1, 2019).
[150] *Id*.

iv.  In September 2015, a guest of the Motel 6 located at 31 North Green Bay Road, Waukegan, Illinois 60085 wrote: "HORRIBLE HOTEL!!!...Prostitutes all over, drug dealers thru [sic] the hallway and parking lot[.]"[151]

v.  A guest of the Motel 6 located at 2727 White Lane, Bakersfield, California 93304 wrote in October 2015: "Prostitutes and drug dealers hung around outside for hours."[152]

vi.  The Motel 6 located at 20 Jefferson Boulevard, Warwick, Rhode Island 02888 received this review in April 2016: "This motel has been in the news for domestic disputes, police standoffs, illegal meth labs, robberies, beatings, prostitution, and human trafficking. I am SHOCKED they are still in business. …[T]he motel looks post apocalyptic. Stay here for Halloween if you really want the scare of your life."[153]

vii.  In September 2016, a reviewer described a Motel 6 in Austin, Texas as follows: "we witnessed shady, sketchy activities of all sorts going on in the parking lot as well as at the businesses surrounding the motel which included: drug activity and use...shady characters circling the buildings multiple times, sex worker transactions, an actual fight, and possible human trafficking activity."[154]

viii.  A review of the Motel 6 located at 34047 Fremont Boulevard, Fremont, California 94555 posted in February 2017 stated: "Guys might be sex trafficking at this Motel 6. I saw young girls and older men often."[155]

[151] Review Of Motel 6 Waukegan (Sept. 14, 2015), *available at* https://www.yelp.com/biz/motel-6-waukegan (last visited Feb. 28, 2019).

[152] Review Of Motel 6 Bakersfield (Oct. 22, 2015), *available at* https://www.yelp.com/biz/motel-6-bakersfield (last visited Feb. 28, 2019).

[153] Review Of Motel 6 Warwick (Apr. 10, 2016), *available at* https://www.yelp.com/biz/motel-6-warwick (last visited Feb. 28, 2019).

[154] Review of Motel 6 Austin-Midtown (Jul. 12, 2017), *available at* https://www.tripadvisor.com/ShowUserReviews-g30196-d98441-r501375572-Motel_6_Austin_Midtown-Austin_Texas.html (last visited Feb. 28, 2019).

[155] Review of Motel 6 Fremont North (Feb. 2017), *available at* https://www.kayak.com/Fremont-Hotels-Motel-6- Fremont-North.113185.ksp (last visited Feb. 28, 2019).

ix.   A guest of the Motel 6 located at 497 Quince Orchard Road, Gaithersburg, Maryland 20878 bemoaned in May 2017: "At one point the fighting between the prostitutes and pimp was so loud that the police were called."[156]

x.   The Motel 6 located at 1015 South Washburn Street, Osh Kosh, Wisconsin received the following review in May 2018: "It was in a very dangerous area and the first night I was there and returned from an outing... there were 8 police men busting some human trafficking people!! This is common there I found out."[157]

xi.   A guest of a Motel 6 in Lawrenceville, New Jersey reported in July 2018: "[A] woman walked...in, barely able to hold herself up and clearly drugged out of her mind[.] She told [the clerk] she had 'an appointment' in room 2-whatever, he handed her a keycard, and she...flagged down a car that was pulled off near the entrance, and walked towards the rooms at the back of the building as the car followed her. To me, that screamed human trafficking/prostitution."[158]

xii.   On September 11, 2018, a reviewer of the Motel 6 located at 7541 Nates Road, Columbia, South Carolina posted: "Really nasty. My husband was propositioned and I was asked if I wanted drugs. Lots of men hanging out in lobby selling women. The room was nasty...The parking lot is harboring a sex trafficking situation along with drug sales. We were lucky to get out with our lives."[159]

xiii.   A guest who stayed at the Motel 6 located at 1051 Eastern Boulevard, Montgomery, Alabama 36117 in December 2018 wrote: "The drug dealers

[156] Review Of Motel 6 Gaithersburg (May 15, 2017), *available at* https://www.yelp.com/biz/motel-6-gaithersburg (last visited Feb. 28, 2019).
[157] Review Of Motel 6 Oshkosh (May 20, 2018), *available at* https://www.booking.com/reviews/us/hotel/motel-6-oshkosh.html (last visited Feb. 28, 2019).
[158] Review Of Motel 6 Lawrenceville, NJ (Jul. 10, 2018), *available at* https://www.travelocity.com/Princeton-Hotels-Howard-Johnson-By-Wyndham-PrincetonLawrenceville.h17767.Hotel-Information (last visited Feb. 28, 2019).
[159] Review Of Motel 6 - Columbia, SC (Sept. 11, 2018), *available at* https://www.yelp.com/biz/motel-6-columbia-2 (last visited Feb. 28, 2019).

