Kimberly L. Adams (*pro hac vice*)
kadams@levinlaw.com
Kathryn L. Avila (*pro hac vice*)
kavila@levinlaw.com
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: 850-435-7056
Facsimile: 850-436-6056

Lori E. Andrus (SBN 205816)
lori@andrusanderson.com
Andrus Anderson LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474
*Attorneys for Plaintiff*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| J.M., as Personal Representative of the ESTATE OF B.M., <br><br> Plaintiff, <br><br> vs. <br><br> WYNDHAM HOTELS & RESORTS, INC.; WYNDHAM HOTEL GROUP, LLC; SUPER 8 MOTELS, INC.; DAYS INN WORLDWIDE, INC.; THE SAN JOSE INN PARTNERSHIP; SUNDOWNER, LP; CHOICE HOTELS INTERNATIONAL, INC.; FIRST MAGANSON HOLDINGS, INC; N.M. & G.N. PANCHAL TRUST; BEST WESTERN INTERNATIONAL, INC.; LANAI GARDEN CORPORATION; and AMBA, LLC, <br><br> Defendant(s). | Case No.: 5:20-cv-00656-BLF <br><br> SECOND AMENDED COMPLAINT (WRONGFUL DEATH AND SURVIVAL) DEMAND FOR JURY TRIAL |

**SECOND AMENDED COMPLAINT**

COMES NOW the Plaintiff J.M., as Personal Representative of the ESTATE OF B.M., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**INTRODUCTION**

1.      Plaintiff J.M. in this case is the mother of B.M. (hereafter "B.M." or "Decedent"). On January 29, 2020, B.M. filed her complaint for damages against Wyndham Hotels & Resorts, Inc., Choice Hotels International, Inc., and G6 Hospitality, LLC for their violations of the Federal Trafficking Victims Protection Act (18 U.S.C. § 1595). ECF No. 1.

2.      On October 2, 2020, the case was stayed until "final adjudication in the trial court" of the "criminal action arising out of the same occurrence in which the claimant is the victim." 18 U.S.C. §1595(b). ECF No. 99.

3.      While the civil case was stayed, on June 27, 2021, B.M. died from complications related to her sexual abuse, sexual exploitation, and sex trafficking facilitated by Defendants.

4.      Defendants showed deliberate indifference to the safety of B.M. while she was trafficked for sex, sexually abused, and sexually exploited in their hotels while she was a minor. Defendants failed to protect B.M. from harm while she was present in their hotels and willfully turned a blind eye to the common signs of sex trafficking in their hotels.

5.      Defendants' misconduct was a substantial factor in facilitating and enabling B.M.'s sexual abuse, sexual exploitation, sex trafficking, and drug addiction used to control her and keep her awake to increase profits. Had Defendants properly trained their staff to spot the signs of sex trafficking and implemented policies and procedures to report and prevent sex trafficking, B.M. would likely have been rescued and would not have been forced into continuous drug use.

6.      Plaintiff J.M. brings a survival action for damages suffered by B.M. and submits her wrongful death action for the loss of B.M.

7.      For decades, criminal sex traffickers have brazenly operated in and out of hotels and motels throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be

repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the expense of human life, human rights, and human dignity.

8.     B.M. was a victim of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

9.     Defendants provided lodging and services and thus had the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry… and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[1]

10.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the Panchal Trust, Maganson, SJ Partnership, Sundowner, Lanai, and Amba as hotel owners, and Defendants Wyndham, Choice, and Best Western, who are major players in the hospitality industry. The presence of sex trafficking and sexual exploitation in hotels is a frequent and obvious occurrence and numerous well-researched trainings and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[2]

11.     Obvious signs of sex trafficking at a hotel, including Defendants' brand hotels, may include: an excess of condoms in rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; renting multiple rooms next door to each other; declining room service for several consecutive days; significant foot traffic in and out of room(s); men traveling with multiple women who appear unrelated; multiple women, girls, or minors known to be staying in rooms together without leaving; women, girls, or minors displaying physical injuries,

---

[1] Giavanna L. C. Cavagnaro, Sex trafficking: The Hospitality Industry's Role and Responsibility, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[2] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*. Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

malnourishment, or signs of fear and anxiety; guests checking in with little or no luggage; hotel guests who prevent another individual from speaking for themselves; or a guest controlling another's identification documents.[3]

12.     Hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[4]

13.     Hotel brand companies such as Wyndham, Choice, and Best Western were obligated to adopt policies and procedures related to sex trafficking and enforce these policies and procedures as brand standards and hotel operation standards.

14.     Hotel owners such as Maganson, Panchal Trust, SJ Partnership, Sundowner, Lanai, and Amba had a duty to implement policies and procedures related to the prevention of sex trafficking and to not facilitate and profit from sex trafficking pursuant to local, state, and federal laws.

15.     Rather than taking timely and effective measures known to prevent or combat sex trafficking and forced prostitution occurrences on their hotel properties, all Defendants hewed to a common policy of harboring known and suspected human traffickers in exchange for financial and other benefits and actively ignored signs of ongoing human trafficking in their hotels.

16.     With proper training and the implementation of reasonable security measures, Defendants could have prevented regular sex trafficking in the hotels they own, operate, supervise, franchise, and/or brand under their flag, including the Super 8, Days Inn, Clarion Inn, Best Western Lanai Garden, and Fontaine Inn where B.M. was trafficked and exploited as a minor.

17.     In 2013, at the young age of fifteen (15), B.M.'s main trafficker began grooming her.  In roughly September 2014, B.M. was sold by traffickers to older men who paid for vaginal sex and other commercial sex acts. Her traffickers refused to let her leave until she met a profit quota.  He threatened to "rob her of the rest of her life" if she tried to leave or work on her own. *See* Case No. 5:16-cr-00150-

---

[3] *Id. See also*, Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), available at https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf
[4] CNN Wire Staff, U.S. human trafficking report includes U.S. cases for first time, CNN.com (Jun. 14, 2010), *available at* https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.

BLF, ECF No. 662 at 5. At various times between July 2014 through February 2016, B.M. was repeatedly and consistently sold and exploited for commercial sex at the Super 8, Days Inn, Clarion Inn, Best Western Lanai Garden, and Fontaine Inn while she was a minor.

18.     At the Super 8, Days Inn, Clarion Inn, Best Western Lanai Garden, and Fontaine Inn, B.M. was trafficked for commercial sex while shew as a minor by traffickers through force, fraud, and coercion, while Defendants turned a blind eye and continued to benefit.

19.     At the Super 8, Days Inn, Clarion Inn, Best Western Lanai Garden, and Fontaine Inn, the traffickers used hotel Wi-Fi and internet access to advertise B.M. for sex on various websites known for trafficking and sexual exploitation. *See supra* n.2.

20.     With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures and refusals to act, mandate, establish, execute, and/or modify their anti-trafficking efforts at the Super 8, Days Inn, Clarion Inn, Best Western Lanai Garden, and Fontaine Inn, B.M. was continuously sex trafficked, sexually exploited, and victimized repeatedly at the Defendants' hotels.

21.     Plaintiff J.M. brings claims for negligence, wrongful death, survival, and punitive damages against the Defendants who participated in a hotel operating venture and knowingly benefited from this venture through room rentals, profits, third party fees, including the value of the "good will" of the Choice®, Wyndham®, and Best Western® brands. The venture knew or should have known that they were profiting from sex trafficking, including the sex trafficking of B.M., in violation of the TVPRA.

## **PARTIES**

22.     **Plaintiff J.M.** is the Personal Representative of the ESTATE OF B.M. who resides in Fresno County, California.

    a.     B.M. was a natural person who resided in Fresno County, California. B.M. was a victim of trafficking pursuant to 18 U.S.C. §1591, and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102(16).

    b.     Due to the sensitive, private, and highly personal nature of the allegations, this Court permitted B.M.'s use of a pseudonym because, as a victim of sex

1    trafficking, B.M.'s need for anonymity outweighed the risk of prejudice to
2    Defendants. ECF No. 80 at 17, 19.

3    c.    B.M. is survived by her mother, Plaintiff J.M.  At all relevant times, Plaintiff J.M.
4          was and is the mother of the Decedent, B.M.

5    d.    B.M. was not married at the time of her death and is not survived by a spouse.

6    e.    B.M. did not have, nor was she survived by, any children.

7    f.    Plaintiff J.M. is the duly appointed, qualified, and acting Personal Representative
8          of the ESTATE OF B.M. and is otherwise *sui juris*.

9    g.    As Personal Representative of the ESTATE OF B.M., Plaintiff J.M. brings this
10         action for B.M.'s injuries and wrongful death in her representative capacity on
11         behalf of B.M.'s statutory survivors and/or beneficiaries.

12   h.    As Personal Representative of the ESTATE OF B.M., Plaintiff J.M. brings this
13         survival action to compensate the ESTATE OF B.M. for the injuries and harms
14         suffered by B.M. prior to her death.

15   23.   **Defendant Wyndham Hotels and Resorts, Inc. ("WHRI")** is the ultimate parent
16   company to several of the largest hotel brands in the world, including the Days Inn and Super 8, with
17   nearly 9,000 branded properties in more than eighty (80) countries. It is a Delaware corporation and
18   can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road,
19   Tatnall Building Suite 104, Wilmington, Delaware 19810.

20   a.    Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham
21         Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains
22         successor liability for wrongful acts of its predecessor, Wyndham Worldwide
23         Corporation.

24   b.    Wyndham Hotels & Resorts, Inc. maintains their corporate headquarters at 22
25         Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of
26         this Court because they regularly conduct business in California; derive
27         substantial revenue from services rendered in California, including through the

28

operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn Sunnyvale. Wyndham Hotels & Resorts, Inc. maintains a registered agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

24. **Defendant Wyndham Hotel Group ("WHG")** was a wholly owned subsidiary of WHRI's predecessor, Wyndham Worldwide Corporation. After the spinoff in 2018, Defendant WHG remains a wholly owned subsidiary of WHRI. At all relevant times, Defendant WHG was responsible for the management, supervision, training, and implementation of brand standards for all of Wyndham's hotel brands, including the Super 8 and Days Inn brands. Together, Defendants WHG and WHRI may be collectively referred to as "Wyndham."

    a. Wyndham Hotel Group maintains their corporate headquarters at 22 Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of this Court because they regularly conduct business in California; derive substantial revenue from services rendered in California, including through the operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn Sunnyvale. Wyndham Hotel Group maintains a registered agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

25. **Defendant Super 8 Motels, Inc. ("Super 8 Motels")** is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and/or Wyndham Hotel Group that enters into franchise agreements and licensing agreements with hotel/motel owners. Super 8® by Wyndham ("Super 8®") is a Wyndham brand. Upon information and belief, the entity responsible for the implementation of brand standards and franchise agreements for all Super 8-branded hotels is Super 8 Motels through WHG.

    a. Super 8 Motels maintains their corporate headquarters at 22 Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of this Court because they regularly conduct business in California; derive substantial revenue

from services rendered in California, including through the operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn Sunnyvale. Super 8 Motels maintains a registered agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

26.     **Defendant Days Inn Worldwide, Inc. ("Days Inn Worldwide")** is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and/or Wyndham Hotel Group that enters into franchise agreements and licensing agreements with hotel/motel owners. Days Inn® by Wyndham ("Days Inn®") is a Wyndham brand. Upon information and belief, the entity responsible for the implementation of brand standards and franchise agreements for all Days Inn-branded hotels is Days Inn Worldwide through WHG.

a.     Days Inn Worldwide maintains their corporate headquarters at 22 Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of this Court because they regularly conduct business in California; derive substantial revenue from services rendered in California, including through the operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn Sunnyvale. Days Inn Worldwide maintains a registered agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

27.     **Defendant San Jose Inn Partnership ("SJ Partnership")**, doing business as the Super 8 by Wyndham motel ("Super 8 Alameda") located at 1860 The Alameda, San Jose, California 95126, owned, operated, managed, and directed one of Defendant Wyndham's Super 8-branded properties. SJ Partnership may be served with service of process at 4747 Mountaire Place, San Jose, California 95138.

28.     **Defendant Sundowner Inn, LP ("Sundowner")**, doing business as the Days Inn Sunnyvale by Wyndham ("Days Inn Sunnyvale") located at 504 Ross Drive, Sunnyvale, California 94089, owned, operated, managed, and directed one of Defendant Wyndham's Days Inn-branded

properties. Sundowner may be served with service of process through their registered agent, Chandrakant K. Shah, located at 26725 Shady Oaks Court, Los Alto Hills, California 94020.

29.      **Defendant Choice Hotels International, Inc. ("Choice" or "Choice Hotels")** is one of the largest hotel brands in the world. It is a Delaware corporation and can be served by its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

      a.    Choice is subject to the jurisdiction of this Court because it regularly conducts business in California; derives substantial revenue from services rendered in California, including through the operation of numerous hotels in California such as the Clarion Inn; has caused indivisible injuries to B.M. in California; and profited from illegal commercial sex trafficking involving B.M. at its motel.

      b.    Choice maintains a registered agent in California and can be served with service of process through its registered agent, Becky Degeorge at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

30.      **Defendants N.M. & G.N. Panchal Trust ("Panchal Trust") and First Maganson Holdings, Inc. ("Maganson")**, doing business as the Clarion Inn® Silicon Valley ("Clarion Inn") located at 3200 Monterey Road, San Jose, California 95111, owned, operated, managed, and directed one of Defendant Choice's Clarion Inn-branded properties. Defendant Panchal Trust and Maganson may be served with service of process through Natwarlal Maganlal Panchal at 115 Arroyo Del Rancho, Los Gatos, California 95032.

31.      **Defendant Best Western International, Inc. ("BWI")** is one of the largest hotel brands in the world. It owns the Best Western brand, which it licenses to over 4,700 hotels worldwide and is a global network of hotels. It is an Arizona corporation with its headquarters located at 6201 North 24th Parkway, Phoenix, Arizona 85016. It can be served by its registered agent, Corporation Service Company, at 8825 N. 23rd Avenue, Suite 100, Phoenix, Arizona 85021.

      a.    BWI is subject to the jurisdiction of this Court because it regularly conducts business in California; derives substantial revenue from services rendered in California, including through the operation of numerous Best Western-branded

hotels in California such as the Best Western Lanai Garden; has caused indivisible injuries to B.M. in California; and profited from illegal commercial sex trafficking involving B.M. at its Best Western Lanai Garden hotel.

b.  BWI maintains a registered agent in California and can be served with service of process through 1505 Corporation CSC – Lawyers Incorporating Service, located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

32.  **Defendant Lanai Garden Corporation ("Lanai")**, doing business as the Best Western Lanai Garden located at 1575 Tully Road, San Jose, California 95122, owned, operated, managed, and directed a Best Western-branded hotel. Defendant Lanai Garden can be served with service of process through its registered agent, Dilip Hardev, located at 1575 Tully Road, San Jose, California 95122.

33.  **Defendant Amba, LLC ("Amba")**, doing business as the Fontaine Inn San Jose located at 2460 Fontaine Road, San Jose, CA 95121, owned, operated, managed, and directed the hotel. Defendant Amba may be served with service of process through its registered agent, Bharat Patel, located at 1893 Fremont Boulevard, Seaside, California 93955.