operating out of some of the rooms. Also there could have been prostitution or human trafficking going on. Very suspicious. Lots of cars in and out all night long."[160]

xiv. In reference to a December 2018, visit to a Motel 6 located at 7640 Cedar Avenue South, Richfield, Minnesota 55423, a reviewer observed: "There's also clearly some human trafficking going on, but judging from the occasional visits by security and police, nothing is going to be done about that."[161]

ff. Furthermore, Defendant G6 has been aware of sex trafficking at the Motel 6® brand property where B.M. was trafficked through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking at the Motel 6® in San Jose, CA and Defendant G6's inattentiveness, for example:

i. A guest who stayed at the Motel 6® in San Jose in March 2012 said: " . . . Saw some pimps and hookers. . ."[162]

ii. The Motel 6® in San Jose received this review in May 2014: " . . . my 6 yr old daughter meet a little girl about 10 yrs old and wanted to play with her I said okay . . . there was a man who was in charge of her later ti find out it was her mother's pimp who was working the truckers parking lot for the motel this guy was a real piece of crap . I told the motel management they did nothing dispite the screaming and yelling that this guy was causing.I always carry my gun where ever I go glad I had it at this place glass breaking through out the night

---

[160] Review Of Motel 6 Montgomery - East (Jan. 1, 2019), *available at* https://www.booking.com/hotel/us/montgomery-1051-eastern-boulevard.html#tab-reviews (last visited Feb. 28, 2019).

[161] Review Of Motel 6 Minneapolis Airport - Mall Of America (Jan. 8, 2019), *available at* https://www.booking.com/hotel/us/motel-6-minneapolis-airport-mall-of-america.html#tab-reviews (last visited Feb. 28, 2019).

[162] Review of Motel 6 South - San Jose (Mar. 01, 2012), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d81691-Reviews-or55-Motel_6_San_Jose_South-San_Jose_California.html.

hookers and pimps running the Isle all night very scary place . . ."[163]

iii.   In August 2014 The Motel 6® in San Jose received this review: "It's crime ridden, whether it's prostitutes servicing the truck drivers in the lot next door, or local gang members partying on a Friday night, this motel. 6 will not remember to leave the light on for  you!"[164]

iv.   A guest described his stay at the Motel 6® in San Jose in August 2015 as follows: "If you want to stay in the same Motel with hookers and drug dealers then this is the place for you. There are better options in Salinas."[165]

v.   The Motel 6® in San Jose received this review in July 2016: "If I had to guess I would say this was a drug dealer hangout or maybe a prostitution business going on. There was loud groups of people continuously through out the entire night. The "security" guard was constantly roaming around but did nothing to stop it. We assumed maybe the security guard was "in on it" too. This place is NO place for a family. Unless you plan on arming yourself heavily, DO NOT stay here!!"[166]

vi.   A guest at the Motel 6® in San Jose described his stay in December 2016 as follows: "It is located in a cesspool or garbage, grime, hookers, drugs, and thugs. . . . I saw a prostitute take 3 different guys to her room, I saw a drug deal happen right next to my car as a pulled up to my room, and I heard several gun shots throughout the night. . . . They told me they had no available rooms to move me, however, the hotel was basically empty. Well except the prostitutes. I even saw a hooker having sex in the alley way at 9am. Staff was moving

---

[163] Review of Motel 6 South - San Jose (May 20, 2015), *available at* https://www.tripadvisor.com/ShowUserReviews-g33020-d81691-r206329629-Motel_6_San_Jose_South-San_Jose_California.html.
[164] Review of Motel 6 South - San Jose (Aug. 18, 2014), *available at* https://www.yelp.com/biz/motel-6-south-san-jose?start=80.
[165] Review of Motel 6 South - San Jose (Aug. 16, 2015), *available at* https://www.yelp.com/biz/motel-6-south-san-jose?start=80.
[166] Review of Motel 6 South - San Jose (July 24, 2016), *available at* https://www.yelp.com/biz/motel-6-south-san-jose?start=80.