34.  Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the supervision, management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

35.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

36.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants'

misconduct and omissions, occurred in the judicial district where this action is brought.

37.     Defendants have submitted to the jurisdiction of California and have purposefully availed themselves of the privilege of conducting acts in California through their dominion and control over their respective brands with brand subsidiaries, brand property subsidiaries, and operating hotels, and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in California; California has an equally strong interest in protecting and assuring the safety of persons within its State.

## SEX TRAFFICKING UNDER FEDERAL LAW

38.     The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).[5]

39.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

## FACTUAL ALLEGATIONS

### A.  PARTICIPATION IN A VENTURE

**Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner Participated in Hotel Operating Ventures**

40.     Wyndham, Super 8 Motels, and Days Inn Worldwide participated in a hotel operating venture that included Defendants SJ Partnership and Sundowner. The venture also included hotel staff and employees at the Super 8 Alameda and Days Inn Sunnyvale hotels, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked

---

[5] On January 5, 2023, Congress once again expanded the scope of liability for civil beneficiary claims pursuant to Section 1595 of the TVPRA.

while she was a minor.

41.    Defendant SJ Partnership owned the Super 8 hotel located at 1860 The Alameda, San Jose, California 95126 ("Super 8 Alameda") and operated the hotel pursuant to the franchise agreement and licensing agreement it entered into with Wyndham and Super 8 Motels. At all times, SJ Partnership and the Super 8 Alameda were subject to strict brand standards which were mandated by the Wyndham Defendants.

42.    Defendant Sundowner owned the Days Inn Sunnyvale located at 504 Ross Drive, Sunnyvale, California 94089 ("Days Inn Sunnyvale") and operated the hotel pursuant to the franchise agreement and licensing agreement it entered into with Wyndham and Days Inn Worldwide. At all times, Sundowner and Days Inn Sunnyvale were subject to strict brand standards which were mandated by the Wyndham Defendants.

43.    Wyndham, Super 8 Motels, and Days Inn Worldwide were in a hotel operation venture with SJ Partnership and Sundowner offering public lodging services in the Super 8 Alameda and Days Inn Sunnyvale. This relationship was established through Wyndham's exercise of an ongoing and systemic right of control over the Super 8 Alameda and Days Inn Sunnyvale by Wyndham's operations, including the means and methods of how the Super 8 Alameda and Days Inn Sunnyvale conducted daily business through one or more of the following actions:

      a.    providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with Wyndham;

      b.    providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

      c.    providing new hire orientation on human rights and corporate responsibility;

      d.    providing both voluntary and mandatory training and education to Super 8® and Days Inn® branded hotels through webinars, seminars, conferences, and online portals;

      e.    providing and controlling customer review and response platforms;

      f.     hosting online bookings on Wyndham's domain;

g.    requiring Super 8® and Days Inn® branded hotels to use Wyndham's customer rewards program;

h.    requiring Super 8® and Days Inn® branded hotels to use Wyndham's property management software;

i.    requiring Super 8® and Days Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

j.    providing IT support for all property management systems, owned, operated and required by Wyndham;

k.    setting employee wages;

l.    making employment decisions;

m.    advertising for employment;

n.    sharing profits;

o.    requiring Super 8® and Days Inn® branded hotels to use Wyndham's property management software;

p.    requiring Super 8® and Days Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

q.    providing IT support for all property management systems, owned, operated and required by Wyndham;

r.    standardized training methods for employees;

s.    building and maintaining the facility in a manner specified by the owner;

t.    standardized or strict rules of operation;

u.    regular inspection of the facility and operation by owner;

v.    fixing prices; or

w.    other actions that deprive Super 8® and Days Inn® branded hotels of independence in business operations.

44.    Wyndham held out Super 8® and Days Inn® branded hotels to the public as possessing authority to act on its behalf. Wyndham clothed the Super 8 Alameda and Days Inn Sunnyvale with

apparent authority to act for Wyndham in the following ways: by requiring the use of Wyndham signs, providing Wyndham branded stationery, requiring the use of Wyndham's website and Wyndham's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Wyndham guest rewards programs. On information and belief, Wyndham's conduct reasonably led B.M.'s perpetrator(s) to believe that the Super 8 Alameda and Days Inn Sunnyvale had the authority it purported to have, and B.M. was injured as a result.

45.     Through its operations manual and brand standards, Wyndham controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked as a minor.

46.     The Super 8 Alameda's website is hosted at Wyndham's domain, www.wyndhamhotels.com.

47.     The Days Inn Sunnyvale's website is hosted at Wyndham's domain, wyndhamhotels.com.

48.     When staying at Wyndham-branded hotels, including the Super 8 Alameda or Days Inn Sunnyvale, guests receive Wyndham Rewards for bookings.

49.     Wyndham exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked for sex.

50.     Wyndham exercises day-to-day control over the Super 8 Alameda and Days Inn Sunnyvale, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including the Super 8 Alameda and Days Inn Sunnyvale, through its brand standards and retains control over the Super 8 Alameda and Days Inn Sunnyvale through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and operating agreements.

51.     Wyndham makes decisions that directly impact the operations and maintenance of their branded hotels, including the Super 8 Alameda and Days Inn Sunnyvale.

52.     Wyndham is the principal in an agency relationship with the Super 8 Alameda and Days

Inn Sunnyvale. In addition to Wyndham's liability under TVPRA section 1595, Wyndham is vicariously liable for the acts and/or omissions of the staff at its Super 8 Alameda and Days Inn Sunnyvale hotels.

53. The Super 8 Alameda and Days Inn Sunnyvale hotels where B.M. was trafficked for sex and victimized have apparent agency for Wyndham so as to establish vicarious liability under California law, in addition to an actual agency relationship.

54. Wyndham has ratified the actions and inactions of SJ Partnership and Sundowner.

55. Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Super 8 Alameda and Days Inn Sunnyvale hotels where B.M. was trafficked for sex while she was a minor. Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner each share the common policies and practices complained of herein.

56. Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

57. As hotel operation venture participants, Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner are separately and jointly responsible for compliance with all applicable laws, including the TVPRA.

58. As hotel operation venture participants, Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner are jointly and severally liable for any damages caused by their employees.

59. At all relevant times, the SJ Partnership owned, managed, supervised, and/or operated the Super 8 Alameda through Wyndham's brand standards, franchise disclosure documents, and franchise agreement. Because Wyndham operated the Super 8 Alameda where B.M. was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals B.M. was victimized

in.

60.     At all relevant times, Sundowner owned, managed, supervised, and/or operated the Days Inn Sunnyvale through Wyndham's brand standards, franchise disclosure documents, and franchise agreement. Because Wyndham operated the Days Inn Sunnyvale where B.M. was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals B.M. was victimized in.

61.     Wyndham, Super 8 Motels, and the SJ Partnership participated in a hotel operating venture in connection with the management and operation of the Super 8 Alameda involving risk and potential profit.

62.     Wyndham, Days Inn Worldwide, and Sundowner participated in a hotel operating venture in connection with the management and operation of the Days Inn Sunnyvale involving risk and potential benefit.

### Defendants Choice, Panchal Trust, and Maganson Participated in a Hotel Operating Venture

63.     Defendant Choice participated in a hotel operating venture that included Defendants Panchal Trust and Maganson. The venture also included hotel staff and employees at the Clarion Inn hotel, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Clarion Inn hotel where B.M. was trafficked.

64.     Defendants Panchal Trust and Maganson owned the Clarion Inn by Choice located at 3200 Monterey Road, San Jose, California 95111 ("Clarion Inn") while B.M. was trafficked and operated the hotel pursuant to the franchise agreements and licensing agreements they entered into with Defendant Choice. At all times, Defendants were subject to strict brand standards which were mandated by Defendant Choice.

65.     Choice was in a hotel operating venture with the Panchal Trust and Maganson offering public lodging services in the Clarion Inn. This relationship was established through Defendant

Choice's exercise of an ongoing and systemic right of control over the Clarion Inn hotel by Defendant Choice's operations, including the means and methods of how Clarion Inn hotel conducted daily business through one or more of the following actions:

    a.    providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with Choice;

    b.    providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

    c.    providing new hire orientation on human rights and corporate responsibility;

    d.    providing mandatory and voluntary training and education to Clarion Inn® branded hotels through webinars, seminars, conferences, and online portals;

    e.    providing and controlling customer review and response platforms;

    f.     hosting online bookings on Defendant Choice's domain;

    g.    requiring Clarion Inn® branded hotels to use Defendant Choice's customer rewards program;

    h.    requiring Clarion Inn® branded hotels to use Defendant Choice's property management software;

    i.    requiring Clarion Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

    j.    providing IT support for all property management systems, owned, operated and required by Choice;

    k.    setting employee wages;

    l.    making employment decisions;

    m.    advertising for employment;

    n.    sharing profits;

    o.    requiring Clarion Inn® branded hotels to use Defendant Choice's property management software;

    p.    requiring Clarion Inn® branded hotels to use approved vendors for internet

services or other requirements for Wi-Fi access and filtering;

q.    providing IT support for all property management systems, owned, operated and required by Choice;

r.    standardized training methods for employees;

s.    building and maintaining the facility in a manner specified by the owner;

t.    standardized or strict rules of operation;

u.    regular inspection of the facility and operation by owner;

v.    fixing prices; or

w.    other actions that deprive Clarion Inn® branded hotels of independence in business operations.

66.    Defendant Choice held out Clarion Inn® branded hotels to the public as possessing authority to act on its behalf. Defendant Choice clothed the Clarion Inn hotel with apparent authority to act for Defendant Choice in the following ways: by requiring the use of Choice signs, providing Choice branded stationery, requiring the use of Choice's website and Choice's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Choice guest rewards programs. On information and belief, Defendant Choice's conduct reasonably led B.M.'s perpetrator(s) to believe that the Clarion Inn hotel had the authority it purported to have, and B.M. was injured as a result.

67.    As the principal and as a hotel operator, Choice controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Clarion Inn hotel where B.M. was trafficked.

68.    Clarion Inn hotel's website is hosted at Choice's domain, www.choicehotels.com.

69.    When staying at Choice branded hotels, guests receive Choice Privileges® (Choice rewards) for bookings.

70.    Defendant Choice exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Clarion Inn hotel where B.M. was trafficked for sex.

71.    Defendant Choice exercises day-to-day control over the Clarion Inn hotel, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including the Clarion Inn hotel, through its brand standards and retains control over the Clarion Inn hotel through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and operating agreements.

72.    Choice makes decisions that directly impact the operations and maintenance of their branded hotels, including the Clarion Inn hotel.

73.    Choice is the principal in an agency relationship with the Clarion Inn hotel.  In addition to Choice's liability under TVPRA section 1595, Choice is vicariously liable for the acts and/or omissions of the staff at its Clarion Inn hotel.

74.    The Clarion Inn hotel where B.M. was trafficked has apparent agency for Choice so as to establish vicarious liability under California law, in addition to an actual agency relationship.

75.    Defendant Choice has ratified the actions and inactions of the Panchal Trust and Maganson.

76.    Defendants Choice, Maganson, and the Panchal Trust are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Clarion Inn hotel where B.M. was trafficked for sex. Defendants Choice, Maganson, and the Panchal Trust each share the common policies and practices complained of herein.

77.    Defendants Choice, Maganson, and the Panchal Trust jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

78.    As hotel operating venture participants, Defendants Choice, Maganson, and the Panchal Trust are separately and jointly responsible for compliance with all applicable laws.

79.    As hotel operating venture participants, Defendants Choice, Maganson, and the Panchal Trust are jointly and severally liable for any damages caused by their employees.

80.    At all relevant times, the Panchal Trust and Maganson owned, managed, supervised, and/or operated the Clarion Inn hotel through Choice's brand standards, franchise disclosure documents, and franchise agreement. Because Choice operated the Clarion Inn hotel where B.M. was

trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals B.M. was victimized in.

81.    Defendants Choice, Maganson, and the Panchal Trust participated in a hotel operating venture in connection with the management and operating of the Clarion Inn hotel involving risk and potential profit.

### Defendants BWI and Lanai Garden
### Participated in a Hotel Operating Venture

82.    Defendant BWI participated in a hotel operating venture that included Defendant Lanai Garden. The venture also included hotel staff and employees at the Best Western Lanai Garden, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Best Western Lanai Garden where B.M. was trafficked.

83.    Defendant Lanai Garden Corporation ("Lanai") owned the Best Western Lanai Garden located at 1575 Tully Road, San Jose, California 95122 ("BW Lanai Garden") while B.M. was trafficked and operated the hotel pursuant to a membership agreement it entered into with Defendant BWI. At all times, Lanai was subject to strict brand standards which were mandated by Defendant BWI.

84.    Defendant BWI was in a hotel operating venture with Lanai and the BW Lanai Garden offering public lodging services in the hotel. This relationship was established through Defendant BWI's exercise of an ongoing and systemic right of control over Lanai's operation of the BW Lanai Garden, including the means and methods of how Best Western branded hotels conducted daily business through the following actions:

        a.    requiring the software, hardware, and platforms where suspicious activity or other concerns should be addressed with BWI;

b.      providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

c.      providing new hire orientation on human rights and corporate responsibility;

d.      providing voluntary and mandatory training and education to branded hotels through webinars, seminars, conferences, and online portals;

e.      providing and controlling customer review and response platforms;

f.      hosting online bookings on Defendant BWI's domain;

g.      requiring Best Western branded hotels to use Defendant BWI's customer rewards program;

h.      requiring Best Western branded hotels to use Defendant BWI's property management software;

i.      requiring Best Western branded hotels to use approved vendors for internet services and mandating other requirements for Wi-Fi access and filtering;

j.      providing IT support for all property management systems, owned, operated and required by BWI;

k.      setting employee wages;

l.      making employment decisions;

m.      advertising for employment;

n.      sharing profits;

o.      providing standardized training methods for employees;

p.      building and maintaining the facility in a manner specified by BWI;

q.      retaining the ability of Defendant BWI to terminate any agreement with Best Western branded hotels if its rules and regulations are violated;

r.      conducting regular inspection of the Best Western branded hotels and operations or management by Defendant BWI;

s.      providing standardized or strict rules of operation;

t.      conducting regular inspection of the facility and operation by owner;

u.      fixing prices; or

v.      engaging in other actions that deprive Best Western branded hotels of independence in business operations.

85.    Defendant BWI holds out Best Western branded hotels to the public as possessing authority to act on its behalf.

86.    BW Lanai Garden's website is hosted at BWI's domain, www.bestwestern.com.

87.    When staying at Best Western branded hotels, guests receive Best Western Rewards for bookings.

88.    Defendant BWI exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the BW Lanai Garden where B.M. was trafficked for sex.

89.    Defendant BWI exercises day-to-day control over the BW Lanai Garden, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including BW Lanai Garden, through its brand standards and retains control over the BW Lanai Garden through its corporate structure, including its membership agreements, franchise agreements, soft brand agreements, and its Rules and Regulations.