throughout the property and NO1 confronted this disgusting woman or her John, I'm pretty sure it's a normal practice at this establishment."[167]

vii. In February 2019 a guest of the Motel 6® in San Jose gave the following review: "This place has very obvious signs of sex trafficking happening. . . ."[168]

viii. The Motel 6® in San Jose received this review in September 2019: "As soon as we got out of our car to unload, we saw a prostitute getting dressed with her curtains wide open. She then walked out of her room, which happened to be right next to ours, and walked 2 doors down and knocked another door. That door was opened by a guy who later offered me drugs and then later my friend when she was alone."[169]

ix. In March 2020 a guest of the Motel 6® in San Jose said: "There's drug dealing going on and prostitution."[170]

gg. In addition to the indictments and other evidence of trafficking at a Motel 6 property nearby, Motel 6 Columbus was aware of illegal activity at its premises and refused to do anything about it. One customer who stayed at the Motel 6 Columbus complained that her "[g]randdaughter [stepped] on [a] broken needle left by previous [tenant]" and the manager "would not make out [an incident] report," so she had to call the police.[171]

---

[167] Review of Motel 6 South - San Jose (Dec. 27, 2016), *available at* https://www.yelp.com/biz/motel-6-south-san-jose?hrid=8bADedi1zv5W2pKYRwZnXQ&osq=prostitut.

[168] Review of Motel 6 South - San Jose (Feb. 10, 2019), *available at* https://www.yelp.com/biz/motel-6-south-san-jose.

[169] Review of Motel 6 South - San Jose (Sept. 10, 2019), *available at* https://www.bringfido.com/lodging/100904.

[170] Review of Motel 6 South - San Jose (Mar. 4, 2020), *available at* https://www.yelp.com/biz/motel-6-san-jose-2.

[171] Review of Motel 6 Columbus - Worthington (Aug. 18, 2015), *available at* https://www.expedia.com/Columbus-Hotels-Motel-6-Columbus-Worthington.h14174.Hotel-Information?chkin=3%2F3%2F2019&chkout=3%2F4%2F2019&rm1=a2&hwrqCacheKey=e16976ef-9a17-4721- 86d5-f4b08c98537aHWRQ1551645996343&cancellable=false&regionId=874&vip=false&c=c09cca44-f814-4c01- a3f4-c9ce719b313d&&exp_dp=52.99&exp_ts=1551645996754&exp_curr=USD&swpToggleOn=false&exp_pg=HSR (last visited Mar. 3, 2015).

hh. Upon information and belief, Defendant G6 monitors customer reviews and complaints for all brand properties.

ii. Upon information and belief, the branded properties depend on Defendant G6 for notification of negative customer reviews.

jj. Upon information and belief, Defendant G6, not the branded properties, house and control the data regarding customer reviews.

### C.    THE SEX TRAFFICKING OF B.M. AT THE SUPER 8

89. In 2014, Plaintiff B.M. was first subjugated to sex trafficking at the Wyndham branded, Super 8 hotel, located at 1860 The Alameda, San Jose, CA, when she was 16 years old.

90. For approximately two years, Plaintiff's trafficker rented two adjoining rooms at the Super 8. Plaintiff was one of up to 10-15 girls that were being simultaneously trafficked in these two rooms. Each girl, including minor Plaintiff B.M., would be forced to perform commercial sex acts with up to 10-15 men a day.

91. At the Super 8, the trafficker hung blankets and shower curtains as partitions in each of the two suites so that sex acts could be performed in the bed room and in the living room of each suite at the same time, essentially making it possible for four girls to be performing sex acts at the same time in their individual room. Accordingly, the traffic and parade of men coming in and out of that Super 8 motel was tremendous. Up to 10-15 customers per day for four girls equals up to 40 and 60 sex customers every day arriving at the Super 8 suites rented by the trafficker. This incredible procession and parade of men lasted almost continuously for a two-year period.

92. The Super 8 hotel security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor BM and her co-victims from occurring on the Super 8 premises.

93. Plaintiff was raped and otherwise sexually abused hundreds and hundreds of times at the Super 8 hotel. The entire time she was a minor.

94. This procession of men would have been open and obvious to anyone working at the Super 8 motel. These were not registered guests. BM was a minor as were several of the other girls being

trafficked at that Super 8 location.

95. Two or three different Super 8 employees who worked at the front desk were involved in the sex trafficking operation to the extent that they served as look-outs for police and accepted money from the trafficker in exchange for allowing him to continue his trafficking operation at the Super 8 location. The trafficker would send "stacks" of cash on a regular basis to the hotel employees as payment. Typically, one of the trafficking victims would deliver that cash.