90.    Defendant BWI does not hold itself out as a franchisor. BWI offers membership agreements in the United States under the brand, Best Western. Upon information and belief, BWI's membership agreements mandate more stringent requirements and higher standards for its branded hotels and BWI retains the right to terminate membership if any branded hotels do not meet its requirements or standards.

91.    Membership Agreement members like Lanai are given voting rights and access to the Best Western platform. Members are required to participate fully, pay monthly fees, annual dues, advertisement assessments, technology assessments, and other fees and charges or risk termination of membership. Members are required to adhere to BWI's bylaws, the terms of membership agreements, brand identity manuals, articles of incorporation, rules and regulations, and other mandates dictated by BWI.

92.    BWI makes decisions that directly impact the operations and maintenance of their branded hotels, including the BW Lanai Garden.

93.    BWI, through its members, conducts and operates business throughout the State of California and makes critical management and business decisions for the BW Lanai Garden where B.M. was trafficked. Specifically, this includes the decisions to mandate training, which prevents human trafficking, to its branded hotels.

94.    Defendant BWI maintains control over a centralized reservation system utilized by its branded properties. Upon information and belief, if any of BWI's branded properties score below a certain amount of points during BWI's inspection of the property, BWI retains the authority to restrict or remove the property's listing on the reservation system until BWI determines eligibility.

95.    Defendant BWI controls and dictates the technology that its branded hotels must use, according to their membership agreements, including but not limited to the type of internet access, internet speeds, software programs, hardware, credit card equipment, and other communication equipment. Thus, BWI has direct access to and direct knowledge of all suspicious activity and criminal activity occurring at their branded properties based on their control over their branded hotels' technology systems.

96.    Upon information and belief, BWI mandates that its branded hotels use vendors of BWI's choosing for the purchase of goods and services necessary to the running of a Brand Western branded hotel.

97.    Defendant BWI selects vendors with the goal of using BWI's collective bargaining power to secure group discounts and secure the largest possible kickback for itself.

98.    Defendant BWI controls who its branded properties may provide discounts to, including the BW Lanai Garden.

99.    Defendant BWI is the principal in an agency relationship with Lanai and the BW Lanai Garden. In addition to BWI's liability under TVPRA section 1595, BWI is vicariously liable for the acts and/or omissions of the staff at the BW Lanai Garden.

100.    Lanai and the BW Lanai Garden where B.M. was trafficked has apparent agency for

Defendant BWI so as to establish vicarious liability under California law, in addition to an actual agency relationship.

101.    Defendant BWI has ratified the actions and inactions of Lanai.

102.    Defendant BWI and Lanai are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the BW Lanai Garden where B.M. was trafficked for sex. Defendant BWI and Lanai share the common policies and practices complained of herein.

103.    Defendant BWI and Lanai jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

104.    As hotel operating venture participants, Defendant BWI and Lanai are separately and jointly responsible for compliance with all applicable laws.

105.    As hotel operating venture participants, Defendant BWI and Lanai are jointly and severally liable for any damages caused by employees.

106.    At all relevant times, Defendant BWI managed, supervised, and/or operated the BW Lanai Garden through its brand standards and membership agreement. Because BWI operated the BW Lanai Garden where B.M. was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals B.M. was victimized in.

107.    Defendant BWI and Lanai participated in a hotel operating venture in connection with the management and operating of the BW Lanai Garden involving risk and potential profit.

**Defendant Amba Participated in a Hotel Operating Venture**

108.    Defendant Amba participated in a hotel operating venture that included hotel staff and employees at the Fontaine Inn, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Fontaine Inn where B.M. was trafficked for sex while she was a minor.

109. Defendant Amba, LLC ("Amba") owned and operated the Fontaine Inn located at 2460 Fontaine Road, San Jose, CA 95121 ("Fontaine Inn") while B.M. was trafficked.

110. Defendant Amba was in an agency relationship with employees at the Fontaine Inn offering public lodging services in the hotel. This agency relationship was established through Amba's exercise of an ongoing and systemic right of control over the operation of the Fontaine Inn, including the means and methods of how the hotel conducted daily business through the following actions:

    a.    requiring the software, hardware, and platforms where suspicious activity or other concerns should be addressed with Amba;

    b.    providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    c.    providing new hire orientation on human rights and corporate responsibility;

    d.    providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

    e.    providing and controlling customer review and response platforms;

    f.    setting employee wages;

    g.    making employment decisions;

    h.    advertising for employment;

    i.    sharing profits;

    j.    providing standardized training methods for employees;

    k.    building and maintaining the facility in a manner specified by Amba;

    l.    providing standardized or strict rules of operation;

    m.    conducting regular inspection of the facility and operation by owner;

    n.    fixing prices.

111. An apparent agency also exists between Defendant Amba and the employees at the Fontaine Inn. Defendant Amba holds out the employees at the Fontaine Inn to the public as possessing authority to act on its behalf.

112. Defendant Amba exercises control over business operations, management, supervision,

administration, and procedures of the Fontaine Inn where B.M. was trafficked for sex.

113.   Amba exercises day-to-day control over the Fontaine Inn, as well its lax policies and procedures with respect to the prevention of sex trafficking at the Fontaine Inn and retains control over the Fontaine Inn.

114.   Amba makes decisions that directly impact the operations and maintenance of the Fontaine Inn.

115.   Amba, through its employees, conducts and operates business in the State of California and makes critical management and business decisions for the Fontaine Inn where B.M. was trafficked.  Specifically, this includes the decisions to mandate training, which prevents human trafficking, to its hotel.

116.   Defendant Amba controls and dictates the technology that Fontaine Inn must use, including but not limited to the type of internet access, internet speeds, software programs, hardware, credit card equipment, and other communication equipment. Thus, Amba has direct access to and direct knowledge of all suspicious activity and criminal activity occurring at its hotel based on its control over their hotel's technology system.

117.   Amba is responsible for compliance with all applicable laws.

118.   Amba is jointly and severally liable for any damages caused by its employees.

119.   At all relevant times, Amba was involved in the staffing and operation of the Fontaine Inn where B.M. was trafficked for sex. Amba managed the hotel and directly offered public lodging services at the Fontaine Inn where B.M. was trafficked for sex.

120.    As a hotel owner, Amba participated in a hotel operating venture that included hotel staff and employees who were closely involved with the daily management and operations of the hotel.

121.   At all relevant times, Defendant Amba managed, supervised, and/or operated the Fontaine Inn. Because Amba operated the Fontaine Inn where B.M. was trafficked and was responsible for its management, supervision, and day-to-day operations, Amba knowingly benefited or received something of value from its participation in a hotel business venture which it knew or should have known facilitated sex trafficking through the room rentals B.M. was victimized in.

122.    Defendant Amba participated in a hotel operating venture in connection with the management and operating of the Fontaine Inn involving risk and potential profit.

## B.  KNEW OR SHOULD HAVE KNOWN

### All Defendants Knew or Should Have Known
### Their Hotel Business Ventures Violated the TVPRA

123.    The hospitality industry plays a crucial role in the sex trade.[6] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer, and profit from, anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

124.    According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[7] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

125.    Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

126.    Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.*, those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[8]

127.    The problem is industry wide. In the United States, as much as 63% of all trafficking

---

[6] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[7] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

[8] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

incidents happen in hotels ranging from luxury to economy.[9]

128.    Due to the failure of the hospitality industry to address the issue, hotels are *the* venue of choice for sex trafficking.[10] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

129.    Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has a duty to train and equip staff on how to identify, report, and prevent sexual exploitation where it is most likely to occur.[11]

130.    From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. Proper training and implementation of reasonable security and cybersecurity measures are the bare minimum necessary for hospitality companies to address regular sex trafficking occurring under their flag.

131.    Hospitality companies such as Wyndham, Choice, and Best Western can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[12]

132.    End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[13] The Code identifies the

---

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[10] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

[11] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

[12] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[13] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacancy_Report.pdf.

following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

133.    ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including: not renting by the hour, not permitting cash payments, blocking "Internet access to popular websites for online sex ads," and monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests."[14]

134.    Campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiatives as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[15] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[16]

135.    Despite the efforts of governmental and non-governmental organizations to combat human trafficking, Wyndham, Choice, and Best Western continued to lag behind in their efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[17]

---

[14] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, *available at* https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.

[15] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[16] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[17] Sarkisian, *supra* n.9.

136.     Some scholars estimate that hotels and motels account for over ninety percent (90%) of commercial exploitation of children.[18] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in hotels and motels in the United States.[19]

137.     The complicity of hospitality giants like Wyndham, Choice, and Best Western is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Hotel staff are often the only outside witnesses to the victims' abuse. But traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

138.     As the ultimate parent companies of thousands of hotels and motels worldwide, Defendants Wyndham, Choice, and Best Western have been cognizant of their role and responsibilities in the sex trafficking industry for years.

139.     In 2010, the Christian Brothers Investment Services ("CBIS") specifically informed Defendant BWI that it "lack[s] programs to deal with child sexual exploitation." CBIS' efforts were ignored as BWI deflected its responsibility to prevent human trafficking elsewhere.[20]

140.     In 2011, Wyndham Hotels trained only *some* of its employees to look for signs of trafficking.[21]

141.     In 2012, an anti-trafficking coalition alerted Defendants Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking

---

[18] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[19] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 387, *available at* https://www.state.gov/documents/organization/258876.pdf.

[20] *See* Christian Brothers Investment Services, *Final Results of the Initiative On Hotels and Human Trafficking at the World Cup*, at 2 (2010); Response of Best Western International to the appeal of Christian Brothers Investment Services to take action to prevent human trafficking in South Africa, *available at* https://www.business-humanrights.org/sites/default/files/reports-and-materials/Best-Western-response-re-CBIS-trafficking-appeal-3-June-2010.doc.

[21] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

1 policies, while urging immediate action regarding trafficking.

2     142.    Choice Hotels claims it has supported the anti-trafficking group Polaris since 2010 and

3 in a partnership with ECPAT (End Child Prostitution, Pornography and Trafficking of Children for

4 Sexual Purposes) developed a training module in 2010 for hotel management and staff.

5     143.    Reports by the Polaris Project were received and reviewed by the executives, directors

6 and managers of Wyndham, Choice, and Best Western.

7     144.    Defendants' "solution" to the problem of human trafficking is always the same—to give

8 lip service about more employee training, and to identify some red flags related to trafficking. But this

9 employee training has never really occurred *en masse*. For instance, according to the reporting in

10 ECPAT's reports, the actual number of employees trained is abysmal. Moreover, although the training

11 may provide some information in identifying trafficking, it provides no clear message on training that

12 will serve to actively address or prevent human trafficking.

13     145.    To curry more favor with the public, Defendants together, most often through state and

14 national associations like the American Hotel & Lodging Association ("AHLA")[22]—where

15 Defendants are all members[23]—advertise policies, practices, and procedures that indicate a unified

16 commitment to fighting human trafficking.[24]

17     146.    Hospitality companies such as Wyndham, Choice, and Best Western have both the power

18

19 [22] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. See American Hotel & Lodging Association, Who We Are, available at https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

20

21

22

23 [23] *See* American Hotel & Lodging Association, Our Members, *available at* https://www.ahla.com/our-members.

24 [24] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking." http:/www.ahla.com/uploadedFiles/_Common/pdf/Trafficking_Principles_Industry_Update.pdf) (note that AHLA's Industry Principles article has since been removed from its website).

25

26

27

28

and responsibility to make sex trafficking difficult for the offenders. Yet, they refuse to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate sex trafficking at their branded hotels, content to direct their efforts solely towards profit and the bottom line.

147.   Upon information and belief, between at least 2008 to 2016, Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

148.   Upon information and belief, between at least 2008 to 2016, Choice held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

149.   Upon information and belief, between at least 2008 to 2016, BWI held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

150.   Upon information and belief, between at least 2008 to 2016 all Defendants held meetings through their local or national trade organizations in which sex trafficking in their motels and hotels was discussed.

151.   Upon information and belief, between at least 2008 to 2016, emails were exchanged by employees of Defendants' respective brands that related to sex trafficking in hotels and motels, including Super 8-, Days Inn-, Clarion Inn-, and Best Western-branded hotels.

152.   Defendants' continuous failure and/or refusal to implement policies sufficient to combat a known problem such as human trafficking in their operations has risen to the level of willful blindness or negligence.[25]

### WHRI, WHG, Super 8 Motels, & Days Inn Worldwide
### (collectively, the "Wyndham Defendants")

153.   At all times that B.M. was trafficked at the Super 8 Alameda and Days Inn Sunnyvale, Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner refused or failed to require any Human Trafficking training in their franchised hotels despite knowing that trafficking was occurring in them.

154.   Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner knew or should have known that forced prostitution and trafficking was taking place well before B.M. was

---

[25] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

trafficked.

155.    Upon information and belief, between at least 2008 to 2016, Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

156.    Between at least 2008 to 2016, Wyndham knew and understood that Human Trafficking was occurring in the hospitality industry generally and in its hotels specifically, including its hotels in the Bay area.

157.    Between at least 2008 to 2016, Wyndham was assuring the public that it was "doing the right thing" by training all of its franchisees on how to identify and address human trafficking. Although Wyndham was aware that over 95% of its hotels were not taking the training, it refused to make that training mandatory. Only in 2019 did Wyndham direct that Brand Standards for its hotels contain mandatory human trafficking training for all hotels in the Wyndham portfolio.

158.    Wyndham maintains that it considers guest safety and security to be important and requires the hotels and motels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.

159.    Wyndham maintains data in server logs and internet files that could be used to help prevent human trafficking, but it refuses to use this data for the prevention of human trafficking.

160.    Wyndham had actual and/or constructive knowledge of sex trafficking, including B.M.'s sex trafficking and victimization, occurring on its branded properties via the following:

      a.    In 2008, a man was spotted outside a Super 8 motel with a minor while a federal vice task force was working a sting. In 2010, the pimp was sentenced to 12.5 years in prison for sex trafficking of a minor.[26]

      b.    In February 2010, an undercover sting resulted in three (3) arrests at the Super 8 Motel where males were hiring females for sex off of Backpage.com.

      c.    In August 2016, three people were arrested at the Super 8 Jackson Hole as a result

---

[26] *'Y2K Pimp' Gets 12 Years for Recruiting Minor on MySpace*, WIRED (Nov. 8, 2010), https://www.wired.com/2010/11/epps/.

1    of an undercover sting.[27]

2    161.    Wyndham manages, supervises, directs, and operates the Super 8 Alameda located at
3    1860 The Alameda, San Jose, California 95126 through its brand standards, franchise agreements,
4    operating agreements, and/or licensing agreements. Wyndham failed to implement and enforce any of
5    its own policy or policies and protect B.M. from being sex trafficked.

6    162.    Wyndham manages, supervises, directs, and operates the Days Inn Sunnyvale located at
7    504 Ross Drive, Sunnyvale, California 94089 through its brand standards, franchise agreements,
8    operating agreements, and/or licensing agreements. Wyndham failed to implement and enforce any of
9    its own policy or policies and protect B.M. from being sex trafficked.