96. On several occasions, the trafficker would have parties at the hotel suites. On more than one occasion, hotel employees participated at these parties where sex, drugs, and alcohol were all served.

97. Super 8 was the base of operations for Plaintiff's trafficker during the time BM was trafficked at the Super 8. As the base of operations, the trafficker would upload advertisements to Backpage and other sex trafficking websites while he was at the Super 8 hotel. The upload would take place through Super 8's Wi-Fi/server system and network. The ads would likely, and certainly had the ability to, reveal the Super 8 hotel's IP address as they were routed from that location.

98. Because Backpage and some of the other sites would post the newer ads at the top of their list, the trafficker wanted and insisted on refreshing the ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, Plaintiff believes the ads may have been refreshed through the Super 8 hotel internet network up to 5-10 times per day. Each of the girl victims would refresh their ads in a similar fashion. Accordingly, anywhere u to 20 to 50 commercial sex advertisements would be routed through Super 8 hotel internet and network system per day. This persisted for approximately two years on virtually a daily basis, resulting in thousands upon thousands of commercial sex ads of minors, including the minor Plaintiff being routed through the Super 8 internet network.

99. Virtually all the ads were unmistakable commercial sex ads. They identified the neighborhood in which the Super 8 was located and they had multiple pictures of the minor Plaintiff in sexually-provocative positions, dressed in very skimpy lingerie and thong underwear. The Plaintiff was an obvious minor as were many of the other minor victims.

100. Most of the photographs used were taken at the Super 8 location on the bed or on the couch, which were easily identifiable as Super 8 furniture and fixtures. No effort was made to

camouflage or hide these identifying features.

101.    Through hotel staff and employees, Super 8 knew or should have known that Plaintiff B.M. was being trafficked for sex due to, but not limited to:

   a.   large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

   b.   payments for the rooms in cash;

   c.   Plaintiff's physical appearance (malnourished, bruised, beaten);

   d.   a continuous procession of older men entering and leaving minor Plaintiff B.M.'s room;

   e.   excessive requests for sheets, cleaning supplies, and room service, which the Super 8 personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids; and,

   f.   the personal relationship between the front desk employees and Plaintiff's trafficker.

### D.   THE SEX TRAFFICKING OF B.M. AT THE CLARION INN

102.    On or about the Spring of 2015, Plaintiff B.M. was first subjugated to sex trafficking at the Choice branded, Clarion Inn, located at 3200 Monterey Road, San Jose, CA, when she was 17 years old.

103.    For many months, Plaintiff's trafficker rented rooms at the Clarion Inn, including rooms by the front office. Plaintiff was one of up to 10-15 girls that were being simultaneously trafficked in these rooms. Each girl, including minor Plaintiff B.M., would be forced to perform commercial sex acts with up to 10-15 adult men a day.

104.    Clarion Inn employees told the trafficker and BM to keep their activities more discrete and threatened to eject Plaintiff B.M. and her traffickers unless they complied.  Despite these threats, Plaintiff B.M. and several other victims continued to be trafficked on the premises.

105.    The traffic and parade of men coming in and out of the Clarion Inn was extremely busy. Multiple victims were trafficked at the Clarion Inn by this trafficker at the same time. The trafficker had each girl under a quota, which resulted in this heavy traffic.

106.    The Clarion Inn security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor BM and her co-victims from occurring on the Clarion Inn premises.

107.    Plaintiff was raped and otherwise sexually abused hundreds of times at the Clarion Inn. The entire time she was a minor.

108.    This procession of men would have been open and obvious to anyone working at the Clarion Inn. These were not registered guests. BM was a minor as were several of the other girls being trafficked at that Clarion Inn location.

109.    The trafficker assured the minor Plaintiff that he always had it worked out with the front desk so that the sex trafficking operation could take place at the Clarion Inn.

110.    The trafficker would upload advertisements to Backpage and other sex trafficking websites while he was at the Clarion Inn. The upload would take place through Clarion Inn's Wi-Fi/server system and network. The ads would be routed through the Clarion Inn's IP address because it was coming from that location.

111.    Because Backpage and some of the other sites would post the newer ads at the top of their list, the trafficker wanted and insisted on refreshing the ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, the ads would be refreshed through the Clarion Inn internet network up to 5-10 times per day. Each of the girl victims would refresh their ads in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements would be routed through the Clarion Inn internet and network system per day. This persisted for many months on virtually a daily basis, resulting in hundreds if not thousands of commercial sex ads of minors, including the minor Plaintiff being routed through the Clarion Inn internet network.