10    163.    For years, Wyndham has been on notice of repeated incidences of sex trafficking
11    occurring on its Super 8- and Days Inn-branded properties, yet Wyndham has failed to take action to
12    prevent sex trafficking at Wyndham branded properties and still persists in failing to take necessary
13    action to prevent sex trafficking on its branded properties. Wyndham's inattention in this regard
14    enabled and contributed to the sex trafficking the B.M. suffered at the Super 8 Alameda and Days Inn
15    Sunnyvale.

16    164.    There are numerous examples across place and time of Wyndham's knowledge of sex
17    trafficking on its branded property and its continued, total inattention to preventing and remedying the
18    blight of human trafficking on the lives and liberties of its victims.

19    165.    Upon information and belief, Wyndham implemented means which gave it the ability to
20    monitor various guest reviews indicating prostitution, trafficking, and guest safety issues at its branded
21    hotels.

22    166.    In 2011, WHRI's predecessor entity Wyndham Worldwide Corporation, signed the
23    ECPAT Code, but as evidenced by the widespread sex trafficking which continued to occur at
24    Wyndham's branded property, Wyndham did not practice what it preached. Wyndham trained only
25    some of its employees to look for signs of trafficking. Wyndham's adoption of the Code was nothing

26
27    [27] *Prostitution bust at Super 8 Motel*, JACKSON HOLE NEWS & GUIDE (Aug. 23, 2016),
      https://www.jhnewsandguide.com/news/cops_courts/article_2eca6a4a-85e0-5bfb-950f-
28    86adcb5bbb55.html.

1  more than a strategic maneuver through which it sought a shield against liability, rather than a sword
2  against human trafficking.

3      167.    Despite Wyndham's anti-trafficking stance, Wyndham failed to implement and enforce
4  any of its own policy or policies, including with respect to the Super 8 Alameda and Days Inn
5  Sunnyvale. Wyndham knew or should have known that the Super 8 Alameda and Days Inn Sunnyvale
6  were located in areas known for sex trafficking activity, and sex trafficking and prostitution continued
7  to regularly occur on and around their branded hotel premises, including when B.M. was trafficked.
8  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded
9  hotels, Wyndham refused to take adequate measures to prevent the misconduct.

10     168.    Wyndham voluntarily assumed the responsibility to implement sufficient policies to
11 combat sex trafficking at its branded property through its partnerships with ECPAT and Polaris, and
12 its activities with the AHLA and other trade organizations. However, Wyndham failed to implement
13 its own policies and those recommended to it by the above mentioned advocacy organizations which
14 led to the inevitable consequence of continued trafficking at its branded property, including the
15 trafficking of B.M.

16     169.    Wyndham had actual and/or constructive knowledge of sex trafficking occurring on its
17 branded hotel property because Wyndham, SJ Partnership, and Sundowner knew that sex trafficking
18 and prostitution are associated, that both carry a high risk of physical and sexual violence, substance
19 abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute
20 relationship involves the use of force, fraud, and coercion. Wyndham, SJ Partnership, and Sundowner
21 allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the
22 Super 8 Alameda and Days Inn Sunnyvale. Wyndham, SJ Partnership, and Sundowner facilitated the
23 trafficking through their practices, policies, and procedures. Wyndham, SJ Partnership, and
24 Sundowner failed to take appropriate action to prevent the trafficking of individuals for sex so that
25 Wyndham, SJ Partnership, and Sundowner could continue to profit from the business that trafficking
26 brings, including business from out-of-state.

27     170.    Wyndham knew or should have known that the Super 8 Alameda and Days Inn

28

Sunnyvale were located in areas known for high incidences of crime and prone to sex trafficking activity on and around the hotel premises, including when B.M. was trafficked.

171.     Wyndham-branded hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country, including in the bay area. Rather than take timely and effective measures to prevent human trafficking, Wyndham brand hotels, and their respective parent companies, have instead refused to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

172.     Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Wyndham has repeatedly refused to stop these actions.

173.     Upon information and belief, Wyndham tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Wyndham's management and control and included all of the indicia of B.M.'s trafficking. This data included the details of B.M.'s check-in, the internet activity associated with her reservation, including Backpage.com advertisements, her location at the hotel, which included the notable fact that she rarely, if ever, left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

174.     Given Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Wyndham® branded hotels, Wyndham breached its duties in the following ways:

      a.     did not adequately distribute information to assist employees in identifying human trafficking;

      b.     failed to mandate a process for escalating human trafficking concerns within the organization;

      c.     failed to mandate managers, employees, or owners attend training related to human trafficking;

d.   failed to provide new hire orientation on human rights and corporate responsibility;

e.   failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

f.   failed to develop and hold or require ongoing training sessions on human trafficking;

g.   failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

h.   failed to evaluate universal reservation systems for suspicious booking activities;

i.   failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

j.   failed to ban cash or prepaid credit cards as payment; and

k.   failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.org, from being accessed via hotel internet service.

175.   Upon information and belief, Wyndham requires its branded hotel properties, including the Super 8 Alameda and Days Inn Sunnyvale, to use a centralized property management system, which is linked to Wyndham's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

176.   Wyndham requires its branded properties to use a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.

177.   Wyndham requires its hotels to carry a certain level of Wi-Fi internet access or security for hotel guests, through a limited number of vendors that Wyndham specifies and requires. For example, in 2016, Wyndham approved two internet vendors. In 2020, Wyndham approved six: Deep

Blue Communications, Safety NetAccess, Air2Data High Speed Wireless, ITG Networks, Allbridge, and Wyndham HCS.

178.   Upon information and belief, Wyndham requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Wyndham the ability to access and harvest that internet data.

179.   Upon information and belief, Wyndham retains and/or can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel property, including the type of monitoring described above.

180.   This access may have included branded hotels' guest information registration, including names, date of booking, and length of stay.

181.   Upon information and belief, Wyndham can therefore see unusual or suspicious bookings, for instances, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded property, or when in the case of B.M., reservations for extended stays were requested.

182.   Upon information and belief, Wyndham has the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites.

183.   Upon information and belief, Wyndham can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including B.M.'s advertisements on Backpage.com.

184.   Upon information and belief, and contrary to ECPAT best practices, Wyndham failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

185.   Upon information and belief, Wyndham has the ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the hotel where B.M. was trafficked for sex.

186.   Despite access to information comprising clear sex trafficking indicators, Wyndham continued to permit and profit from hotel guests who rented hotel rooms to buy sex, including those who bought B.M.

187.    Upon information and belief, Wyndham monitors and reviews reports of criminal activity, including through online reviews, at its branded property.

188.    Upon information and belief, Wyndham provides a platform for brand property employees to report, at their discretion, to Wyndham suspicious activity occurring at their branded hotel. Wyndham controls and houses this collective data from all branded property.

189.    Defendants Wyndham, SJ Partnership, and Sundowner have been aware of sex trafficking on Wyndham brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Wyndham-branded properties and Defendants' inattentiveness.

190.    Upon information and belief, Wyndham regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com, Travelocity, and TripAdvisor, including the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked.

a.    The Super 8 located at 31-62 14th Street Long Island City, New York 11106 received this review in October 2008: "If you are wanting to stay at a motel that promotes prostitution then this is the place for you…"[28]

b.    The Super 8 located at 1832 ½ W Lucas Street Florence, South Carolina 29501 received this review in April 2010: "…This is truly a prostitution ring. Not worth bringing your children to. You could hear women in high heels walking up and down the stairs, vehicles pulling in and out, knocking on hotel rooms upstairs and downstairs. So much activity, it's literally dangerous…"[29]

c.    In September 2012, a reviewer described the Super 8 in Manassas, Virginia as follows: "This place is a dump! I left 1 day early because of bug bites. Saw people

---

[28] Review of Super 8 by Wyndham Long Island City (Oct. 4, 2008), *available at* https://www.tripadvisor.com/ShowUserReviews-g48080-d248683-r20611520-Super_8_by_Wyndham_Long_Island_City_LGA_Hotel-Long_Island_City_Queens_New_York.html.
[29] Review of Super 8 by Wyndham Florence (Apr. 18, 2010), *available at* https://www.tripadvisor.com/ShowUserReviews-g54229-d97167-r61797195-Super_8_by_Wyndham_Florence-Florence_South_Carolina.html.

hanging out on the balcony at night. Also saw a man leave from a 1st floor room with a prostitute. So much for being family friendly."[30]

d.    In August 2016, a Yelp reviewer described the Days Inn Sunnyvale as a "RAPIST paradise! Full of drug dealers and gang people. NOT safe, stay away!!!!".

e.    The Super 8 located at 340 W Illinois Avenue I-55 Exit 12C Memphis, Tennessee 38106 received this review in August 2018: "Please don't stay here… The people in the next room had men coming in and out all night…"[31]

f.    The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in July 2012: "UNSAFE: I know prostitutes when I see them, and there were a few working the parking lot. And some dudes were really watching us closely and if they weren't gang members, they sure looked the part. I know it sounds judgmental, but that was the reality."[32]

g.    The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in October 2014: " . . . The place also smelled, had prostitutes, drug deals in the parking lot, and partyers. . . DO NOT GO HERE."[33]

h.    The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in July 2015: ". . . Not to judge people by their appearance, but I am fairly certain that there were prostitutes in the lobby at breakfast time. Again, the place

---

[30] Review of Super 8 by Wyndham Manassas (Sept. 26, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g60895-d110534-r141365522-Super_8_by_Wyndham_Manassas-Manassas_Prince_William_County_Virginia.html.

[31] Review of Super 8 by Wyndham Memphis/Dwtn/Graceland Area (Aug. 31, 2018), *available at* https://www.tripadvisor.com/ShowUserReviews-g55197-d105222-r612562242-Super_8_by_Wyndham_Memphis_Dwtn_Graceland_Area-Memphis_Tennessee.html.

[32] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (July 31, 2012), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or280-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

[33] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (Oct. 07, 2014), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or170-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

is not safe, it smells, and it is not worth your safety! DO NOT STAY HERE!"[34]

i.  In July 2017, a reviewer described their stay at the Days Inn Sunnyvale as follows: "I was harassed multiple times about my service animal while there were prostitutes running the room next to us…"

j.  In 2018, a Google reviewer described the Days Inn Sunnyvale as "Out-dated and dirty. We watched about 5 different men visit the prostitutes in the room next to us within an hour span…"

k.  In 2022, a Yelp reviewer described a stay at the Days Inn Sunnyvale as follows: "Cheap motel. I believe there is sex trafficking going in here based on conversations I heard next door to my room. I was concerned for my safety."

191.  Upon information and belief, Wyndham monitors customer reviews and complaints for all brand properties, including the Super 8 Alameda and Days Inn Sunnyvale.

192.  Upon information and belief, branded properties like the Super 8 Alameda and Days Inn Sunnyvale depend on Wyndham for notification of negative customer reviews.

193.  Upon information and belief, Wyndham, not the branded property, houses and controls the data regarding customer reviews.

194.  Wyndham has been on notice of repeated incidences of sex trafficking occurring at their brand hotels, including the Super 8 Alameda and Days Inn Sunnyvale, yet has refused to take the necessary action to meaningfully address sex trafficking and still refuses to take the necessary action to meaningfully address sex trafficking at their hotels.

195.  Upon information and belief, Defendants Wyndham, SJ Partnership, and Sundowner had actual or constructive knowledge of law enforcement in close proximity to the Super 8 Alameda and Days Inn Sunnyvale. For example:

a.  In October of 2005, 31 women were arrested when suspected brothels in South Bay were raid. Officers later determined that a number of victims may have been

---

[34] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (September, 2015), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or110-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

victims of Human Trafficking.[35]

    b.    In June of 2014, six teen prostitutes were found in San Jose after officers conducted 14 operations, arresting 54 buyers, 13 pimps, and 57 adult prostitutes as part of a nation operation to minimize sex trafficking and prostitution activities.[36]

    c.    In June of 2012, a nationwide prostitution sting netted to pimps in the San Jose area.[37]

    d.    In September of 2012, citizens in the San Jose area took to the streets to protest the ramped prostitution taking place after budget cuts disbanded the vice police unit.[38]

    e.    In October of 2013, a man was arrested for pimping and beating a woman whom he pushed into prostitution.[39]

    f.    In January of 2014, a California man from the San Jose area plead guilty for bringing minor across state lines in order to sex traffic her for money.[40]

    g.    Upon information and belief, at least six calls for service in regards to prostitution to the police were conducted at the Super 8 in 2015.

    h.    Upon information and belief, one missing person was found at the Super 8 in 2015.

    i.    Upon information and belief, at least 130 calls for service to police were conducted at the Super 8 during B.M.'s trafficking period.

196.    Despite evidence of prostitution and sex trafficking occurring for years at the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked, Wyndham has failed to meaningfully

---

[35] Prostitution Case Yields Guilty Pleas, Illegal Immigrants Worked at 10 Sites, San Jose Mercury News, Feb. 16 2006; Six teen prostitutes recued in Bay Area, The Mercury News, Jun 23, 2014

[37] Nationwide Prostitution Sting Results In Bay Area Arrests, CBS Bay Area, Jun. 25, 2012
[38] San Jose Marches Against Prostitution, NBC Bay Area, Sept 27, 2012
[39] San Jose man pushed unemployed woman into prostitution, The Mercury News, Oct. 15, 2013
[40] Californian Pleads Guilty to Bringing Minor to Las Vegas for Prostitution, Las Vegas Nyheter, Jan. 29, 2014

1    address it and escort ads continue to advertise these locations for commercial sex.[41]

2        197.    Thus, for years, Wyndham has demonstrated actual and/or constructive knowledge of the

3    rampant culture of sex trafficking which tragically occurs on its Wyndham® branded property

4    throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex

5    trafficking facilitated the sex trafficking of B.M. at the Super 8 Alameda and Days Inn Sunnyvale that

6    forms the basis of this complaint.

7                    **Choice Hotels International, Inc. ("Choice")**

8        198.    At all times that B.M. was trafficked at the Clarion Inn hotel, Defendants refused or failed

9    to require any Human Trafficking training despite knowing that trafficking was occurring.

10       199.    Defendants Choice, Maganson, and the Panchal Trust knew or should have known that

11   forced prostitution and trafficking was taking place well before B.M. was trafficked.

12       200.    Upon information and belief, between at least 2008 to 2016 Choice held meetings

13   through their trade organizations in which sex trafficking in their hotels was discussed.

14       201.    Upon information and belief, during at least 2008 to 2016, emails were exchanged by

15   employees of Choice that related to sex trafficking in hotels, including Maganson and the Panchal

16   Trust's Clarion Inn hotel.

17       202.    Choice represents that it considers guest safety and security important and requires the

18   brand hotels in its portfolio to comply with Choice brand standards and all local, state, and federal

19   laws.