112.    Virtually all the ads were unmistakable commercial sex ads. They identified the neighborhood in which the Clarion Inn was located and they had multiple pictures of the minor Plaintiff in sexually-provocative positions, dressed in very skimpy lingerie and thong underwear. The Plaintiff was an obvious minor as were many of the other minor victims.

113.    Most of the photographs used were taken at the Clarion Inn location on the bed or on the couch, which were easily identifiable as Clarion Inn furniture and fixtures. No effort was made to camouflage or hide these identifying features.

114.    Through hotel staff and employees, reservation information and cybersecurity information, Clarion Inn knew or should have known that Plaintiff B.M. was being trafficked for sex due to, but not limited to:

a.  large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

b.  payments for the rooms in cash;

c.  Plaintiff's physical appearance (malnourished, bruised, beaten);

d.  a continuous procession of older men entering and leaving minor Plaintiff B.M.'s room; and

e.  excessive requests for sheets, cleaning supplies, and room service, which the Clarion Inn personnel readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids.

### E.    THE SEX TRAFFICKING OF B.M. AT THE MOTEL 6

115.    Plaintiff B.M. was first subjugated to sex trafficking at the G6 branded, Motel 6, located at 2560 Fontaine Road, San Jose, CA, when she was 16 or 17 years old.

116.    For approximately one month, Plaintiff B.M. was trafficked at the Motel 6, where she was raped hundreds of times for the profit of her trafficker and to the benefit of Defendant G6. Plaintiff was one of several girls that were being simultaneously trafficked in these rooms. Each girl, including minor Plaintiff B.M., would be forced to perform commercial sex acts with 10-15 men a day, and even up to 20-23 men per day.

117.    One of Plaintiff's traffickers had a personal relationship with an employee at the Motel 6 and paid the employee cash to secure a room. Through this relationship and cash payment, Plaintiff's trafficker was able to secure a room in the back of the hotel, out of sight from most of the other patrons and passerby. This front desk employee would also notify the trafficker when law enforcement officials were on or near the premises. Because of the trafficker's personal/professional relationship

with one of the Motel 6 employees, arrangements were made for the trafficker to give that employee a tattoo. The trafficker assured the minor Plaintiff that he always had it worked out with the front desk so that the sex trafficking operation could take place at the hotel.

118.     The adult men arriving at the Plaintiff's room were typically middle-aged men of a variety of races – none of whom appeared to be age-appropriate contemporaries of the minor Plaintiff. None of these visitors acted in any manner as though they were a guardian or relative of the minor Plaintiff.

119.     Day after day, a procession of adult men would enter minor Plaintiff B.M.'s room, stay for 15 minutes to an hour on average, and then leave. This procession of men would have been open and obvious to anyone working at the Motel 6 motel. These were not registered guests. BM was a minor as were several of the other girls being trafficked at that Motel 6 location.

120.     Plaintiff was raped and otherwise sexually abused hundreds of times at the Motel 6 hotel. The entire time she was a minor.

121.      The Motel 6 hotel security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their mandated surveillance and security to prevent the flagrant sex trafficking of the minor BM and her co-victims from occurring on the Motel 6 premises.

122.     The trafficker would upload advertisements to Backpage and other sex trafficking websites while he was at the Motel 6 hotel. The upload would take place through Motel 6's Wi-Fi/server system and network. The ads would be routed through the Motel 6 hotel's IP address because it was coming from that location.

123.     Because Backpage and some of the other sites would post the newer ads at the top of their list, the trafficker wanted and insisted on refreshing the ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, the ads would be refreshed through the Motel 6 hotel internet network up to 5-10 times per day. Each of the girl victims would refresh their ads in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements would be routed through the Motel 6 hotel internet and network system per day. This persisted for the entire time that the minor Plaintiff was sex trafficked at the Motel 6,

resulting in hundreds of commercial sex ads of minors, including the minor Plaintiff being routed through the Motel 6 internet network.

124.    Virtually all the ads were unmistakable commercial sex ads. They identified the neighborhood in which the Motel 6 was located and they had multiple pictures of the minor Plaintiff in sexually-provocative positions, dressed in very skimpy lingerie and thong underwear. The Plaintiff was an obvious minor as were many of the other minor victims.

125.    Most of the photographs used were taken at the Motel 6 location on the bed or on the couch, which were easily identifiable as Motel 6 furniture and fixtures. No effort was made to camouflage or hide these identifying features.