20       203.    Defendant Choice maintains data in server logs and internet files that could be used to

21   help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

22       204.    Even though Defendant Choice has sought and received publicity for its purported anti-

23   human trafficking measures, Defendant Choice could have accessed data and databases, including

24   

25   [41] *See* Escort Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (Jan.
     12, 2020) *available at* https://escortfish.ch/ad/view/cumm-whore-incall-in-san-jose/26013198; Escort
26   Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (May 12, 2020)
     available at https://escortfish.ch/ad/view/linda24/28072570;  Escort Advertisement listing location
27   Super 8 by Wyndham Hotel Rose Garden San Jose (July 02, 2020) *available at*
     https://us.escortsaffair.com/sanjose/detail/5efec34316327377085a4462.
28

from data from The Polaris Project, that demonstrated the prevalence of human trafficking at Choice-branded hotels and in the hospitality industry generally. Despite the availability of such data and information, Defendant Choice ignored or turned a blind eye to the growing body of information regarding the prevalence of human trafficking at Choice brand hotels and in the hospitality industry generally and continued to profit from the human trafficking occurring at Choice brand hotels.

205.    In the instance of B.M., had staff at the Clarion Inn been properly trained, many of the human trafficking red flags and indicators would have been recognized and reported. But Defendant Choice chose not to invest the time to implement and execute the anti-trafficking program amongst its branded hotels. Instead, the only steps Choice took were to advertise to the public that they had implemented human trafficking policies. Defendant Choice breached its duties and did not implement or enforce anti-human trafficking policies that could have saved B.M. from continuously being sex trafficked at its branded hotels.

206.    Despite knowledge of the problem of sex trafficking in its hotels, Defendant Choice did not require that employees participate in training to prevent sex trafficking and only "recommended" this training to new employees during the time the B.M. was victimized.[42]

207.    Defendant Choice had actual and/or constructive knowledge of sex trafficking, including B.M.'s sex trafficking and victimization, occurring on its branded property via the following:

a.    Defendant Choice supervises, manages, or operates the Clarion Inn hotel located at 3200 Monterey Road, Santa Clara, California through its brand standards, franchise agreements, operating agreements, and/or licensing agreements. Choice failed to implement and enforce any of its own policy or policies and protect B.M. from being sex trafficked.

b.    Defendant Choice voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations.

---

[42] *Belinda Luscombe*, Time.com, *How To Spot A Human Trafficking Victim At A Hotel* (Oct. 28, 2014), http://time.com/3525640/sex-trafficking-victim-prostitution-hotel/.

However, Choice failed to implement its own policies and those recommended to it by the above-mentioned advocacy organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of B.M.[43]

c.  Upon information and belief, Choice implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d.  Defendant Choice had actual and/or constructive knowledge of sex trafficking occurring on its branded hotel properties because Choice, Maganson, and the Panchal Trust knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Choice, Maganson, and the Panchal Trust allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Clarion Inn hotel. Choice, Maganson, and the Panchal Trust facilitated the trafficking through its practices, policies, and procedures. Choice, Maganson, and the Panchal Trust failed to take appropriate action to prevent the trafficking of individuals for sex so that Choice, Maganson, and the Panchal Trust could continue to profit from the business that trafficking brings, including business from out-of-state.

e.  Choice knew or should have known that the Clarion Inn hotel where B.M. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when B.M. was trafficked.

f.  Choice brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their

---

[43] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

properties throughout the country. Rather than take timely and effective measures to prevent human trafficking, Choice brand hotels, and their respective parent companies, have instead failed to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

g.    Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Choice has repeatedly ignored these actions.

h.    Upon information and belief, Defendant Choice could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Choice's management and control and included all of the indicia of B.M.'s trafficking. This data included the details of B.M.'s check-in, the internet activity associated with her reservation, including access to Backpage.com to post advertisements from the hotel, access to other online websites known for sexual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

208.   Given Defendant Choice's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including the Clarion Inn, Defendant Choice breached its duties in the following ways:

a.    did not adequately distribute information to assist employees in identifying human trafficking;

b.    failed to mandate a process for escalating human trafficking concerns within the

organization;

    c.    failed to mandate managers, employees, or owners attend training related to human trafficking;

    d.    failed to provide new hire orientation on human rights and corporate responsibility;

    e.    failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f.    failed to develop and hold or require ongoing training sessions on human trafficking; or

    g.    failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

    h.    failed to evaluate universal reservation systems for suspicious booking activities;

    i.    failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

    j.    failed to ban cash or prepaid credit cards as payment; and

    k.    failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.org, from being accessed via hotel internet service.

209.    Upon information and belief, Defendant Choice requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Choice specifies and requires.[44]

210.    Upon information and belief, Defendant Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Choice access to the internet data.

---

[44] *See* https://web.archive.org/web/20200427221712/https://thepointsguy.com/2014/11/free-hotel-wifi-how-to-get-online-while-youre-on-property/ (Choice Hotels has stringent requirements for its preferred vendors).

211.    Defendant Choice states in its privacy policy that it collects the following categories of information from hotel guests: contact information such as name, gender, postal address, telephone number, email address; financial information such as credit and debit card number or other payment data; date and place of birth; membership or loyalty program data; social media account IDs, profile photos or data made available by linking social media and loyalty accounts; biometric data; images and video and audio data via security cameras in public areas and body-worn cameras carried by loss prevention officers and other security personnel; and other technological data including a customer's browser or device, data collected when downloading or using an app; cookies that collect data such as time spent on online services, pages visited, and IP addresses.[45]

212.    Defendant Choice retains and can view internet access, which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

213.    Choice's centralized property management system also gains Choice access to Choice hotel guest information and registration information, including names, date of booking, and length of stay.

214.    Defendant Choice Hotels states in its privacy policy that it maintains a centralized reservation system, which collects contact and credit card information from customers, and collects other information from customers, including: geo-location data, "name, address, telephone number, e-mail address, room preference, credit card details, day and month of your birth date," and internet usage data, "which may include your browser type and operating system, the various Choice web pages you view, Internet Protocol addresses, unique device identifiers, and sites visited before viewing our websites."[46]

215.    Defendant Choice Hotels requires its hotels use a limited number of qualified vendors to

---

[45] *See* Choice Hotels Privacy Policy, *available at* https://www.choicehotels.com/legal/privacy-policy
[46] *See* Choice Hotels Privacy Policy, *available at* https://www.choicehotels.com/legal/privacy-policy.

purchase certain services.[47]

216.    Defendant Choice Hotels collects this data from sources including the consumers themselves, social networks, and Choice Hotels properties (whether franchised or not), and may disclose it to assist with law enforcement or other investigations.[48]

217.    Upon information and belief, Defendant Choice Hotels requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Choice Hotels specifies and requires.[49]

218.    In 2015, Defendant Choice approved Blueprint RF as a qualified internet service provider for its branded properties.[50]

219.    Upon information and belief, Defendant Choice can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

220.    Upon information and belief, Defendant Choice has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[51]

221.    Upon information and belief, Defendant Choice can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including B.M.'s advertisements on Backpage.com.

---

[47] *See* https://web.archive.org/web/20200427221712/https://thepointsguy.com/2014/11/free-hotel-wifi-how-to-get-online-while-youre-on-property/ (Choice Hotels has stringent requirements for its preferred vendors).

[48] *See* Choice Hotels Privacy Policy, *available at* https://www.choicehotels.com/legal/privacy-policy, last accessed August 26, 2020.

[49] *See* https://web.archive.org/web/20200427221712/https://thepointsguy.com/2014/11/free-hotel-wifi-how-to-get-online-while-youre-on-property/

[50] *See* https://web.archive.org/web/20200427224123/https://www.hospitalityupgrade.com/_news/NewsArticles/Blueprint-RF-Named-a-Choice-Hotels-Preferred-Vendor.asp/

[51] *See* Slideshow from Liveport in 2011, showing dashboard of Access Logs, with quote "we monitor your network" *available at* https://web.archive.org/web/20200428003032/https://www.slideshare.net/Liveport/2011-liveport-choice-hotels-international-convention-slideshow.

222.     Upon information and belief, and contrary to ECPAT best practices, Defendant Choice failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

223.     Upon information and belief, Defendant Choice's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Clarion Inn hotel where B.M. was trafficked for sex.

224.     Despite access to information comprising clear sex trafficking indicators, Defendant Choice continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought B.M.

225.     Upon information and belief, Defendant Choice monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

226.     Upon information and belief, Defendant Choice provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Choice controls and houses this collective data from all branded properties.

227.     For years, Defendant Choice has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Clarion Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of B.M. at the Clarion Inn hotel that forms the basis of this complaint. For example:

> a.     In June of 2007, a reviewer on Travelocity.com described their stay at the Clarion Inn in San Jose, California as follows: "Hotel is in a questionable area of town - we observed a number of ""working girls"" amidst the numerous liquor stores and nightclubs."[52]

> b.     In August of 2017, a reviewer on Facebook.com described a stay at the Clarion Inn in San Jose, California as follows: "The surrounding area has constant traffic

---

[52] Review of Clarion Inn Silicon Valley (June 27, 2007), *available at* https://www.travelocity.com/San-Jose-Hotels-Clarion-Inn-Silicon-Valley.h7176.Hotel-Information.

from prostitutes and druggies."[53]

c. The Clarion Inn in San Jose, California received this review in April 2019: "Ive stayed a few times even though the hotel isn't in a good neighborhood. There's homeless and street  walkers that walk up and down at night . . ."[54]

228. Additionally, Defendant Choice has been aware of sex trafficking and guest safety issues on Clarion Inn® and other Choice-branded properties through publicly available websites such as www.tripadvisor.com, www.expedia.com, and www.booking.com. Online reviews show the pervasiveness of customer reported sex trafficking and guest safety issues on Clarion Inn® and general Choice branded properties and Defendant Choice's inattentiveness, for example:

a. In May 2014, the City of Sacramento closed a Clarion Inn in order to remove a threat to public safety, which included criminal activity such as human trafficking.[55]

b. In October 2014, a human trafficking case made its way through the Knox County judicial system after undercover detectives responded to a Backpage ad and made arrangements to meet a prostitute at the Clarion Inn.[56]

c. In June 2015, two men were charged with sex trafficking after allegedly forcing a teenage girl into prostitution after responding to an advertisement and meeting the young girl at the Clarion hotel in Queens, New York.[57]

229. Upon information and belief, Defendant Choice regularly reviews and monitors customer

---

[53] Review of Clarion Inn Silicon Valley (August 1, 2017), *available at* https://www.facebook.com/pg/Clarion-Inn-Silicon-Valley-635660233171453/reviews/?referrer=page_recommendations_see_all&ref=page_internal.
[54] Review of Clarion Inn Silicon Valley (April 1, 2019), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d82208-Reviews-Clarion_Inn_Silicon_Valley-San_Jose_California.html.
[55] Bill Lindelof, *Sacramento hotel closed after complaints of drugs, prostitution, robbery*, THE SACRAMENTO BEE (May 2015), https://www.sacbee.com/news/business/article20180466.html.
[56] Jamie Satterfield, *Sex trafficking case sent to Knox County grand jury*, KNOXVILLE NEWS SENTINEL (Oct. 2014), http://archive.knoxnews.com/news/crime-courts/sex-trafficking-case-sent-to-knox-county-grand-jury-ep-701240457-354070691.html/.
[57] Jackie Strawbridge, *Cuffed Brooklyn Men Allegedly Pimped at LIC Hotel*, LICpost.com (Jun. 2015), https://licpost.com/cuffed-brooklyn-men-allegedly-pimped-at-lic-hotel.

reviews of its properties posted on various online review websites such as yelp.com, Travelocity, and TripAdvisor, including the Clarion Inn hotel where B.M. was trafficked.

230.    Upon information and belief, Defendant Choice monitors customer reviews and complaints for all brand properties, including the Clarion Inn hotel.

231.    Upon information and belief, the branded properties like Clarion Inn hotel depend on Defendant Choice for notification of negative customer reviews.

232.    Upon information and belief, Defendant Choice, not the branded properties, house and control the data regarding customer reviews.

233.    Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

234.    Upon information and belief, Defendants Choice, Maganson, and the Panchal Trust had actual or constructive knowledge of law enforcement activity in close proximity to the Clarion Inn hotel.

235.    Upon information and belief, over 30 calls for service to police took place at the Clarion Inn during B.M.'s trafficking period.

236.    Upon information and belief, Defendants Choice, Maganson, and the Panchal Trust had actual or constructive knowledge of law enforcement activity at the Clarion Inn hotel reporting sexual battery, drug dealing and other illicit activities occurring at the hotel. For example:

> a.    In April of 2012, a woman was arrested after being accused of assaulting her mother at the Defendants' Clarion Inn hotel.[58]

> b.    Upon information and belief, over 100 calls for service were made in 2012 at Defendants' Clarion Inn hotel, including seventeen investigations.

237.    The above is just a mere sampling of information that Plaintiff was able to presently find in the public domain. Plaintiff contends there will be more information of this nature but will only be

---

[58] Domestic Violence Arrest, The Naples Daily, Apr. 2,2012, at pg. 8.

accessible during discovery.

**Best Western International, Inc. ("BWI")**

238.    At all times that B.M. was trafficked at the BW Lanai Garden, Defendants BWI and Lanai refused or failed to require any Human Trafficking training despite knowing that trafficking was occurring.

239.    Defendant BWI and Lanai knew or should have known that forced prostitution and trafficking was taking place well before Plaintiff was trafficked.

240.    Upon information and belief, between at least 2014 to 2016, Defendant BWI held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

241.    Upon information and belief, during at least 2014 to 2016, emails were exchanged by employees of Defendant BWI that related to sex trafficking in hotels, including Defendant BWI's branded hotels.

242.    Upon information and belief, between at least 2014 to 2016, Defendant BWI and Lanai held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

243.    Defendant BWI maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with BWI brand standards and all local, state, and federal laws.

244.    Defendant BWI maintains data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

245.    Defendant BWI had actual and/or constructive knowledge of sex trafficking, including B.M.'s sex trafficking and victimization, occurring on its branded property via the following:

246.    Defendant BWI supervises, directs, and operates the BW Lanai Garden located at 1575 Tully Road, San Jose, California 95122. BWI failed to implement and enforce any of its own policy or policies and protect B.M. from being sex trafficked.

247.    Defendant BWI had actual knowledge of sex trafficking occurring on its branded hotel property because BWI and Lanai knew that sex trafficking and prostitution are associated with a high

risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and Lanai allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the BW Lanai Garden. BWI and Lanai facilitated the trafficking through its practices, policies, and procedures. Lanai failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and Lanai could continue to profit from the business that trafficking brings, including business from out-of-state.

248.    Defendant BWI had constructive knowledge of sex trafficking occurring on its branded hotel properties because BWI and Lanai knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and Lanai allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the BW Lanai Garden. BWI and Lanai facilitated the trafficking through its practices, policies, and procedures. BWI and Lanai failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and Lanai could continue to profit from the business that trafficking brings, including business from out-of-state.

249.    BWI knew or should have known that the BW Lanai Garden where B.M. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when B.M. was trafficked.

250.    Best Western brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country. Rather than take timely and effective measures to prevent human trafficking, Best Western brand hotels, and their respective parent companies, have instead failed to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

251.    Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant BWI has repeatedly ignored these actions.