126.    Through hotel staff and employees, Motel 6 knew or should have known that Plaintiff B.M. was being trafficked for sex due to, but not limited to:

    a.  large amounts of used condoms, empty lube bottles, and other sex-related items in the hotel room;

    b.  payments for the rooms in cash;

    c.  Plaintiff's physical appearance (malnourished, bruised, beaten);

    d.  a continuous procession of older men entering and leaving minor Plaintiff B.M.'s room;

    e.  excessive requests for sheets, cleaning supplies, room service; and,

    f.  the personal relationship between the front desk employees and Plaintiff's traffickers.

## F.    THE DEFENDANTS FACILITATED THE TRAFFICKING OF B.M.

127. Wyndham, Choice, and G6 ("Defendant Hotels") profited from the sex trafficking of B.M. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to B.M.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject B.M. to repeated exploitation as he forced her into sexual servitude.

128.Defendant Hotels knew, or should have known, that B.M. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because B.M.'s trafficker frequented the Defendants' hotels.

129. Defendant Hotels knew, or should have known, that B.M. was being trafficked because B.M. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotels for his illegal sex trafficking venture.

130. Defendant Hotels actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor B.M. while he was trafficking her.

131. Defendant Hotels profited from the sex trafficking of B.M. and knowingly or negligently aided and participated with B.M.'s trafficker in his criminal venture. The Defendants took no action as B.M. repeatedly visited the hotel, often with different guests, avoiding all eye contact, and exhibiting signs of malnourishment.

132. The Defendant Hotels all had the opportunity to stop B.M.'s trafficker and offenders like him from victimizing B.M. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

133. The Defendant Hotels all financially benefited from the sex trafficking of B.M., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

134. Defendant Hotels enjoy the steady stream of income that sex traffickers bring to their hotel brands, such as the Super 8, Clarion Inn, and Motel 6.

135. Defendant Hotels financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

136. Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

137. Defendant Hotels failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent

sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

138.  Defendant Hotels maintained their deficiencies to maximize profits by:

a.  Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b.  Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

139.  As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, B.M. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.     COUNT ONE – 18 U.S.C §1595 ("TVPRA")

**(Against all Defendants)**

140.  The Plaintiff B.M. incorporates each foregoing allegation.

141.  B.M. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

142.  The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined

above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of B.M. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

143. The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of B.M. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of B.M.'s injuries and damages.

144. B.M. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591(a).

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

c. past and future lost wages and loss of earning capacity;

d. past and future emotional distress;

e. consequential and/or special damages;

f. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.   disgorgement of profits obtained through unjust enrichment;

h.   restitution;

i.   punitive damages with respect to each cause of action;

j.   reasonable and recoverable attorneys' fees;

k.   costs of this action; and

l.   pre-judgment and all other interest recoverable.

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  August 31, 2020                    **RESPECTFULLY SUBMITTED,**

*/s/ Erik L. Bauer*
**Erik L. Bauer** (*pro hac vice*)
WSBA No. 14937
**Susanna L. Southworth** (*pro hac vice*)
WSBA No. 35687
THE LAW OFFICE OF ERIK L. BAUER
215 Tacoma Avenue South
Tacoma, Washington 98402
T: 253-383-2000
F: 253-383-0154
E: erik@erikbauerlaw.com

*/s/ Kathryn L. Avila*
**Kimberly L. Adams** (*pro hac vice*)
FL Bar No. 0014479
**Kathryn L. Avila** (*pro hac vice*)
FL Bar No. 1019574
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850-435-7000

F: 850-436-6153
E: kadams@levinlaw.com / kavila@levinlaw.com

*/s/ Danielle Bianculli Pinter*
**Danielle Bianculli Pinter** (*pro hac vice*)
FL Bar No. 120441
**Benjamin W. Bull** (*pro hac vice*)
DC Bar No. 388206
NATIONAL CENTER ON SEXUAL
EXPLOITATION
440 First Street NW
Suite 840
Washington, D.C. 20001
T: 352-266-7989
F: 202-393-1717
E: dpinter@ncoselaw.org/bbull@ncose.com

*/s/ Lori Andrus*
**Lori E. Andrus** (SBN 205816)
lori@andrusanderson.com
**Jennie Lee Anderson** (SBN 203586)
jennie@andrusanderson.com
**Audrey Siegel** (SBN 286771)
audrey.siegel@andrusanderson.com
Andrus Anderson LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

***Attorneys for Plaintiff***