252.    Given Defendant BWI's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including BW Lanai Garden, Defendant BWI breached its duties in the following ways:

   a.   did not adequately distribute information to assist employees in identifying human trafficking;

   b.   failed to mandate a process for escalating human trafficking concerns within the organization;

   c.   failed to mandate managers, employees, or owners attend training related to human trafficking;

   d.   failed to provide new hire orientation on human rights and corporate responsibility;

   e.   failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

   f.   failed to develop and hold or require ongoing training sessions on human trafficking;

   g.   failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

   h.   failed to evaluate universal reservation systems for suspicious booking activities;

   i.   failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

   j.   failed to ban cash or prepaid credit cards as payment; and

   k.   failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

253.    For years, Defendant BWI has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Best Western® branded properties

throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of B.M. at the BW Lanai Garden that forms the basis of this complaint.

      a.    In July 2007, a manager of two Best Western hotels publicly announced that they had banned "prostitution related activities" on their premises, which included training employees how to identify prostitution and denying entry to suspected prostitutes and their clients.

      b.    In October 2007, a Best Western construction in the middle of an industrial area raised concerns from the local community about the hotel becoming a den of prostitution. Community board members and residents requested the hotel's owner to answer all of their questions about the site and provide details about the rooms, management, parking, and security. The building of hotels in industrial areas had become such a problem that the Borough President had called for a moratorium on such facilities in industrial areas.

      c.    In October 2008, two women were arrested on drug charges in a prostitution sting and eight men were arrested for soliciting sex at the Best Western Hotel in Rockland.

      d.    In December of 2013, authorities caught a man trafficking women from his jail cell. The man would post online advertisements of the girls and send them to service clients at the Best Western in Rockville, Maryland.

      e.    In October of 2017, a man plead guilty to trafficking a 16-year-old girl out of a Best Western in Arlington, Virginia. The man trafficked the minor through numerous states, posted advertisements of her online, and took all of the profit.

254.    Defendant BWI and Lanai have been aware of sex trafficking on Best Western brand properties through publicly available websites such as www.tripadvisor.com. Both Defendant BWI and Lanai have responded to a number of online reviews. Online reviews show the pervasiveness of customer reported sex trafficking on Best Western brand properties, including the BW Lanai Garden,

and Defendants' inattentiveness, for example:

a.   In January of 2013, a reviewer described the Best Western in Galveston, Texas as follows: "There was criminal activity in the parking lot - prostitutes and our car was broken in to and the gas and gas cap were actually stolen!"

b.   Regarding a March 2016 stay at a Best Western Executive Inn in Seagoville, Texas, a customer wrote: "…At night there was a pimp and prostitute argument and the front desk allowed this to happen. Very loud until early in the morning. The front desk allows prostitution at night. Told the morning shift about it they didn't care…"

c.   Regarding a 2014 stay at Best Western Inn Bonita Springs, located at 27991 Oakland Drive, Bonita Springs, Florida, a customer wrote: "Hotel is located at the front of a very shady trailer park. I had someone steal a tire off my truck leaving it on a block. The hotel staff was absolutely in no way any help. Told me they have no cameras outside despite there being some clearly visible on the building."

d.   Regarding a 2014 stay at Best Western Naples Plaza, located at 6400 Dudley Drive, Naples, Florida, a customer wrote: "WARNING: Do not stay here!! Booked hotel online only to be hold they could not take my reservation!!! Dangerous area with druggies and prostitutes lurking about!! I warned you"

e.   Regarding a December 2011 stay at Defendants' hotel, Best Western Naples Plaza, located at 6400 Dudley Drive, Naples, Florida, a customer wrote: ". . . Loud kids running up and down the halls though and a condom in the elevator !"

f.   Regarding a September 2019 stay at Defendants' hotel, Best Western Naples Plaza, located at 6400 Dudley Drive, Naples, Florida, a customer wrote: ". . . When we arrived, this Best Western was full of drug addicts, clearly on drugs, a drug dealer was escorted off the property and taken to his car in the parking lot that was getting search for drugs by three cops. . . There were more policemen

and multiple cop cars parked all over the property. There were men in their twenties, covered in tattoos, standing with their arms crossed in the lobby at the entry of the only functional elevator staring at people as they entered, almost taking inventory of what we were bringing into the hotel. It made me feel very unsafe - like I was going to be robbed, or worse, later in the evening. . ."

g.   Regarding an October 2015 stay at Best Western Inn Naples Plaza, located at 6400 Dudley Drive, Naples, Florida, a customer wrote: "Do not pay attention to the false reviews posted here. Do not go anywhere near this hotel. It's been under construction for years and is still uninhabitable. You are warned not to answer your phone by the front desk due to the high level of scammers. If you do answer the phone it is for the drug dealer who just left the room in a hurry.. There is a reason this hotel is so inexpensive. Please be smarter with your life and your money."

255.    Upon information and belief, Defendant BWI regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com, Travelocity, and TripAdvisor, including the BW Lanai Garden where B.M. was trafficked.

256.    Upon information and belief, Defendant BWI monitors customer reviews and complaints for all brand properties, including the BW Lanai Garden.

257.    Upon information and belief, branded properties like the BW Lanai Garden depend on Defendant BWI for notification of negative customer reviews.

258.    Upon information and belief, Defendant BWI, not the branded properties, houses and controls the data regarding customer reviews.

259.    Defendant BWI has been on notice of repeated incidences of sex trafficking occurring at its branded hotels, including the BW Lanai Garden, yet has refused to take the necessary action to meaningfully address sex trafficking and still refuses to take the necessary action to meaningfully address sex trafficking at their hotels.

260.    Several courts have found failure to implement policies sufficient to combat a known

problem in one's operations can rise to the level of willful blindness or negligence.

261.    Upon information and belief, Defendant BWI and Lanai had actual or constructive knowledge of law enforcement in close proximity to the BW Lanai Garden.

262.    Upon information and belief, Defendant BWI and Lanai had actual or constructive knowledge of law enforcement activity at the BW Lanai Garden reporting sexual battery, drug dealing and other illicit activities occurring at the hotel.

263.    The above is just a mere sampling of information that Plaintiff was able to presently find in the public domain. Plaintiff contends there will be more information of this nature but will only be accessible during discovery.

**Defendants Knew or Should Have Known that**
**Their Business Ventures Facilitated the Sex Trafficking of B.M.**

**THE SEX TRAFFICKING OF B.M. AT THE SUPER 8 ALAMEDA**

264.    In approximately 2014 and 2015, when B.M. was just 16 and 17, she was sold for sex by her traffickers at the Super 8 Alameda, located at 1860 The Alameda, San Jose, CA.

265.    Over the course of two years, B.M.'s traffickers rented adjoining rooms at the Super 8. B.M. was one of up to 10-15 girls that were being simultaneously trafficked in these rooms. Each girl, including minor B.M., would be forced to perform commercial sex acts with up to 10-15 men a day.

266.    While at the Super 8 Alameda, the trafficker would force drugs such as methamphetamine and cocaine on B.M. and the other victims in order to keep them awake for days at a time to continue "working", making money, and to lose weight.

267.    The trafficker withheld food and used drugs and sleep deprivation as methods of coercion and control. The trafficker set quotas for his victims, including B.M., and would punish them if they didn't meet those quotas. The trafficker would hold "team meetings" to intimidate his victims and would beat them in front of each other to establish dominance and control. The trafficker would also display his gun to intimidate and threaten his victims.

268.    At the Super 8 Alameda, the traffickers often hung blankets and shower curtains to act as partitions in the rooms so that sex acts could be performed in the bedroom and in the living room at the same time, essentially making it possible for four girls to be performing sex acts at the same

time in the room. Accordingly, the traffic and parade of men coming in and out of the Super 8 Alameda was tremendous. Up to 10-15 customers per day for four girls equals up to 40 and 60 sex customers every day arriving at the Super 8 Alameda rooms rented by the traffickers. This incredible procession and parade of men lasted almost continuously for a two-year period.

269.    This procession of unregistered guests in and out of B.M.'s room would have been open and obvious to anyone working at the Super 8 Alameda. B.M. was a minor as were several of the other girls being trafficked at the Super 8 Alameda.

270.    The Super 8 Alameda security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor B.M. and her co-victims from occurring at the Super 8 Alameda.

271.    Upon information and belief, SJ Partnership regularly checks the Super 8 Alameda security camera recordings to keep an eye on employees and would have seen the obvious signs of sex trafficking occurring in their hotel.

272.    B.M. was raped and otherwise sexually abused hundreds and hundreds of times at the Super 8 Alameda. The entire time, she was a minor.

273.    Two or three different Super 8 Alameda employees who worked at the front desk were involved in the sex trafficking operation to the extent that they served as look-outs for police and accepted money from the trafficker in exchange for allowing him to continue his trafficking operation at the Super 8 location. The trafficker would send "stacks" of cash on a regular basis to the hotel employees as payment. Typically, one of the trafficking victims would deliver that cash.

274.    On several occasions, the trafficker would have parties at the hotel. On more than one occasion, hotel employees participated at these parties where sex was sold and drugs and alcohol were all served.

275.    Super 8 Alameda was the base of operations for B.M.'s traffickers during the time B.M. was trafficked. As the base of operations, the traffickers would upload advertisements of minor B.M. to Backpage and other sex trafficking websites while she was at the Super 8 Alameda. The upload

would take place through the hotel's Wi-Fi/server system and network. The ads, which were also child sexual abuse material (CSAM), likely revealed the Super 8 Alameda's IP address as they were routed from that location.

276. Because Backpage and some of the other websites would display the newest ads at the top of their list, the traffickers posted and reposted his victim's ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, B.M. believes the ads were reposted via the Super 8 Alameda internet network multiple times per day. Each of the victims' ads were reposted in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements and CSAM would be routed through Super 8 Alameda internet and network system per day.

277. Virtually all the ads were unmistakable commercial sex ads. They identified the neighborhood in which the Super 8 Alameda was located and they had multiple pictures of the minor B.M.in sexually-provocative positions, dressed in very skimpy lingerie and thong underwear. B.M. was an obvious minor as were many of the other minor victims.

278. Most of the photographs used were taken at the Super 8 Alameda on the bed or on the couch, which were easily identifiable as Super 8 furniture and fixtures. No effort was made to camouflage or hide these identifying features.

279. Through hotel staff and employees, SJ Partnership knew or should have known that B.M. was being trafficked for sex due to, but not limited to:

      a.    large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

      b.    payments for the rooms in cash;

      c.    B.M.'s physical appearance (young, malnourished, sleep deprived, bruised, beaten);

      d.    a continuous procession of older men entering and leaving minor B.M.'s room;

      e.    excessive requests for sheets, cleaning supplies, and room service, which the Super 8 personnel, having been paid off and part of this venture, readily complied

with these requests to provide clean linen and towels for the ones soiled with human bodily fluids; and,

f.    the personal relationship between the front desk employees and B.M.'s trafficker(s).

280.    Super 8 Alameda employees leased rooms to B.M.'s traffickers when they knew, or should have known, that her traffickers were using their room to subject B.M. to repeated sexual abuse, rape, and sexual exploitation as they forced her into sexual servitude.

## THE SEX TRAFFICKING OF B.M. AT THE DAYS INN SUNNYVALE

281.    In approximately 2014 and 2015, when B.M. was just 16 and 17, she was sold for sex by her traffickers at the Days Inn Sunnyvale, located at 504 Ross Drive, Sunnyvale, California 94089.

282.    The Days Inn Sunnyvale is known to law enforcement as being located in a high crime area where law enforcement has often encountered individuals engaging in illicit and illegal activity such as prostitution, sales of narcotics, gun possession, gang activity, and prostitution activity.

283.    The trafficker was arrested on October 6, 2015 at the Days Inn Sunnyvale parking lot for drug possession.

284.    B.M. was recovered from the Days Inn Sunnyvale on October 6, 2015.

285.    B.M.'s traffickers rented the rooms at the Days Inn Sunnyvale where she was sold for sex while she was a minor. B.M. was one of several girls that were being simultaneously trafficked in these rooms. Each girl, including minor B.M., would be forced to perform commercial sex acts with up to 10-15 men a day.

286.    While at the Days Inn Sunnyvale, the trafficker would force drugs such as methamphetamine and cocaine on B.M. and the other victims in order to keep them awake for days at a time to continue "working", making money, and to lose weight.

287.    The traffickers withheld food and used drugs and sleep deprivation as methods of coercion and control. The trafficker set quotas for his victims, including B.M., and would punish them if they didn't meet those quotas. The trafficker would hold "team meetings" to intimidate his victims and would beat them in front of each other to establish dominance and control. The trafficker would

also display his gun to intimidate and threaten his victims.

288.   At the Days Inn Sunnyvale, the traffic and parade of men coming in and out of B.M.'s room was tremendous. Up to 10-15 "clients" per day for four girls equals up to 40 and 60 "clients" every day arriving at the Days Inn Sunnyvale rented by the traffickers. Hotel staff at the Days Inn Sunnyvale would have observed an incredible procession and parade of men in and out of minor B.M.'s room.

289.   The Days Inn Sunnyvale security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor B.M. and her co-victims from occurring on the Days Inn Sunnyvale premises. Sundowner staff would have seen the obvious signs of sex trafficking occurring at the Days Inn Sunnyvale, including via security camera footage.

290.   This procession of unregistered guests in and out of B.M.'s hotel room would have been open and obvious to anyone working at the Days Inn Sunnyvale hotel.

291.   B.M. was raped and sexually abused hundreds and hundreds of times at the Days Inn Sunnyvale hotel. The entire time, she was a minor.

292.   During the time B.M. was trafficked at the Days Inn Sunnyvale, the traffickers would upload advertisements to Backpage and other sex trafficking websites while he was at the Days Inn Sunnyvale hotel. The upload would take place through Days Inn Sunnyvale's Wi-Fi/server system and network. The ads, which were also child sexual abuse material (CSAM), likely revealed the Days Inn Sunnyvale's IP address as they were routed from that location.

293.   Because Backpage and some of the other websites would display the newest ads at the top of their list, the traffickers posted and reposted his victim's ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, B.M. believes the ads were reposted via the Days Inn Sunnyvale internet network multiple times per day. Each of the victims' ads were reposted in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements and CSAM would be routed through Days Inn Sunnyvale internet

1  and network system per day.

2      294.    Virtually all the ads were unmistakable commercial sex ads and CSAM. The ads depicted

3  multiple images of the minor B.M.in sexually-provocative positions, dressed in very skimpy lingerie

4  and thong underwear or nude. B.M. was an obvious minor, as were many of the other minor victims.

5  The ads listed the commercial sex acts and their prices and provided the number to call.

6      295.    Through hotel staff and employees, Sundowner knew or should have known that B.M.

7  was being trafficked for sex due to, but not limited to:

8      a.    large amounts of used condoms, empty lube bottles, bodily fluids on the sheets

9      and towels, and other sex-related items in the hotel rooms;

10     b.    used condoms in the trash cans;

11     c.    B.M.'s physical appearance (young, malnourished, sleep deprived, bruised,

12     beaten);

13     d.    a large, continuous procession of older men entering and leaving minor B.M.'s

14     room at all hours of the night;

15     e.    excessive requests for sheets and cleaning supplies; and

16     f.    the trafficker's arrest on property and B.M.'s recovery from the hotel room.

17     296.    Days Inn Sunnyvale employees leased rooms to B.M.'s traffickers when they knew, or

18 should have known, that her traffickers were using their room to subject B.M. to repeated sexual abuse,

19 rape, and sexual exploitation as they forced her into sexual servitude.

20 **THE SEX TRAFFICKING OF B.M. AT THE CLARION INN BY CHOICE**

21     297.    On or about the Spring of 2015, B.M. was first subjugated to sex trafficking at the Choice

22 branded, Clarion Inn, located at 3200 Monterey Road, San Jose, CA, when she was 17 years old.

23     298.    For many months, B.M.'s traffickers rented rooms at the Clarion Inn, including rooms

24 by the front office. B.M. was one of up to 10-15 girls that were being simultaneously trafficked in

25 these rooms. Each girl, including minor B.M., would be forced to perform commercial sex acts with

26 up to 10-15 adult men a day.

27     299.    While at the Clarion Inn, the trafficker would force drugs such as methamphetamine and

28

cocaine on B.M. and the other victims in order to keep them awake for days at a time to continue "working", making money, and to lose weight.

300.   The trafficker withheld food and used drugs and sleep deprivation as methods of coercion and control. The trafficker set quotas for his victims, including B.M., and would punish them if they didn't meet those quotas. The trafficker would hold "team meetings" to intimidate his victims and would beat them in front of each other to establish dominance and control. The trafficker would also display his gun to intimidate and threaten his victims.

301.   Clarion Inn employees told the trafficker and B.M. to keep their activities more discrete and threatened to eject B.M. and her traffickers unless they complied.  Despite these threats, B.M. and several other victims continued to be trafficked on the premises.

302.   The traffic and parade of men coming in and out of the Clarion Inn was extremely busy. Multiple victims were trafficked at the Clarion Inn at the same time.

303.   The Clarion Inn security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor B.M. and her co-victims from occurring on the Clarion Inn premises.

304.   B.M. was raped and otherwise sexually abused hundreds of times at the Clarion Inn. The entire time, she was a minor.

305.   This procession of men would have been open and obvious to anyone working at the Clarion Inn. These were not registered guests. B.M. was a minor as were several of the other girls being trafficked at that Clarion Inn location.

306.   One trafficker assured B.M. that he always had it worked out with the front desk so that the sex trafficking activities could take place at the Clarion Inn.

307.   The trafficker would upload advertisements to Backpage and other sex trafficking websites while he was at the Clarion Inn. The upload would take place through Clarion Inn's Wi-Fi/server system and network. The ads would be routed through the Clarion Inn's IP address because it was coming from that location.

308.    Because Backpage and some of the other websites would display the newest ads at the top of their list, the traffickers posted and reposted his victim's ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, B.M. believes the ads were reposted via the Clarion Inn internet network multiple times per day. Each of the victims' ads were reposted in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements and CSAM would be routed through Clarion Inn internet and network system per day.

309.    Virtually all the ads were unmistakable commercial sex ads and CSAM. The ads depicted multiple images of the minor B.M.in sexually-provocative positions, dressed in very skimpy lingerie and thong underwear or nude. B.M. was an obvious minor, as were many of the other minor victims. The ads listed the commercial sex acts and their prices and provided the number to call.

310.    Most of the photographs used were taken at the Clarion Inn location on the bed or on the couch, which were easily identifiable as Clarion Inn furniture and fixtures. No effort was made to camouflage or hide these identifying features.

311.    Through hotel staff and employees, reservation information and cybersecurity information, Clarion Inn knew or should have known that B.M. was being trafficked for sex due to, but not limited to:

        a.    large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

        b.    payments for the rooms in cash;

        c.    B.M.'s physical appearance (young, malnourished, sleep deprived, bruised, beaten);

        d.    a continuous procession of older men entering and leaving minor B.M.'s room; and

        e.    excessive requests for sheets, cleaning supplies, and room service, which the Clarion Inn personnel readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids.

312.     Clarion Inn employees leased rooms to B.M.'s traffickers when they knew, or should have known, that her traffickers were using their room to subject B.M. to repeated sexual abuse, rape, and sexual exploitation as they forced her into sexual servitude.

**THE SEX TRAFFICKING OF B.M. AT THE BW LANAI GARDEN**

313.     In approximately 2014 and 2015, when B.M. was just 16 and 17, she was sold for sex by her traffickers at BW Lanai Garden, located at 1575 Tully Road, San Jose, California 95122.

314.     The BW Lanai Garden is known to law enforcement as being located in a high crime area where law enforcement has often encountered individuals engaging in illicit and illegal activity such as prostitution, sales of narcotics, gun possession, gang activity, and prostitution activity.

315.     B.M.'s traffickers rented the rooms at the BW Lanai Garden where she was sold for sex while she was a minor. B.M. was one of several girls that were being simultaneously trafficked in these rooms. Each girl, including minor B.M., would be forced to perform commercial sex acts with up to 10-15 men a day.

316.     While at the BW Lanai Garden, the trafficker would force drugs such as methamphetamine and cocaine on B.M. and the other victims in order to keep them awake for days at a time to continue "working", making money, and to lose weight.

317.     In one instance, the trafficker beat one his victims at the BW Lanai Garden for sleeping when she was supposed to be "working".

318.     The trafficker withheld food and used drugs and sleep deprivation as methods of coercion and control. The trafficker set quotas for his victims, including B.M., and would punish them if they didn't meet those quotas. The trafficker would hold "team meetings" to intimidate his victims and would beat them in front of each other to establish dominance and control. The trafficker would also display his gun to intimidate and threaten his victims.

319.     At the BW Lanai Garden, the traffic and parade of men coming in and out of B.M.'s room was tremendous. Up to 10-15 "clients" per day for four girls equals up to 40 and 60 "clients" every day arriving at the BW Lanai Garden rented by the traffickers. Hotel staff at the BW Lanai Garden would have observed an incredible procession and parade of men in and out of minor B.M.'s

1   room.

2   320.   The BW Lanai Garden security cameras undoubtedly filmed a great deal of this obvious

3   traffic as well as the underage victims as they entered and left the premises. No one at the corporate

4   level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant

5   sex trafficking of the minor B.M. and her co-victims from occurring on the BW Lanai Garden

6   premises. Lanai staff would have seen the obvious signs of sex trafficking occurring at the BW Lanai

7   Garden, including via security camera footage.

8   321.   This procession of unregistered guests in and out of B.M.'s hotel room would have been

9   open and obvious to anyone working at the BW Lanai Garden hotel.

10   322.   B.M. was raped and sexually abused hundreds of times at the BW Lanai Garden hotel.

11   The entire time, she was a minor.

12   323.   During the time B.M. was trafficked at the BW Lanai Garden, the traffickers would

13   upload advertisements to Backpage and other sex trafficking websites while he was at the BW Lanai

14   Garden hotel. The upload would take place through BW Lanai Garden's Wi-Fi/server system and

15   network. The ads, which were also child sexual abuse material (CSAM), likely revealed the BW Lanai

16   Garden's IP address as they were routed from that location.

17   324.   Because Backpage and some of the other websites would display the newest ads at the

18   top of their list, the traffickers posted and reposted his victim's ads multiple times a day in order to

19   keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly,

20   B.M. believes the ads were reposted via the BW Lanai Garden internet network multiple times per

21   day. Each of the victims' ads were reposted in a similar fashion. Accordingly, anywhere up to 20 to

22   50 commercial sex advertisements and CSAM would be routed through BW Lanai Garden internet

23   and network system per day.

24   325.   Virtually all the ads were unmistakable commercial sex ads and CSAM. The ads depicted

25   multiple images of the minor B.M.in sexually-provocative positions, dressed in very skimpy lingerie

26   and thong underwear or nude. B.M. was an obvious minor, as were many of the other minor victims.

27   The ads listed the commercial sex acts and their prices and provided the number to call.

28

326.     Through hotel staff and employees, Lanai knew or should have known that B.M. was being trafficked for sex due to, but not limited to:

      a.     large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

      b.     payments for the rooms in cash;

      c.     B.M.'s physical appearance (young, malnourished, sleep deprived, bruised, beaten);

      d.     a continuous procession of older men entering and leaving minor B.M.'s room;

      e.     excessive requests for sheets, cleaning supplies, and room service.

327.     BW Lanai Garden employees leased rooms to B.M.'s traffickers when they knew, or should have known, that her traffickers were using their room to subject B.M. to repeated sexual abuse, rape, and sexual exploitation as they forced her into sexual servitude.

**THE SEX TRAFFICKING OF B.M. AT THE FONTAINE INN**

328.     In approximately 2014 and 2015, when B.M. was just 16 and 17, she was sold for sex by her traffickers at Fontaine Inn, located at 2460 Fontaine Road, San Jose, CA 95121.

329.     B.M.'s traffickers rented the rooms at the Fontaine Inn where she was sold for sex while she was a minor. B.M. was one of several girls that were being simultaneously trafficked in these rooms. Each girl, including minor B.M., would be forced to perform commercial sex acts with up to 10-15 men a day.

330.     While at the Fontaine Inn, the trafficker would force drugs such as methamphetamine and cocaine on B.M. and the other victims in order to keep them awake for days at a time to continue "working", making money, and to lose weight.

331.     The trafficker withheld food and used drugs and sleep deprivation as methods of coercion and control. The trafficker set quotas for his victims, including B.M., and would punish them if they didn't meet those quotas. The trafficker would hold "team meetings" to intimidate his victims and would beat them in front of each other to establish dominance and control. The trafficker would also display his gun to intimidate and threaten his victims.

332.    At the Fontaine Inn, the traffic and parade of men coming in and out of B.M.'s room was tremendous. Up to 10-15 "clients" per day for four girls equals up to 40 and 60 "clients" every day arriving at the Fontaine Inn rented by the traffickers. Hotel staff at the Fontaine Inn would have observed an incredible procession and parade of men in and out of minor B.M.'s room.

333.    The Fontaine Inn security cameras would have filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No staff or employees of Fontaine Inn apparently ever utilized their surveillance and security to prevent the flagrant sex trafficking of the minor B.M. and her co-victims from occurring on the Fontaine Inn premises. Amba's staff should have seen the obvious signs of sex trafficking occurring at the Fontaine Inn, including via security camera footage.

334.    This procession of unregistered guests in and out of B.M.'s hotel room would have been open and obvious to anyone working at the Fontaine Inn.

335.    B.M. was raped and sexually abused hundreds of times at the Fontaine Inn. The entire time, she was a minor.

336.    During the time B.M. was trafficked at the Fontaine Inn, the traffickers would upload advertisements to Backpage and other sex trafficking websites while he was at the Fontaine Inn. The upload would take place through Fontaine Inn's Wi-Fi/server system and network. The ads, which were also child sexual abuse material (CSAM), likely revealed the Fontaine Inn's IP address as they were routed from that location.

337.    Because Backpage and some of the other websites would display the newest ads at the top of their list, the traffickers posted and reposted his victim's ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, B.M. believes the ads were reposted via the Fontaine Inn internet network multiple times per day. Each of the victims' ads were reposted in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements and CSAM would be routed through Fontaine Inn internet and network system per day. Virtually all the ads were unmistakable commercial sex ads and CSAM. The ads depicted multiple images of the minor B.M.in sexually-provocative positions, dressed in very skimpy

lingerie and thong underwear or nude. B.M. was an obvious minor, as were many of the other minor victims. The ads listed the commercial sex acts and their prices and provided the number to call.

338.  Through hotel staff and employees, Amba knew or should have known that B.M. was being trafficked for sex due to, but not limited to:

        a.    large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

        b.    payments for the rooms in cash;

        c.    B.M.'s physical appearance (young, malnourished, sleep deprived, bruised, beaten);

        d.    a continuous procession of older men entering and leaving minor B.M.'s room;

        e.    excessive requests for sheets, cleaning supplies, and room service.

339.  Fontaine Inn employees leased rooms to B.M.'s traffickers when they knew, or should have known, that her traffickers were using their room to subject B.M. to repeated sexual abuse, rape, and sexual exploitation as they forced her into sexual servitude.

### C.  KNOWING BENEFIT:

### Defendants Knowingly Benefited from their Hotel Business Ventures

340.  Upon information and belief, SJ Partnership and Sundowner were apprised of instances of sex trafficking at their Super 8 Alameda and Days Inn Sunnyvale hotels via their corporate parent, Wyndham, or via their franchisors, Super 8 Motels and Days Inn Worldwide. In addition, SJ Partnership and Sundowner had personal knowledge of the trafficking of B.M. at the Super 8 Alameda and Days Inn Sunnyvale. As outlined in further detail below, SJ Partnership and Sundowner employees and staff openly observed signs of trafficking, did not aid B.M., and thereby had constructive and/or actual knowledge of the trafficking of B.M. at the Super 8 Alameda and Days Inn Sunnyvale. Despite these open and obvious signs, SJ Partnership and Sundowner profited and received revenue, a percentage of which it then provided to Wyndham, Super 8 Motels, and Days Inn Worldwide directly from B.M.'s trafficking via the rooms rented by her traffickers and rooms rented at the direction of her traffickers.

341.     Wyndham knowingly benefited, or received something of value, from its participation in a hotel operating venture which it knew or should have known violated the TVPRA through, *inter alia*, royalty payments, licensing fees, membership fees and dues, reservation fees, and percentages of the gross room revenue which Wyndham is entitled to under corporate structure and relationship with its branded hotels under the agreements.

342.     Through their brand standards, franchise agreements, licensing agreements, and operating agreements, Wyndham controls the training, procedures, and policy for the Super 8 Alameda and Days Inn Sunnyvale hotels where B.M. was trafficked, and which bear its brand name.

343.     Through SJ Partnership, Sundowner, and Wyndham's continuous business venture of offering lodging services and renting hotel rooms which were used for trafficking B.M. at the Super 8 Alameda and Days Inn Sunnyvale, SJ Partnership and Sundowner knowingly benefited or received something of value from activity that their facilitation of or participation in a venture which they knew or should have known had violated the TVPRA through the rental of rooms where B.M. was trafficked for sex while she was a minor.

344.     Upon information and belief, Maganson and the Panchal Trust were apprised of instances of sex trafficking at their Clarion Inn hotel via their corporate parent or franchisor, Defendant Choice. In addition, Maganson and the Panchal Trust had personal knowledge of the trafficking of B.M. at the Clarion Inn hotel. As outlined in further detail below, Maganson and Panchal Trust employees and staff openly observed signs of trafficking, did not aid B.M., and thereby had constructive and/or actual knowledge of the trafficking of B.M. at the Clarion Inn hotel. Despite these open and obvious signs, Maganson and the Panchal Trust profited and received revenue, a percentage of which it then provided to Defendant Choice, directly from B.M.'s trafficking via the rooms rented by her traffickers and rooms rented at the direction of her traffickers.

345.     Choice knowingly benefited, or received something of value, from its participation in a hotel operating venture which it knew or should have known violated the TVPRA through, *inter alia*, royalty payments, licensing fees, membership fees and dues, reservation fees, and percentages of the gross room revenue which Choice is entitled to under corporate structure and relationship with its

1    branded hotels under the agreements.

2    346.    Through their brand standards, franchise agreements, licensing agreements, and

3    operating agreements, Defendant Choice controls the training, procedures, and policy for the Clarion

4    Inn hotel where B.M. was trafficked, which bears its brand name. Through its brand standards and

5    franchise agreements, Choice knowingly benefited or received something of value from its facilitation

6    of or participation in a venture which it knew or should have known facilitated the sex trafficking of

7    B.M. through the room rentals in which B.M. was trafficked.

8    347.    Through Maganson, the Panchal Trust, and Choice's continuous business venture of

9    renting hotel rooms, which were used for trafficking B.M. at the Clarion Inn hotel, Maganson and the

10   Panchal Trust knowingly benefited or received something of value from activity that their facilitation

11   of or participation in a venture which they knew or should have known had violated the TVPRA

12   through the rental of rooms where B.M. was trafficked.

13   348.    Upon information and belief, Lanai was apprised of instances of sex trafficking at the

14   BW Lanai Garden via their corporate parent or franchisor, Defendant BWI. In addition, Lanai had

15   personal knowledge of the trafficking of B.M. at the BWI Lanai Garden. As outlined in further detail

16   below, Lanai employees and staff openly observed signs of trafficking, did not aid B.M., and thereby

17   had constructive and/or actual knowledge of the trafficking of B.M. at the BW Lanai Garden. Despite

18   these open and obvious signs, Lanai profited and received revenue, a percentage of which it then

19   provided to Defendant BWI, directly from B.M.'s trafficking via the rooms rented by her traffickers

20   and rooms rented at the direction of her traffickers.

21   349.    BWI knowingly benefited, or received something of value, from its participation in a

22   hotel operating venture which it knew or should have known violated the TVPRA through, *inter alia*,

23   royalty payments, licensing fees, membership fees and dues, reservation fees, and percentages of the

24   gross room revenue which BWI is entitled to under its corporate structure and relationship with its

25   branded hotels under the agreements.

26   350.    Through their brand standards, franchise agreements, licensing agreements, and

27   operating agreements, Defendant BWI controls the training, procedures, and policy for the BW Lanai

28

Garden where B.M. was trafficked, which bears its brand name. Through its brand standards and franchise agreements, BWI knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known facilitated the sex trafficking of B.M. through the room rentals in which B.M. was trafficked.

351.    Through Lanai and BWI's continuous business venture of offering lodging services and renting hotel rooms which were used for trafficking B.M. at the BW Lanai Garden, Lanai knowingly benefited or received something of value from activity that their facilitation of or participation in a venture which they knew or should have known had violated the TVPRA through the rental of rooms where B.M. was trafficked.

352.    Amba employees and staff openly observed signs of trafficking, did not aid B.M., and thereby had constructive and/or actual knowledge of the trafficking of B.M. at the Fontaine Inn. Despite these open and obvious signs, Amba profited and received revenue directly from B.M.'s trafficking via the rooms rented by her traffickers and rooms rented at the direction of her traffickers.

353.    Through Amba's continuous business venture of offering lodging services and renting hotel rooms which were used for trafficking B.M. at the Fontaine Inn, Amba knowingly benefited or received something of value from activity that their facilitation of or participation in a venture which they knew or should have known had violated the TVPRA through the rental of rooms where B.M. was trafficked.

354.    Defendants knew, or should have known, that B.M. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because B.M.'s trafficker frequented the Defendants' hotel properties.

355.    Wyndham receives revenue from the money generated by the operations of the Super 8 motel, including revenue from the reservation fees charged for the room in which B.M. was trafficked at the Super 8 motel.

356.    Defendant Choice receives revenue from the money generated by the operations of the Clarion Inn hotel, including revenue from the reservation fees charged for the room in which B.M. was trafficked at the Clarion Inn hotel.

357.    Defendant BWI receives revenue from the money generated by the operations of the BW Lanai Garden, including revenue from the reservation fees charged for the room in which B.M. was trafficked at the BW Lanai Garden.

358.    Defendant Amba receives revenue from the money generated by the operations of the Fontaine Inn, including revenue from the reservation fees charged for the room in which B.M. was trafficked at the Fontaine Inn.

359.    Defendants Choice, Wyndham, and BWI benefit financially from room rentals, reservation fees, and other incidentals recognized by renting rooms at the brand properties in which the B.M. was commercially sex trafficked.

360.    Defendants Choice, Wyndham, and BWI have benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their branded properties.

361.    Defendants SJ Partnership, Sundowner, Maganson, Panchal Trust, Lanai, and Amba directly benefited financially from room rentals, revenue from the rental fees charged for the rooms in which B.M. was trafficked at their respective motel and hotel and other incidentals recognized by renting rooms.

362.    Defendants profited from the sex trafficking of B.M. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of B.M. The Defendants leased rooms to B.M.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject B.M. to repeated exploitation as he forced her into sexual servitude.

363.    Defendants profited from the sex trafficking of B.M. and knowingly or negligently facilitated B.M.'s continuous victimization. The Defendants actively ignored B.M. and her trafficker repeatedly visiting the motel and hotel, often with different guests, avoiding eye contact, and dressing inappropriately.

364.    The Defendants all financially benefited from the sex trafficking of B.M., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

365.    Defendants benefit from the steady stream of income that sex traffickers bring to their Wyndham, Choice, and BWI hotel brands.

366.    Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

367.    Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect B.M., including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

368.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

369.    Defendants maintained their deficiencies and knowingly benefited by maximizing profits by:

        a.    Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

        b.    Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

        c.    Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotel;

d.     Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and

e.     Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C. § 1595 ("TVPRA")
#### (Against all Defendants)

370.     Plaintiff J.M. incorporates each foregoing allegation.

371.     B.M. was a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action, through her personal representative, under 18 U.S.C. § 1595.

372.     The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to violate the TVPRA. At all relevant times, the Defendants breached this duty by benefitting from and facilitating the harboring and providing of a minor, B.M., who was also induced by force, fraud and coercion, for the purposes of commercial sex.

373.     The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of B.M. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of B.M.'s injuries and damages.

374.     Prior to B.M.'s death, she suffered substantial physical and psychological injuries and incurred medical and hospital expenses as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of the TVPRA.

375.     In the wrongful acts or omissions described throughout this complaint, Defendants acted

with fraud, oppression, and malice.

376.     By reason of Defendants' wrongful acts or omissions and violations of Section 1595 of the TVPRA as described in this complaint, Plaintiff is entitled to recover punitive and exemplary damages.

377.     Wherefore, Plaintiff demands judgment as set forth below.

### B.  COUNT TWO – CCP § 1714 (Negligence)
### (Against All Defendants)

378.     Plaintiff J.M. incorporates each foregoing allegation.

379.     As owners or operators in a hotel venture, Defendants each owed a heightened duty of care to Plaintiff, who was a guest at their hotels.

380.     Defendants had a duty of reasonable care to select, train, supervise, and retain its agents and employees working at hotels on the properties, including but not limited to, proper training and or supervision relating to the observation, investigation, and reporting of signs of guest misconduct, including, but not limited to, human trafficking and sexual exploitation in or about hotels.

381.     Defendants had a duty to use reasonable care to ensure the safety and security of guests at their hotels, including minor B.M.

382.     Defendants breached their duties and did not implement and/or enforce any anti-human trafficking policies that could have saved Plaintiff from being trafficked at Defendant properties.

383.     Throughout this time period relevant hereto, and as outlined above, the Defendants and/or their actual and/or apparent agents, servants, and/or employees, repeatedly failed to observe and report signs of guest misconduct at their hotel and/or properties, including, but not limited to, signs of human trafficking and or sexual exploitation taking place on premises.  Furthermore, upon information and belief, the Defendants, and/or their actual and/or apparent agents, servants, and/or employees, repeatedly failed to warn their customers, including B.M., of said trafficking.

384.     Additionally, prior to the incidents alleged herein, the Defendants failed to properly train their employees and agents regarding security and the detection of guest misconduct in their hotels and on their properties, including, but not limited to, signs of human trafficking and sexual exploitation.

385.   The Defendants breached this duty of care by acts, omissions, and commissions including, but not limited to:

    a.   Failure to adequately train, supervise, audit, and retain employees and franchisees to ensure proper monitoring of surveillance cameras at their hotels and properties for signs of human trafficking and/or sexual exploitation.

    b.   Failure to adequately train, supervise, audit, and retain employees and franchisees to ensure proper monitoring of the number of guests in each room of their hotels, and non-guest visitors in their hotels or on their properties.

    c.   Failure to ensure, provide, and/or train adequate security in their hotels and/or on their properties with the knowledge that said premises had a history of trafficking;

    d.   Failure to adequately train, supervise, audit, and retain employees and franchisees, to ensure proper monitoring of their hotels for signs of dangerous conditions including, but not limited to, human trafficking, sexual exploitation, and rape, by ignoring any combination of the following conditions:

        i.   The repeated refusal of maid service;

        ii.   The repeated, almost exclusive, use of side or rear exits for ingress and egress;

        iii.   The number and frequency of visitors entering and existing the hotel and/or property;

        iv.   Guests present in any particular room in excess of the room's capacity;

        v.   Signs of repeated verbal, physical abuse, restraint and/or confinement of an individual by another;

        vi.   Signs of control over an individual and/or an individual's personal property by another;

        vii.   Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire;

viii.   The repeated renting of specific rooms in the hotels and/or presence on the property;

ix.   The repeated use of cash payments for rooms;

e.   Failure to adequately train, supervise, audit, and retain employees and franchisees, to ensure proper monitoring of their hotels and their properties for signs of suspicious behavior on the premises, which would have alerted the Defendants to the sex trafficking of B.M. including, but not limited to loud noises and sounds of distress coming from rooms and areas in the hotel and/or on the property, the odor of drugs emanating from rooms and areas in the hotel and/or on the property, discarded drug paraphernalia, non-guests entering and exiting rooms in the hotel and/or on the property, the repeated renting of specific rooms in the hotel and/or presence on the property, and the apparent purchasing of sex acts in the hotel and/or on the property

f.   Failure to adequately train, supervise, audit, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure the investigation of suspicious behavior at their hotel and/or properties which would have alerted the Defendants to the sex trafficking of B.M.;

g.   Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure proper reporting to law enforcement of signs of guest misconduct at their hotels and/or on their properties, including, but not limited to human trafficking and sexual exploitation;

h.   Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure a timely response and investigation into guest complaints regarding suspicious behavior at their hotels and/or on their properties, which would have resulted in their discovery of the sex trafficking of B.M.;

i.    Failure to provide adequate security and take reasonable steps to protect B.M.; and

j.    Being otherwise careless and negligent.

386.   B.M. was a minor at the time she was trafficked for sex at Defendants' hotels and was part of a vulnerable class of persons.

387.   As a result of Defendants' negligence, B.M. was repeatedly and continuously victimized, trafficked, and abused in Defendants' hotel rooms in violation of California Penal Code §§ 261.5, 288. Said acts were repeatedly perpetrated at the Defendants' hotels and the Defendants failed to prevent or thwart such horrible acts. The imminent harm described above, as well as B.M.'s injuries and untimely death, were foreseeable and preventable result of Defendants' negligence.

## C.  COUNT THREE – CCP § 377.60 (Wrongful Death)
### (Against All Defendants)

388.   Plaintiff J.M. incorporates each foregoing allegation.

389.   As Personal Representative of the ESTATE OF B.M. and B.M.'s mother, Plaintiff J.M. has standing to bring a wrongful death action on behalf of B.M against all Defendants.

390.   Defendants' wrongful acts, negligence, and misconduct were substantial factors leading to B.M.'s death.

391.   Defendants actively ignored signs of sex trafficking, allowing minor B.M. to be continuously abused, raped, and victimized repeatedly in their hotels.

392.   B.M.'s abuse was caused by Defendants' willful blindness and negligence for approximately two years, during which time she was forced into drug addiction and held as a victim and sexual slave at Defendants' properties.

393.   As a direct and proximate result of the death of B.M., her heirs have been deprived of B.M.'s future support, love, care, comfort affection, society, presence, companionship, protection.

394.   As a further direct and proximate result of the death of B.M., decedent's heirs have incurred or will incur funeral and/or expenses related to her death.

395.   Wherefore, Plaintiff demands judgment as set for below.

//

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

      a.      General Damages according to proof;

      b.      Special Damages according to proof;

      c.      Punitive damages;

      d.      All available compensatory damages for the described losses with respect to each cause of action;

      e.      past and future medical expenses, as well as the costs associated with past and future life care;

      f.      past and future lost wages and loss of earning capacity;

      g.      all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

      h.      disgorgement of profits obtained through unjust enrichment;

      i.      restitution;

      j.      reasonable and recoverable attorneys' fees;

      k.      costs of this action; and

      l.      pre-judgment interest and post-judgment interest and all other interest recoverable; and

      m.      Such other and further relief as the Court may deem proper.

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief

1  the Court or jury deems appropriate under the circumstances.

2  //

1    **THE PLAINTIFF DEMANDS A TRIAL BY JURY**

2    Dated:  June 26, 2023                                    **RESPECTFULLY SUBMITTED,**

3

4                                                            */s/ Erik L. Bauer*
                                                            **Erik L. Bauer** (*pro hac vice*)
5                                                            WSBA No. 14937
                                                            THE LAW OFFICE OF ERIK L. BAUER
6                                                            215 Tacoma Avenue South
                                                            Tacoma, Washington 98402
7                                                            T: 253-383-2000
                                                            F: 253-383-0154
8                                                            E: erik@erikbauerlaw.com

9
                                                            **Kimberly L. Adams** (*pro hac vice*)
10                                                           FL Bar No. 0014479
                                                            **Kathryn L. Avila** (*pro hac vice*)
11                                                           FL Bar No. 1019574
                                                            LEVIN, PAPANTONIO, THOMAS,
12                                                           MITCHELL, RAFFERTY & PROCTOR, P.A.
                                                            316 S. Baylen St. Suite 600
13                                                           Pensacola, Florida 32502
                                                            T: 850-435-7000
14                                                           F: 850-436-6153
                                                            E: kadams@levinlaw.com / kavila@levinlaw.com
15

16
                                                            **Danielle Bianculli Pinter** (*pro hac vice*)
17                                                           FL Bar No. 120441
                                                            **Benjamin W. Bull** (*pro hac vice*)
18                                                           DC Bar No. 388206
                                                            NATIONAL CENTER ON SEXUAL
19                                                           EXPLOITATION
                                                            440 First Street NW
20                                                           Suite 840
                                                            Washington, D.C. 20001
21                                                           T: 352-266-7989
                                                            F: 202-393-1717
22                                                           E: dpinter@ncoselaw.org/bbull@ncose.com
23

24
                                                            **Lori E. Andrus** (SBN 205816)
25                                                           lori@andrusanderson.com
                                                            **Jennie Lee Anderson** (SBN 203586)
26                                                           jennie@andrusanderson.com
                                                            Andrus Anderson LLP
27                                                           155 Montgomery Street, Suite 900

28

San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

***Attorneys for Plaintiff***