Lori E. Andrus (SBN 205816)
lori@andrusanderson.com
Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

Kimberly L. Adams (*pro hac vice*)
kadams@levinlaw.com
Susanna L. Southworth, PhD (*pro hac vice*)
LEVIN PAPANTONIO
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: 850-435-7056
Facsimile: 850-436-6056

*Attorneys for Plaintiff*

*[Additional Counsel Listed on Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| J.M., as Personal Representative of the ESTATE OF B.M., <br><br> Plaintiff, <br> vs. <br><br> WYNDHAM HOTELS & RESORTS, INC.; WYNDHAM HOTEL GROUP, LLC; SUPER 8 MOTELS, INC.; DAYS INN WORLDWIDE, INC.; THE SAN JOSE INN PARTNERSHIP; and SUNDOWNER, LP, <br><br> Defendant(s). | Case No.: 5:20-cv-00656-BLF <br><br> SECOND AMENDED COMPLAINT (WRONGFUL DEATH AND SURVIVAL) DEMAND FOR JURY TRIAL |

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff J.M., as Personal Representative of the ESTATE OF B.M., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**INTRODUCTION**

1. Plaintiff J.M. in this case is the mother of B.M. (hereafter "B.M." or "Decedent"). On January 29, 2020, B.M. filed her complaint for damages against Wyndham Hotels & Resorts, Inc., Choice Hotels International, Inc., and G6 Hospitality, LLC for their violations of the Federal Trafficking Victims Protection Act (18 U.S.C. § 1595). ECF No. 1.

2. Between October 2, 2020 and October 13, 2023, the case was stayed until "final adjudication in the trial court" of the "criminal action arising out of the same occurrence in which the claimant is the victim." 18 U.S.C. §1595(b). ECF No. 99.

3. While the civil case was stayed, on June 27, 2021, B.M. died from complications related to her sexual abuse, sexual exploitation, and sex trafficking facilitated by Defendants.

4. Defendants showed deliberate indifference to the safety of B.M. while she was trafficked for sex, sexually abused, and sexually exploited in their hotels while she was a minor. Defendants failed to protect B.M. from harm while she was present in their hotels and willfully turned a blind eye to the common signs of sex trafficking in their hotels.

5. Defendants' misconduct was a substantial factor in facilitating and enabling B.M.'s sexual abuse, sexual exploitation, sex trafficking, and drug addiction used to control her and keep her awake to increase profits. Had Defendants properly trained their staff to spot the signs of sex trafficking and implemented policies and procedures to report and prevent sex trafficking, B.M. would likely have been rescued and would not have been forced into continuous drug use.

6. Plaintiff J.M. brings a survival action for damages suffered by B.M. and submits her wrongful death action for the loss of B.M.

7. For decades, sex traffickers have brazenly operated in and out of hotels and motels throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel

operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the expense of human life, human rights, and human dignity.

8.   B.M. was a victim of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

9.   Defendants provided lodging and services and thus had the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry… and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[1]

10.   Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the SJ Partnership and Sundowner as hotel owners, and Defendant Wyndham, who is a major player in the hospitality industry. The presence of sex trafficking and sexual exploitation in hotels is a frequent and obvious occurrence and numerous well-researched trainings and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[2]

11.   Obvious signs of sex trafficking at a hotel, including Defendants' brand hotels, may include: an excess of condoms in rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; renting multiple rooms next door to each other; declining room service for several consecutive days; significant foot traffic in and out of room(s); men traveling with multiple women who appear unrelated; multiple women, girls, or minors known to be staying in rooms together without leaving; women, girls, or minors displaying physical injuries, malnourishment, or signs of fear and anxiety; guests checking in with little or no luggage; hotel guests

---

[1] Giavanna L. C. Cavagnaro, Sex trafficking: The Hospitality Industry's Role and Responsibility, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[2] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*. Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

who prevent another individual from speaking for themselves; or a guest controlling another's identification documents.[3]

12.    Hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[4]

13.    Hotel brand companies such as Wyndham were obligated to adopt policies and procedures related to sex trafficking and enforce these policies and procedures as brand standards and hotel operation standards.

14.    Hotel owners such as SJ Partnership and Sundowner had a duty to implement policies and procedures related to the prevention of sex trafficking and to not facilitate and profit from sex trafficking pursuant to local, state, and federal laws.

15.    Rather than taking timely and effective measures known to prevent or combat sex trafficking and forced prostitution occurrences on their hotel properties, all Defendants hewed to a common policy of harboring known and suspected human traffickers in exchange for financial and other benefits and actively ignored signs of ongoing human trafficking in their hotels.

16.    With proper training and the implementation of reasonable security measures, Defendants could have prevented regular sex trafficking in the hotels they own, operate, supervise, franchise, and/or brand under their flag, including the Super 8 and Days Inn where B.M. was trafficked and exploited as a minor.

17.    In 2013, at the young age of fifteen (15), B.M.'s main trafficker began grooming her. In roughly September 2014, B.M. was sold by traffickers to older men who paid for vaginal sex and other commercial sex acts. Her traffickers refused to let her leave until she met a profit quota. He threatened to "rob her of the rest of her life" if she tried to leave or work on her own. *See* Case No. 5:16-cr-00150-BLF, ECF No. 662 at 5. At various times between July 2014 through February 2016, B.M. was

---

[3] *Id. See also*, Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), available at https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf

[4] CNN Wire Staff, U.S. human trafficking report includes U.S. cases for first time, CNN.com (Jun. 14, 2010), *available at* https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.

repeatedly and consistently sold and exploited for commercial sex at the Super 8 and Days Inn hotels while she was a minor.

18.    At the Super 8 and Days Inn, B.M. was trafficked for commercial sex while she was a minor by traffickers through force, fraud, and coercion, while Defendants turned a blind eye and continued to benefit.

19.    At the Super 8 and Days Inn, the traffickers used hotel Wi-Fi and internet access to advertise B.M. for sex on various websites known for trafficking and sexual exploitation. *See supra* n.2.

20.    With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures and refusals to act, mandate, establish, execute, and/or modify their anti-trafficking efforts at the Super 8 and Days Inn, B.M. was continuously sex trafficked, sexually exploited, and victimized repeatedly at the Defendants' hotels.

21.    Plaintiff J.M. brings claims for negligence, wrongful death, survival, and punitive damages against the Defendants who participated in a hotel operating venture and knowingly benefited from this venture through room rentals, profits, third party fees, including the value of the "good will" of the Wyndham® brand. The venture knew or should have known that they were profiting from sex trafficking, including the sex trafficking of B.M., in violation of the TVPRA.

## PARTIES

22.    **Plaintiff J.M.** is the Personal Representative of the ESTATE OF B.M. who resides in Fresno County, California.

    a.    B.M. was a natural person who resided in Fresno County, California. B.M. was a victim of trafficking pursuant to 18 U.S.C. §1591, and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102(16).

    b.    Due to the sensitive, private, and highly personal nature of the allegations, this Court permitted B.M.'s use of a pseudonym because, as a victim of sex trafficking, B.M.'s need for anonymity outweighed the risk of prejudice to Defendants. ECF No. 80 at 17, 19.

c. B.M. is survived by her mother, Plaintiff J.M.  At all relevant times, Plaintiff J.M. was and is the mother of the Decedent, B.M.

d. B.M. was not married at the time of her death and is not survived by a spouse.

e. B.M. did not have, nor was she survived by, any children.

f. Plaintiff J.M. is the duly appointed, qualified, and acting Personal Representative of the ESTATE OF B.M. and is otherwise *sui juris*.

g. As Personal Representative of the ESTATE OF B.M., Plaintiff J.M. brings this action for B.M.'s injuries and wrongful death in her representative capacity on behalf of B.M.'s statutory survivors and/or beneficiaries.

h. As Personal Representative of the ESTATE OF B.M., Plaintiff J.M. brings this survival action to compensate the ESTATE OF B.M. for the injuries and harms suffered by B.M. prior to her death.

23.   **Defendant Wyndham Hotels & Resorts, Inc. ("WHRI")** is the ultimate parent company to several of the largest hotel brands in the world, including the Days Inn and Super 8, with nearly 9,000 branded properties in more than eighty (80) countries. It is a Delaware corporation and can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a. Defendant Wyndham Hotels & Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels & Resorts, Inc. retains successor liability for wrongful acts of its predecessor, Wyndham Worldwide Corporation.

b. Wyndham Hotels & Resorts, Inc. maintains their corporate headquarters at 22 Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of this Court because they regularly conduct business in California; derive substantial revenue from services rendered in California, including through the operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn Sunnyvale. Wyndham Hotels & Resorts, Inc. maintains a registered

agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

24. **Defendant Wyndham Hotel Group ("WHG")** was a wholly owned subsidiary of WHRI's predecessor, Wyndham Worldwide Corporation. After the spinoff of WHRI in 2018, Defendant WHG remains a wholly owned subsidiary of WHRI. At all relevant times, Defendant WHG was responsible for the management, supervision, training, and implementation of brand standards for all of Wyndham's hotel brands, including the Super 8 and Days Inn brands. Together, Defendants WHG and WHRI may be collectively referred to as "Wyndham."

    a. Wyndham Hotel Group maintains their corporate headquarters at 22 Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of this Court because they regularly conduct business in California; derive substantial revenue from services rendered in California, including through the operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn Sunnyvale. Wyndham Hotel Group maintains a registered agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

25. **Defendant Super 8 Motels, Inc. ("Super 8 Motels")** is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and/or Wyndham Hotel Group that enters into franchise agreements and licensing agreements with hotel/motel owners. Super 8® by Wyndham ("Super 8®") is a Wyndham brand. Upon information and belief, the entity responsible for the implementation of brand standards and franchise agreements for all Super 8-branded hotels is Super 8 Motels through WHG.

    a. Super 8 Motels maintains their corporate headquarters at 22 Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of this Court because they regularly conduct business in California; derive substantial revenue from services rendered in California, including through the operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn

Sunnyvale. Super 8 Motels maintains a registered agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

26.    **Defendant Days Inn Worldwide, Inc. ("Days Inn Worldwide")** is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and/or Wyndham Hotel Group that enters into franchise agreements and licensing agreements with hotel/motel owners. Days Inn® by Wyndham ("Days Inn®") is a Wyndham brand. Upon information and belief, the entity responsible for the implementation of brand standards and franchise agreements for all Days Inn-branded hotels is Days Inn Worldwide through WHG.

a.    Days Inn Worldwide maintains their corporate headquarters at 22 Sylvan Way, Parsippany, New Jersey, 07054 but is subject to the jurisdiction of this Court because they regularly conduct business in California; derive substantial revenue from services rendered in California, including through the operation of numerous hotels in California such as the Super 8 Alameda and the Days Inn Sunnyvale. Days Inn Worldwide maintains a registered agent in California and can be served with service of process through Corporate Creations Network, Inc., located at 5901 W. Century Boulevard, #850, Los Angeles, California 90045.

27.    **Defendant San Jose Inn Partnership ("SJ Partnership")**, doing business as the Super 8 by Wyndham motel ("Super 8 Alameda") located at 1860 The Alameda, San Jose, California 95126, owned, operated, managed, and directed one of Defendant Wyndham's Super 8-branded properties. SJ Partnership may be served with service of process at 4747 Mountaire Place, San Jose, California 95138.

28.    **Defendant Sundowner Inn, LP ("Sundowner")**, doing business as the Days Inn Sunnyvale by Wyndham ("Days Inn Sunnyvale") located at 504 Ross Drive, Sunnyvale, California 94089, owned, operated, managed, and directed one of Defendant Wyndham's Days Inn-branded properties. Sundowner may be served with service of process through their registered agent, Chandrakant K. Shah, located at 26725 Shady Oaks Court, Los Alto Hills, California 94020.

29.     Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the supervision, management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

32.     Defendants have submitted to the jurisdiction of California and have purposefully availed themselves of the privilege of conducting acts in California through their dominion and control over their respective brands with brand subsidiaries, brand property subsidiaries, and operating hotels, and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in California; California has an equally strong interest in protecting and assuring the safety of persons within its State.

## SEX TRAFFICKING UNDER FEDERAL LAW

33.     The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).[5]

---

[5] On January 5, 2023, Congress once again expanded the scope of liability for civil beneficiary claims pursuant to Section 1595 of the TVPRA.

34.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

## FACTUAL ALLEGATIONS

### A.  PARTICIPATION IN A VENTURE

**Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner Participated in Hotel Operating Ventures**

35.     Wyndham, Super 8 Motels, and Days Inn Worldwide participated in a hotel operating venture that included Defendants SJ Partnership and Sundowner. The venture also included hotel staff and employees at the Super 8 Alameda and Days Inn Sunnyvale hotels, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked while she was a minor.

36.     Defendant SJ Partnership owned the Super 8 hotel located at 1860 The Alameda, San Jose, California 95126 ("Super 8 Alameda") and operated the hotel pursuant to the franchise agreement and licensing agreement it entered into with Wyndham and Super 8 Motels. At all times, SJ Partnership and the Super 8 Alameda were subject to strict brand standards which were mandated by the Wyndham Defendants.

37.     Defendant Sundowner owned the Days Inn Sunnyvale located at 504 Ross Drive, Sunnyvale, California 94089 ("Days Inn Sunnyvale") and operated the hotel pursuant to the franchise agreement and licensing agreement it entered into with Wyndham and Days Inn Worldwide. At all times, Sundowner and Days Inn Sunnyvale were subject to strict brand standards which were mandated by the Wyndham Defendants.

38.     Wyndham, Super 8 Motels, and Days Inn Worldwide were in a hotel operation venture with SJ Partnership and Sundowner offering public lodging services in the Super 8 Alameda and Days Inn Sunnyvale. This relationship was established through Wyndham's exercise of an ongoing and

systemic right of control over the Super 8 Alameda and Days Inn Sunnyvale by Wyndham's operations, including the means and methods of how the Super 8 Alameda and Days Inn Sunnyvale conducted daily business through one or more of the following actions:

a. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with Wyndham;

b. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

c. providing new hire orientation on human rights and corporate responsibility;

d. providing both voluntary and mandatory training and education to Super 8® and Days Inn® branded hotels through webinars, seminars, conferences, and online portals;

e. providing and controlling customer review and response platforms;

f. hosting online bookings on Wyndham's domain;

g. requiring Super 8® and Days Inn® branded hotels to use Wyndham's customer rewards program;

h. requiring Super 8® and Days Inn® branded hotels to use Wyndham's property management software;

i. requiring Super 8® and Days Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

j. providing IT support for all property management systems, owned, operated and required by Wyndham;

k. setting employee wages;

l. making employment decisions;

m. advertising for employment;

n. sharing profits;

o. requiring Super 8® and Days Inn® branded hotels to use Wyndham's property management software;

p.      requiring Super 8® and Days Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

q.      providing IT support for all property management systems, owned, operated and required by Wyndham;

r.      standardized training methods for employees;

s.      building and maintaining the facility in a manner specified by the owner;

t.      standardized or strict rules of operation;

u.      regular inspection of the facility and operation by owner;

v.      fixing prices; or

w.      other actions that deprive Super 8® and Days Inn® branded hotels of independence in business operations.

39.     Wyndham held out Super 8® and Days Inn® branded hotels to the public as possessing authority to act on its behalf. Wyndham clothed the Super 8 Alameda and Days Inn Sunnyvale with apparent authority to act for Wyndham in the following ways: by requiring the use of Wyndham signs, providing Wyndham branded stationery, requiring the use of Wyndham's website and Wyndham's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Wyndham guest rewards programs. On information and belief, Wyndham's conduct reasonably led B.M.'s perpetrator(s) to believe that the Super 8 Alameda and Days Inn Sunnyvale had the authority it purported to have, and B.M. was injured as a result.

40.     Through its operations manual and brand standards, Wyndham controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked as a minor.

41.     The Super 8 Alameda's website is hosted at Wyndham's domain, www.wyndhamhotels.com.

42.     The Days Inn Sunnyvale's website is hosted at Wyndham's domain, wyndhamhotels.com.

43.     When staying at Wyndham-branded hotels, including the Super 8 Alameda or Days Inn

Sunnyvale, guests receive Wyndham Rewards for bookings.

44.    Wyndham exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked for sex.

45.    Wyndham exercises day-to-day control over the Super 8 Alameda and Days Inn Sunnyvale, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including the Super 8 Alameda and Days Inn Sunnyvale, through its brand standards and retains control over the Super 8 Alameda and Days Inn Sunnyvale through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and operating agreements.

46.    Wyndham makes decisions that directly impact the operations and maintenance of their branded hotels, including the Super 8 Alameda and Days Inn Sunnyvale.

47.    Wyndham is the principal in an agency relationship with the Super 8 Alameda and Days Inn Sunnyvale.  In addition to Wyndham's liability under TVPRA section 1595, Wyndham is vicariously liable for the acts and/or omissions of the staff at its Super 8 Alameda and Days Inn Sunnyvale hotels.

48.    The Super 8 Alameda and Days Inn Sunnyvale hotels where B.M. was trafficked for sex and victimized have apparent agency for Wyndham so as to establish vicarious liability under California law, in addition to an actual agency relationship.

49.    Wyndham has ratified the actions and inactions of SJ Partnership and Sundowner.

50.    Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Super 8 Alameda and Days Inn Sunnyvale hotels where B.M. was trafficked for sex while she was a minor. Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner each share the common policies and practices complained of herein.

51.    Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical

joint employment.

52.    As hotel operation venture participants, Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner are separately and jointly responsible for compliance with all applicable laws, including the TVPRA.

53.    As hotel operation venture participants, Wyndham, Super 8 Motel, Days Inn Worldwide, SJ Partnership, and Sundowner are jointly and severally liable for any damages caused by their employees.

54.    At all relevant times, the SJ Partnership owned, managed, supervised, and/or operated the Super 8 Alameda through Wyndham's brand standards, franchise disclosure documents, and franchise agreement. Because Wyndham operated the Super 8 Alameda where B.M. was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals B.M. was victimized in.

55.    At all relevant times, Sundowner owned, managed, supervised, and/or operated the Days Inn Sunnyvale through Wyndham's brand standards, franchise disclosure documents, and franchise agreement. Because Wyndham operated the Days Inn Sunnyvale where B.M. was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals B.M. was victimized in.

56.    Wyndham, Super 8 Motels, and the SJ Partnership participated in a hotel operating venture in connection with the management and operation of the Super 8 Alameda involving risk and potential profit.

57.    Wyndham, Days Inn Worldwide, and Sundowner participated in a hotel operating venture in connection with the management and operation of the Days Inn Sunnyvale involving risk and potential benefit.

## B. KNEW OR SHOULD HAVE KNOWN

### Defendants Knew or Should Have Known
### Their Hotel Business Ventures Violated the TVPRA

58.     The hospitality industry plays a crucial role in the sex trade.[6] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer, and profit from, anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

59.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[7] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

60.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an "in call."

61.     Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.*, those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[8]

62.     The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[9]

---

[6] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[7] *National Human Trafficking Hotline Statistics*¸ THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[8] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility,* CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015)

63.     Due to the failure of the hospitality industry to address the issue, hotels are *the* venue of choice for sex trafficking.[10] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

64.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has a duty to train and equip staff on how to identify, report, and prevent sexual exploitation where it is most likely to occur.[11]

65.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. Proper training and implementation of reasonable security and cybersecurity measures are the bare minimum necessary for hospitality companies to address regular sex trafficking occurring under their flag.

66.     Hospitality companies such as Wyndham can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[12]

67.     End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[13] The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further

---

[10] *Hotels Initiative,* THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

[11] *Combatting Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-insustry_b_7840754 (last visited November 18, 2019).

[12] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[13] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacancy_Report.pdf.

partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

68.    ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including: not renting by the hour, not permitting cash payments, blocking "Internet access to popular websites for online sex ads," and monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests."[14]

69.    Campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiatives as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[15] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[16]

70.    Despite the efforts of governmental and non-governmental organizations to combat human trafficking, Wyndham continued to lag behind in their efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[17]

71.    Some scholars estimate that hotels and motels account for over ninety percent (90%) of

[14] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, *available at* https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.
[15] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[16] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).
[17] Sarkisian, supra n.9.

commercial exploitation of children.[18] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in hotels and motels in the United States.[19]

72.    The complicity of hospitality giants like Wyndham is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Hotel staff are often the only outside witnesses to the victims' abuse. But traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

73.    As the ultimate parent companies of thousands of hotels and motels worldwide, Defendant Wyndham has been cognizant of their role and responsibilities in the sex trafficking industry for years.

74.    In 2011, Wyndham Hotels trained only *some* of its employees to look for signs of trafficking.[20]

75.    Reports by the Polaris Project were received and reviewed by the executives, directors and managers of Wyndham.

76.    Defendants' "solution" to the problem of human trafficking is always the same – to give lip service about more employee training, and to identify some red flags related to trafficking. But this employee training has never really occurred *en masse*. For instance, according to the reporting in ECPAT's reports, the actual number of employees trained is abysmal. Moreover, although the training may provide some information in identifying trafficking, it provides no clear message on training that will serve to actively address or prevent human trafficking.

77.    To curry more favor with the public, Defendants together, most often through state and

---

[18] See Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).
[19] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 387, *available at* https://www.state.gov/documents/organization/258876.pdf.
[20] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

national associations like the American Hotel & Lodging Association ("AHLA")[21] – where Wyndham is a member[22] – advertise policies, practices, and procedures that indicate a unified commitment to fighting human trafficking.[23]

78.     Hospitality companies, including Wyndham, have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they refuse to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate sex trafficking at their branded hotels, content to direct their efforts solely towards profit and the bottom line.

79.     Upon information and belief, between at least 2008 to 2016, Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

80.     Upon information and belief, between at least 2008 to 2016 all Defendants held meetings through their local or national trade organizations in which sex trafficking in their motels and hotels was discussed.

81.     Upon information and belief, between at least 2008 to 2016, emails were exchanged by employees of Defendants' respective brands that related to sex trafficking in hotels and motels, including Super 8- and Days Inn-branded hotels.

82.     Defendants' continuous failure and/or refusal to implement policies sufficient to combat a known problem such as human trafficking in their operations has risen to the level of willful

---

[21] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. See American Hotel & Lodging Association, Who We Are, available at https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

[22] *See* American Hotel & Lodging Association, Our Members, *available at* https://www.ahla.com/our-members.

[23] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking." http:/www.ahla.com/uploadedFiles/_Common/pdf/Trafficking_Principles_Industry_Update.pdf) (note that AHLA's Industry Principles article has since been removed from its website).

blindness or negligence. [24]

**WHRI, WHG, Super 8 Motels, & Days Inn Worldwide
(collectively, the "Wyndham Defendants")**

83.     At all times that B.M. was trafficked at the Super 8 Alameda and Days Inn Sunnyvale, Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner refused or failed to require any Human Trafficking training in their franchised hotels despite knowing that trafficking was occurring in them.

84.     Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner knew or should have known that forced prostitution and trafficking was taking place well before B.M. was trafficked.

85.     Upon information and belief, between at least 2008 to 2016, Wyndham, Super 8 Motels, Days Inn Worldwide, SJ Partnership, and Sundowner held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

86.     Between at least 2008 to 2016, Wyndham knew and understood that Human Trafficking was occurring in the hospitality industry generally and in its hotels specifically, including its hotels in the Bay area.

87.     Between at least 2008 to 2016, Wyndham was assuring the public that it was "doing the right thing" by training all of its franchisees on how to identify and address human trafficking. Although Wyndham was aware that over 95% of its hotels were not taking the training, it refused to make that training mandatory. Only in 2019 did Wyndham direct that Brand Standards for its hotels contain mandatory human trafficking training for all hotels in the Wyndham portfolio.

88.     Wyndham maintains that it considers guest safety and security to be important and requires the hotels and motels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.

89.     Wyndham maintains data in server logs and internet files that could be used to help prevent human trafficking, but it refuses to use this data for the prevention of human trafficking.

---

[24] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007).

90.     Wyndham had actual and/or constructive knowledge of sex trafficking, including B.M.'s sex trafficking and victimization, occurring on its branded properties via the following:

   a.     In 2008, a man was spotted outside a Super 8 motel with a minor while a federal vice task force was working a sting. In 2010, the pimp was sentenced to 12.5 years in prison for sex trafficking of a minor. [25]

   b.     In February 2010, an undercover sting resulted in three (3) arrests at the Super 8 Motel where males were hiring females for sex off of Backpage.com.

   c.     In August 2016, three people were arrested at the Super 8 Jackson Hole as a result of an undercover sting.[26]

91.     Wyndham manages, supervises, directs, and operates the Super 8 Alameda located at 1860 The Alameda, San Jose, California 95126 through its brand standards, franchise agreements, operating agreements, and/or licensing agreements. Wyndham failed to implement and enforce any of its own policy or policies and protect B.M. from being sex trafficked.

92.     Wyndham manages, supervises, directs, and operates the Days Inn Sunnyvale located at 504 Ross Drive, Sunnyvale, California 94089 through its brand standards, franchise agreements, operating agreements, and/or licensing agreements. Wyndham failed to implement and enforce any of its own policy or policies and protect B.M. from being sex trafficked.

93.     For years, Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Super 8- and Days Inn-branded properties, yet Wyndham has failed to take action to prevent sex trafficking at Wyndham branded properties and still persists in failing to take necessary action to prevent sex trafficking on its branded properties. Wyndham's inattention in this regard enabled and contributed to the sex trafficking the B.M. suffered at the Super 8 Alameda and Days Inn Sunnyvale.

94.     There are numerous examples across place and time of Wyndham's knowledge of sex

[25] *'Y2K Pimp' Gets 12 Years for Recruiting Minor on MySpace*, WIRED (Nov. 8, 2010), https://www.wired.com/2010/11/epps/.
[26] *Prostitution bust at Super 8 Motel*, JACKSON HOLE NEWS & GUIDE (Aug. 23, 2016), https://www.jhnewsandguide.com/news/cops_courts/article_2eca6a4a-85e0-5bfb-950f-86adcb5bbb55.html.

trafficking on its branded property and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

95.     Upon information and belief, Wyndham implemented means which gave it the ability to monitor various guest reviews indicating prostitution, trafficking, and guest safety issues at its branded hotels.

96.     In 2011, WHRI's predecessor entity Wyndham Worldwide Corporation, signed the ECPAT Code, but as evidenced by the widespread sex trafficking which continued to occur at Wyndham's branded property, Wyndham did not practice what it preached. Wyndham trained only some of its employees to look for signs of trafficking. Wyndham's adoption of the Code was nothing more than a strategic maneuver through which it sought a shield against liability, rather than a sword against human trafficking.

97.     Despite Wyndham's anti-trafficking stance, Wyndham failed to implement and enforce any of its own policy or policies, including with respect to the Super 8 Alameda and Days Inn Sunnyvale. Wyndham knew or should have known that the Super 8 Alameda and Days Inn Sunnyvale were located in areas known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when B.M. was trafficked. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Wyndham refused to take adequate measures to prevent the misconduct.

98.     Wyndham voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded property through its partnerships with ECPAT and Polaris, and its activities with the AHLA and other trade organizations. However, Wyndham failed to implement its own policies and those recommended to it by the above mentioned advocacy organizations which led to the inevitable consequence of continued trafficking at its branded property, including the trafficking of B.M.

99.     Wyndham had actual and/or constructive knowledge of sex trafficking occurring on its branded hotel property because Wyndham, SJ Partnership, and Sundowner knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance

abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham, SJ Partnership, and Sundowner allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Super 8 Alameda and Days Inn Sunnyvale. Wyndham, SJ Partnership, and Sundowner facilitated the trafficking through their practices, policies, and procedures. Wyndham, SJ Partnership, and Sundowner failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, SJ Partnership, and Sundowner could continue to profit from the business that trafficking brings, including business from out-of-state.

100.    Wyndham knew or should have known that the Super 8 Alameda and Days Inn Sunnyvale were located in areas known for high incidences of crime and prone to sex trafficking activity on and around the hotel premises, including when B.M. was trafficked.

101.    Wyndham-branded hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country, including in the bay area. Rather than take timely and effective measures to prevent human trafficking, Wyndham brand hotels, and their respective parent companies, have instead refused to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

102.    Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Wyndham has repeatedly refused to stop these actions.

103.    Upon information and belief, Wyndham tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Wyndham's management and control and included all of the indicia of B.M.'s trafficking. This data included the details of B.M.'s check-in, the internet activity associated with her reservation, including Backpage.com advertisements, her location at the hotel, which included the notable fact that she rarely, if ever, left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

104.    Given Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Wyndham® branded hotels, Wyndham breached its duties in the following ways:

      a.  did not adequately distribute information to assist employees in identifying human trafficking;

      b.  failed to mandate a process for escalating human trafficking concerns within the organization;

      c.  failed to mandate managers, employees, or owners attend training related to human trafficking;

      d.  failed to provide new hire orientation on human rights and corporate responsibility;

      e.  failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

      f.  failed to develop and hold or require ongoing training sessions on human trafficking;

      g.  failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

      h.  failed to evaluate universal reservation systems for suspicious booking activities;

      i.  failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

      j.  failed to ban cash or prepaid credit cards as payment; and

      k.  failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.org, from being accessed via hotel internet service.

105.    Upon information and belief, Wyndham requires its branded hotel properties, including the Super 8 Alameda and Days Inn Sunnyvale, to use a centralized property management system,

which is linked to Wyndham's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

106.    Wyndham requires its branded properties to use a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.

107.    Wyndham requires its hotels to carry a certain level of Wi-Fi internet access or security for hotel guests, through a limited number of vendors that Wyndham specifies and requires. For example, in 2016, Wyndham approved two internet vendors. In 2020, Wyndham approved six: Deep Blue Communications, Safety NetAccess, Air2Data High Speed Wireless, ITG Networks, Allbridge, and Wyndham HCS.

108.    Upon information and belief, Wyndham requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Wyndham the ability to access and harvest that internet data.

109.    Upon information and belief, Wyndham retains and/or can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel property, including the type of monitoring described above.

110.    This access may have included branded hotels' guest information registration, including names, date of booking, and length of stay.

111.    Upon information and belief, Wyndham can therefore see unusual or suspicious bookings, for instances, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded property, or when in the case of B.M., reservations for extended stays were requested.

112.    Upon information and belief, Wyndham has the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites.

113.    Upon information and belief, Wyndham can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including B.M.'s

advertisements on Backpage.com.

114. Upon information and belief, and contrary to ECPAT best practices, Wyndham failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

115. Upon information and belief, Wyndham has the ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the hotel where B.M. was trafficked for sex.

116. Despite access to information comprising clear sex trafficking indicators, Wyndham continued to permit and profit from hotel guests who rented hotel rooms to buy sex, including those who bought B.M.

117. Upon information and belief, Wyndham monitors and reviews reports of criminal activity, including through online reviews, at its branded property.

118. Upon information and belief, Wyndham provides a platform for brand property employees to report, at their discretion, to Wyndham suspicious activity occurring at their branded hotel. Wyndham controls and houses this collective data from all branded property.

119. Defendants Wyndham, SJ Partnership, and Sundowner have been aware of sex trafficking on Wyndham brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Wyndham-branded properties and Defendants' inattentiveness.

120. Upon information and belief, Wyndham regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com, Travelocity, and TripAdvisor, including the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked.

    a. The Super 8 located at 31-62 14th Street Long Island City, New York 11106 received this review in October 2008: "If you are wanting to stay at a motel that promotes prostitution then this is the place for you…"[27]

---

[27] Review of Super 8 by Wyndham Long Island City (Oct. 4, 2008), *available at* https://www.tripadvisor.com/ShowUserReviews-g48080-d248683-r20611520-Super_8_by_Wyndham_Long_Island_City_LGA_Hotel-Long_Island_City_Queens_New_York.html.

b. The Super 8 located at 1832 ½ W Lucas Street Florence, South Carolina 29501 received this review in April 2010: "…This is truly a prostitution ring. Not worth bringing your children to. You could hear women in high heels walking up and down the stairs, vehicles pulling in and out, knocking on hotel rooms upstairs and downstairs. So much activity, it's literally dangerous…"[28]

c. In September 2012, a reviewer described the Super 8 in Manassas, Virginia as follows: "This place is a dump! I left 1 day early because of bug bites. Saw people hanging out on the balcony at night. Also saw a man leave from a 1st floor room with a prostitute. So much for being family friendly."[29]

d. In August 2016, a Yelp reviewer described the Days Inn Sunnyvale as a "RAPIST paradise! Full of drug dealers and gang people. NOT safe, stay away!!!!".

e. The Super 8 located at 340 W Illinois Avenue I-55 Exit 12C Memphis, Tennessee 38106 received this review in August 2018: "Please don't stay here… The people in the next room had men coming in and out all night…"[30]

f. The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in July 2012: "UNSAFE: I know prostitutes when I see them, and there were a few working the parking lot. And some dudes were really watching us closely and if they weren't gang members, they sure looked the part. I know it sounds judgmental, but that was the reality."[31]

---

[28] Review of Super 8 by Wyndham Florence (Apr. 18, 2010), *available at* https://www.tripadvisor.com/ShowUserReviews-g54229-d97167-r61797195-Super_8_by_Wyndham_Florence-Florence_South_Carolina.html.
[29] Review of Super 8 by Wyndham Manassas (Sept. 26, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g60895-d110534-r141365522-Super_8_by_Wyndham_Manassas-Manassas_Prince_William_County_Virginia.html.
[30] Review of Super 8 by Wyndham Memphis/Dwtn/Graceland Area (Aug. 31, 2018), *available at* https://www.tripadvisor.com/ShowUserReviews-g55197-d105222-r612562242-Super_8_by_Wyndham_Memphis_Dwtn_Graceland_Area-Memphis_Tennessee.html.
[31] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (July 31, 2012), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or280-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

g. The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in October 2014: " . . . The place also smelled, had prostitutes, drug deals in the parking lot, and partyers. . . DO NOT GO HERE."[32]

h. The Super 8 located at 1860 The Alameda, San Jose, CA 95126 received this review in July 2015: ". . . Not to judge people by their appearance, but I am fairly certain that there were prostitutes in the lobby at breakfast time. Again, the place is not safe, it smells, and it is not worth your safety! DO NOT STAY HERE!"[33]

i. In July 2017, a reviewer described their stay at the Days Inn Sunnyvale as follows: "I was harassed multiple times about my service animal while there were prostitutes running the room next to us…"

j. In 2018, a Google reviewer described the Days Inn Sunnyvale as "Out-dated and dirty. We watched about 5 different men visit the prostitutes in the room next to us within an hour span…"

k. In 2022, a Yelp reviewer described a stay at the Days Inn Sunnyvale as follows: "Cheap motel. I believe there is sex trafficking going in here based on conversations I heard next door to my room. I was concerned for my safety."

121. Upon information and belief, Wyndham monitors customer reviews and complaints for all brand properties, including the Super 8 Alameda and Days Inn Sunnyvale.

122. Upon information and belief, branded properties like the Super 8 Alameda and Days Inn Sunnyvale depend on Wyndham for notification of negative customer reviews.

123. Upon information and belief, Wyndham, not the branded property, houses and controls the data regarding customer reviews.

124. Wyndham has been on notice of repeated incidences of sex trafficking occurring at their

---

[32] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (Oct. 07, 2014), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or170-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

[33] Review of Super 8 by Wyndham Hotel Rose Garden San Jose (September, 2015), *available at* https://www.tripadvisor.com/Hotel_Review-g33020-d225261-Reviews-or110-Hotel_Rose_Garden-San_Jose_California.html#REVIEWS.

brand hotels, including the Super 8 Alameda and Days Inn Sunnyvale, yet has refused to take the necessary action to meaningfully address sex trafficking and still refuses to take the necessary action to meaningfully address sex trafficking at their hotels.

125.    Upon information and belief, Defendants Wyndham, SJ Partnership, and Sundowner had actual or constructive knowledge of law enforcement in close proximity to the Super 8 Alameda and Days Inn Sunnyvale. For example:

a.  In October of 2005, 31 women were arrested when suspected brothels in South Bay were raid. Officers later determined that a number of victims may have been victims of Human Trafficking.[34]

b.  In June of 2014, six teen prostitutes were found in San Jose after officers conducted 14 operations, arresting 54 buyers, 13 pimps, and 57 adult prostitutes as part of a nation operation to minimize sex trafficking and prostitution activities.[35]

c.  In June of 2012, a nationwide prostitution sting netted to pimps in the San Jose area.[36]

d.  In September of 2012, citizens in the San Jose area took to the streets to protest the ramped prostitution taking place after budget cuts disbanded the vice police unit.[37]

e.  In October of 2013, a man was arrested for pimping and beating a woman whom he pushed into prostitution.[38]

f.  In January of 2014, a California man from the San Jose area plead guilty for bringing minor across state lines in order to sex traffic her for money.[39]

[34] Prostitution Case Yields Guilty Pleas, Illegal Immigrants Worked at 10 Sites, San Jose Mercury News, Feb. 16, 2006; Six teen prostitutes recued in Bay Area, The Mercury News, Jun 23, 2014
[35] *Id.*
[36] Nationwide Prostitution Sting Results In Bay Area Arrests, CBS Bay Area, Jun. 25, 2012
[37] San Jose Marches Against Prostitution, NBC Bay Area, Sept 27, 2012
[38] San Jose man pushed unemployed woman into prostitution, The Mercury News, Oct. 15, 2013
[39] Californian Pleads Guilty to Bringing Minor to Las Vegas for Prostitution, Las Vegas Nyheter, Jan. 29, 2014

g.  Upon information and belief, at least six calls for service in regards to prostitution to the police were conducted at the Super 8 in 2015.

h.  Upon information and belief, one missing person was found at the Super 8 in 2015.

i.  Upon information and belief, at least 130 calls for service to police were conducted at the Super 8 during B.M.'s trafficking period.

126.    Despite evidence of prostitution and sex trafficking occurring for years at the Super 8 Alameda and Days Inn Sunnyvale where B.M. was trafficked, Wyndham has failed to meaningfully address it and escort ads continue to advertise these locations for commercial sex.[40]

127.    Thus, for years, Wyndham has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Wyndham® branded property throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of B.M. at the Super 8 Alameda and Days Inn Sunnyvale that forms the basis of this complaint.

**Defendants Knew or Should Have Known that
Their Business Ventures Facilitated the Sex Trafficking of B.M.**

**THE SEX TRAFFICKING OF B.M. AT THE SUPER 8 ALAMEDA**

128.    In approximately 2014 and 2015, when B.M. was just 16 and 17, she was sold for sex by her traffickers at the Super 8 Alameda, located at 1860 The Alameda, San Jose, CA.

129.    Over the course of two years, B.M.'s traffickers rented adjoining rooms at the Super 8. B.M. was one of up to 10-15 girls that were being simultaneously trafficked in these rooms. Each girl, including minor B.M., would be forced to perform commercial sex acts with up to 10-15 men a day.

130.    While at the Super 8 Alameda, the trafficker would force drugs such as methamphetamine and cocaine on B.M. and the other victims in order to keep them awake for days at

---

[40] *See* Escort Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (Jan. 12, 2020) *available at* https://escortfish.ch/ad/view/cumm-whore-incall-in-san-jose/26013198; Escort Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (May 12, 2020) available at https://escortfish.ch/ad/view/linda24/28072570;  Escort Advertisement listing location Super 8 by Wyndham Hotel Rose Garden San Jose (July 02, 2020) *available at* https://us.escortsaffair.com/sanjose/detail/5efec34316327377085a4462.

a time to continue "working", making money, and to lose weight.

131. The trafficker withheld food and used drugs and sleep deprivation as methods of coercion and control. The trafficker set quotas for his victims, including B.M., and would punish them if they didn't meet those quotas. The trafficker would hold "team meetings" to intimidate his victims and would beat them in front of each other to establish dominance and control. The trafficker would also display his gun to intimidate and threaten his victims.

132. At the Super 8 Alameda, the traffickers often hung blankets and shower curtains to act as partitions in the rooms so that sex acts could be performed in the bedroom and in the living room at the same time, essentially making it possible for four girls to be performing sex acts at the same time in the room. Accordingly, the traffic and parade of men coming in and out of the Super 8 Alameda was tremendous. Up to 10-15 customers per day for four girls equals up to 40 and 60 sex customers every day arriving at the Super 8 Alameda rooms rented by the traffickers. This incredible procession and parade of men lasted almost continuously for a two-year period.

133. This procession of unregistered guests in and out of B.M.'s room would have been open and obvious to anyone working at the Super 8 Alameda. B.M. was a minor as were several of the other girls being trafficked at the Super 8 Alameda.

134. The Super 8 Alameda security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor B.M. and her co-victims from occurring at the Super 8 Alameda.

135. Upon information and belief, SJ Partnership regularly checks the Super 8 Alameda security camera recordings to keep an eye on employees and would have seen the obvious signs of sex trafficking occurring in their hotel.

136. B.M. was raped and otherwise sexually abused hundreds and hundreds of times at the Super 8 Alameda. The entire time, she was a minor.

137. Two or three different Super 8 Alameda employees who worked at the front desk were involved in the sex trafficking operation to the extent that they served as look-outs for police and

accepted money from the trafficker in exchange for allowing him to continue his trafficking operation at the Super 8 location. The trafficker would send "stacks" of cash on a regular basis to the hotel employees as payment. Typically, one of the trafficking victims would deliver that cash.

138.    On several occasions, the trafficker would have parties at the hotel. On more than one occasion, hotel employees participated at these parties where sex was sold and drugs and alcohol were all served.

139.    Super 8 Alameda was the base of operations for B.M.'s traffickers during the time B.M. was trafficked. As the base of operations, the traffickers would upload advertisements of minor B.M. to Backpage and other sex trafficking websites while she was at the Super 8 Alameda. The upload would take place through the hotel's Wi-Fi/server system and network. The ads, which were also child sexual abuse material (CSAM), likely revealed the Super 8 Alameda's IP address as they were routed from that location.

140.    Because Backpage and some of the other websites would display the newest ads at the top of their list, the traffickers posted and reposted his victim's ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, B.M. believes the ads were reposted via the Super 8 Alameda internet network multiple times per day. Each of the victims' ads were reposted in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements and CSAM would be routed through Super 8 Alameda internet and network system per day.

141.    Virtually all the ads were unmistakable commercial sex ads. They identified the neighborhood in which the Super 8 Alameda was located and they had multiple pictures of the minor B.M. in sexually-provocative positions, dressed in very skimpy lingerie and thong underwear. B.M. was an obvious minor as were many of the other minor victims.

142.    Most of the photographs used were taken at the Super 8 Alameda on the bed or on the couch, which were easily identifiable as Super 8 furniture and fixtures. No effort was made to camouflage or hide these identifying features.

143.    Through hotel staff and employees, SJ Partnership knew or should have known that B.M.

was being trafficked for sex due to, but not limited to:

    a.   large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b.   payments for the rooms in cash;

    c.   B.M.'s physical appearance (young, malnourished, sleep deprived, bruised, beaten);

    d.   a continuous procession of older men entering and leaving minor B.M.'s room;

    e.   excessive requests for sheets, cleaning supplies, and room service, which the Super 8 personnel, having been paid off and part of this venture, readily complied with these requests to provide clean linen and towels for the ones soiled with human bodily fluids; and,

    f.   the personal relationship between the front desk employees and B.M.'s trafficker(s).

144. Super 8 Alameda employees leased rooms to B.M.'s traffickers when they knew, or should have known, that her traffickers were using their room to subject B.M. to repeated sexual abuse, rape, and sexual exploitation as they forced her into sexual servitude.

### THE SEX TRAFFICKING OF B.M. AT THE DAYS INN SUNNYVALE

145. In approximately 2014 and 2015, when B.M. was just 16 and 17, she was sold for sex by her traffickers at the Days Inn Sunnyvale, located at 504 Ross Drive, Sunnyvale, California 94089.

146. The Days Inn Sunnyvale is known to law enforcement as being located in a high crime area where law enforcement has often encountered individuals engaging in illicit and illegal activity such as prostitution, sales of narcotics, gun possession, gang activity, and prostitution activity.

147. The trafficker was arrested on October 6, 2015 at the Days Inn Sunnyvale parking lot for drug possession.

148. B.M. was recovered from the Days Inn Sunnyvale on October 6, 2015.

149. B.M.'s traffickers rented the rooms at the Days Inn Sunnyvale where she was sold for sex while she was a minor. B.M. was one of several girls that were being simultaneously trafficked in

these rooms. Each girl, including minor B.M., would be forced to perform commercial sex acts with up to 10-15 men a day.

150.    While at the Days Inn Sunnyvale, the trafficker would force drugs such as methamphetamine and cocaine on B.M. and the other victims in order to keep them awake for days at a time to continue "working", making money, and to lose weight.

151.    The traffickers withheld food and used drugs and sleep deprivation as methods of coercion and control. The trafficker set quotas for his victims, including B.M., and would punish them if they didn't meet those quotas. The trafficker would hold "team meetings" to intimidate his victims and would beat them in front of each other to establish dominance and control. The trafficker would also display his gun to intimidate and threaten his victims.

152.    At the Days Inn Sunnyvale, the traffic and parade of men coming in and out of B.M.'s room was tremendous. Up to 10-15 "clients" per day for four girls equals up to 40 and 60 "clients" every day arriving at the Days Inn Sunnyvale rented by the traffickers. Hotel staff at the Days Inn Sunnyvale would have observed an incredible procession and parade of men in and out of minor B.M.'s room.

153.    The Days Inn Sunnyvale security cameras undoubtedly filmed a great deal of this obvious traffic as well as the underage victims as they entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of the minor B.M. and her co-victims from occurring on the Days Inn Sunnyvale premises. Sundowner staff would have seen the obvious signs of sex trafficking occurring at the Days Inn Sunnyvale, including via security camera footage.

154.    This procession of unregistered guests in and out of B.M.'s hotel room would have been open and obvious to anyone working at the Days Inn Sunnyvale hotel.

155.    B.M. was raped and sexually abused hundreds and hundreds of times at the Days Inn Sunnyvale hotel. The entire time, she was a minor.

156.    During the time B.M. was trafficked at the Days Inn Sunnyvale, the traffickers would upload advertisements to Backpage and other sex trafficking websites while he was at the Days Inn

Sunnyvale hotel. The upload would take place through Days Inn Sunnyvale's Wi-Fi/server system and network. The ads, which were also child sexual abuse material (CSAM), likely revealed the Days Inn Sunnyvale's IP address as they were routed from that location.

157.    Because Backpage and some of the other websites would display the newest ads at the top of their list, the traffickers posted and reposted his victim's ads multiple times a day in order to keep his victim's ads at the top of the list and thereby more visible to sex customers. Accordingly, B.M. believes the ads were reposted via the Days Inn Sunnyvale internet network multiple times per day. Each of the victims' ads were reposted in a similar fashion. Accordingly, anywhere up to 20 to 50 commercial sex advertisements and CSAM would be routed through Days Inn Sunnyvale internet and network system per day.

158.    Virtually all the ads were unmistakable commercial sex ads and CSAM. The ads depicted multiple images of the minor B.M.in sexually-provocative positions, dressed in very skimpy lingerie and thong underwear or nude. B.M. was an obvious minor, as were many of the other minor victims. The ads listed the commercial sex acts and their prices and provided the number to call.

159.    Through hotel staff and employees, Sundowner knew or should have known that B.M. was being trafficked for sex due to, but not limited to:

      a.    large amounts of used condoms, empty lube bottles, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

      b.    used condoms in the trash cans;

      c.    B.M.'s physical appearance (young, malnourished, sleep deprived, bruised, beaten);

      d.    a large, continuous procession of older men entering and leaving minor B.M.'s room at all hours of the night;

      e.    excessive requests for sheets and cleaning supplies; and

      f.    the trafficker's arrest on property and B.M.'s recovery from the hotel room.

160.    Days Inn Sunnyvale employees leased rooms to B.M.'s traffickers when they knew, or should have known, that her traffickers were using their room to subject B.M. to repeated sexual abuse,

rape, and sexual exploitation as they forced her into sexual servitude.

## C. KNOWING BENEFIT:

### Defendants Knowingly Benefited from their Hotel Business Ventures

161. Upon information and belief, SJ Partnership and Sundowner were apprised of instances of sex trafficking at their Super 8 Alameda and Days Inn Sunnyvale hotels via their corporate parent, Wyndham, or via their franchisors, Super 8 Motels and Days Inn Worldwide. In addition, SJ Partnership and Sundowner had personal knowledge of the trafficking of B.M. at the Super 8 Alameda and Days Inn Sunnyvale. As outlined in further detail below, SJ Partnership and Sundowner employees and staff openly observed signs of trafficking, did not aid B.M., and thereby had constructive and/or actual knowledge of the trafficking of B.M. at the Super 8 Alameda and Days Inn Sunnyvale. Despite these open and obvious signs, SJ Partnership and Sundowner profited and received revenue, a percentage of which it then provided to Wyndham, Super 8 Motels, and Days Inn Worldwide directly from B.M.'s trafficking via the rooms rented by her traffickers and rooms rented at the direction of her traffickers.

162. Wyndham knowingly benefited, or received something of value, from its participation in a hotel operating venture which it knew or should have known violated the TVPRA through, *inter alia*, royalty payments, licensing fees, membership fees and dues, reservation fees, and percentages of the gross room revenue which Wyndham is entitled to under corporate structure and relationship with its branded hotels under the agreements.

163. Through their brand standards, franchise agreements, licensing agreements, and operating agreements, Wyndham controls the training, procedures, and policy for the Super 8 Alameda and Days Inn Sunnyvale hotels where B.M. was trafficked, and which bear its brand name.

164. Through SJ Partnership, Sundowner, and Wyndham's continuous business venture of offering lodging services and renting hotel rooms which were used for trafficking B.M. at the Super 8 Alameda and Days Inn Sunnyvale, SJ Partnership and Sundowner knowingly benefited or received something of value from activity that their facilitation of or participation in a venture which they knew or should have known had violated the TVPRA through the rental of rooms where B.M. was trafficked

for sex while she was a minor.

165.    Defendants knew, or should have known, that B.M. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because B.M.'s trafficker frequented the Defendants' hotel properties.

166.    Wyndham receives revenue from the money generated by the operations of the Super 8 motel, including revenue from the reservation fees charged for the room in which B.M. was trafficked at the Super 8 motel.

167.    The Wyndham Defendants benefit financially from room rentals, reservation fees, and other incidentals recognized by renting rooms at the brand properties in which the B.M. was commercially sex trafficked.

168.    The Wyndham Defendants benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their branded properties.

169.    Defendants SJ Partnership and Sundowner directly benefited financially from room rentals, revenue from the rental fees charged for the rooms in which B.M. was trafficked at their respective motel and hotel and other incidentals recognized by renting rooms.

170.    All Defendants profited from the sex trafficking of B.M. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of B.M. The Defendants leased rooms to B.M.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject B.M. to repeated exploitation as he forced her into sexual servitude.

171.    Defendants profited from the sex trafficking of B.M. and knowingly or negligently facilitated B.M.'s continuous victimization. The Defendants actively ignored B.M. and her trafficker repeatedly visiting the motel and hotel, often with different guests, avoiding eye contact, and dressing inappropriately.

172.    The Defendants all financially benefited from the sex trafficking of B.M., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

173. Defendants benefit from the steady stream of income that sex traffickers bring to Wyndham hotel brands.

174. Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

175. Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect B.M., including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

176. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

177. Defendants maintained their deficiencies and knowingly benefited by maximizing profits by:

    a. Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b. Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

    c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotel;

d. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers; and

e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

## CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C. § 1595 ("TVPRA")
### (Against all Defendants)

178.    Plaintiff J.M. incorporates each foregoing allegation.

179.    B.M. was a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action, through her personal representative, under 18 U.S.C. § 1595.

180.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to violate the TVPRA. At all relevant times, the Defendants breached this duty by benefitting from and facilitating the harboring and providing of a minor, B.M., who was also induced by force, fraud and coercion, for the purposes of commercial sex.

181.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of B.M. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of B.M.'s injuries and damages.

182.    Prior to B.M.'s death, she suffered substantial physical and psychological injuries and incurred medical and hospital expenses as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of the TVPRA.

183.    In the wrongful acts or omissions described throughout this complaint, Defendants acted

with fraud, oppression, and malice.

184.    By reason of Defendants' wrongful acts or omissions and violations of Section 1595 of the TVPRA as described in this complaint, Plaintiff is entitled to recover punitive and exemplary damages.

185.    Wherefore, Plaintiff demands judgement as set forth below.

**B.  COUNT TWO – CCP § 1714 (Negligence)**
**(Against All Defendants)**

186.    Plaintiff J.M. incorporates each foregoing allegation.

187.    As owners or operators in a hotel venture, Defendants each owed a heightened duty of care to Plaintiff, who was a guest at their hotels.

188.    Defendants had a duty of reasonable care to select, train, supervise, and retain its agents and employees working at hotels on the properties, including but not limited to, proper training and or supervision relating to the observation, investigation, and reporting of signs of guest misconduct, including, but not limited to, human trafficking and sexual exploitation in or about hotels.

189.    Defendants had a duty to use reasonable care to ensure the safety and security of guests at their hotels, including minor B.M.

190.    Defendants breached their duties and did not implement and/or enforce any anti-human trafficking policies that could have saved Plaintiff from being trafficked at Defendant properties.

191.    Throughout this time period relevant hereto, and as outlined above, the Defendants and/or their actual and/or apparent agents, servants, and/or employees, repeatedly failed to observe and report signs of guest misconduct at their hotel and/or properties, including, but not limited to, signs of human trafficking and or sexual exploitation taking place on premises.  Furthermore, upon information and belief, the Defendants, and/or their actual and/or apparent agents, servants, and/or employees, repeatedly failed to warn their customers, including B.M., of said trafficking.

192.    Additionally, prior to the incidents alleged herein, the Defendants failed to properly train their employees and agents regarding security and the detection of guest misconduct in their hotels and on their properties, including, but not limited to, signs of human trafficking and sexual exploitation.

193.    The Defendants breached this duty of care by acts, omissions, and commissions including, but not limited to:

    a.  Failure to adequately train, supervise, audit, and retain employees and franchisees to ensure proper monitoring of surveillance cameras at their hotels and properties for signs of human trafficking and/or sexual exploitation.

    b.  Failure to adequately train, supervise, audit, and retain employees and franchisees to ensure proper monitoring of the number of guests in each room of their hotels, and non-guest visitors in their hotels or on their properties.

    c.  Failure to ensure, provide, and/or train adequate security in their hotels and/or on their properties with the knowledge that said premises had a history of trafficking;

    d.  Failure to adequately train, supervise, audit, and retain employees and franchisees, to ensure proper monitoring of their hotels for signs of dangerous conditions including, but not limited to, human trafficking, sexual exploitation, and rape, by ignoring any combination of the following conditions:

        i.  The repeated refusal of maid service;

        ii.  The repeated, almost exclusive, use of side or rear exits for ingress and egress;

        iii.  The number and frequency of visitors entering and existing the hotel and/or property;

        iv.  Guests present in any particular room in excess of the room's capacity;

        v.  Signs of repeated verbal, physical abuse, restraint and/or confinement of an individual by another;

        vi.  Signs of control over an individual and/or an individual's personal property by another;

        vii.  Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire;

viii.   The repeated renting of specific rooms in the hotels and/or presence on the property;

ix. The repeated use of cash payments for rooms;

e.   Failure to adequately train, supervise, audit, and retain employees and franchisees, to ensure proper monitoring of their hotels and their properties for signs of suspicious behavior on the premises, which would have alerted the Defendants to the sex trafficking of B.M. including, but not limited to loud noises and sounds of distress coming from rooms and areas in the hotel and/or on the property, the odor of drugs emanating from rooms and areas in the hotel and/or on the property, discarded drug paraphernalia, non-guests entering and exiting rooms in the hotel and/or on the property, the repeated renting of specific rooms in the hotel and/or presence on the property, and the apparent purchasing of sex acts in the hotel and/or on the property

f.   Failure to adequately train, supervise, audit, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure the investigation of suspicious behavior at their hotel and/or properties which would have alerted the Defendants to the sex trafficking of B.M.;

g.   Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure proper reporting to law enforcement of signs of guest misconduct at their hotels and/or on their properties, including, but not limited to human trafficking and sexual exploitation;

h.   Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure a timely response and investigation into guest complaints regarding suspicious behavior at their hotels and/or on their properties, which would have resulted in their discovery of the sex trafficking of B.M.;

     i.     Failure to provide adequate security and take reasonable steps to protect B.M.; and

     j.     Being otherwise careless and negligent.

194.    B.M. was a minor at the time she was trafficked for sex at Defendants' hotels and was part of a vulnerable class of persons.

195.    As a result of Defendants' negligence, B.M. was repeatedly and continuously victimized, trafficked, and abused in Defendants' hotel rooms in violation of California Penal Code §§ 261.5, 288. Said acts were repeatedly perpetrated at the Defendants' hotels and the Defendants failed to prevent or thwart such horrible acts. The imminent harm described above, as well as B.M.'s injuries and untimely death, were foreseeable and preventable result of Defendants' negligence.

### C.  COUNT THREE – CCP § 377.60 (Wrongful Death)
### (Against All Defendants)

196.    Plaintiff J.M. incorporates each foregoing allegation.

197.    As Personal Representative of the ESTATE OF B.M. and B.M.'s mother, Plaintiff J.M. has standing to bring a wrongful death action on behalf of B.M against all Defendants.

198.    Defendants' wrongful acts, negligence, and misconduct were substantial factors leading to B.M.'s death.

199.    Defendants actively ignored signs of sex trafficking, allowing minor B.M. to be continuously abused, raped, and victimized repeatedly in their hotels.

200.    B.M.'s abuse was caused by Defendants' willful blindness and negligence for approximately two years, during which time she was forced into drug addiction and held as a victim and sexual slave at Defendants' properties.

201.    As a direct and proximate result of the death of B.M., her heirs have been deprived of B.M.'s future support, love, care, comfort affection, society, presence, companionship, protection.

202.    As a further direct and proximate result of the death of B.M., decedent's heirs have incurred or will incur funeral and/or expenses related to her death.

203.    Wherefore, Plaintiff demands judgment as set for below.

**PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

    a.   General Damages according to proof;

    b.   Special Damages according to proof;

    c.   Punitive damages;

    d.   All available compensatory damages for the described losses with respect to each cause of action;

    e.   past and future medical expenses, as well as the costs associated with past and future life care;

    f.   past and future lost wages and loss of earning capacity;

    g.   all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    h.   disgorgement of profits obtained through unjust enrichment;

    i.   restitution;

    j.   reasonable and recoverable attorneys' fees;

    k.   costs of this action; and

    l.   pre-judgment interest and post-judgment interest and all other interest recoverable; and

    m.  Such other and further relief as the Court may deem proper.

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the

Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: July 24, 2024                                    **RESPECTFULLY SUBMITTED,**

                                                        */s/ Lori E. Andrus*
                                                        **Lori E. Andrus** (SBN 205816)
                                                        lori@andrusanderson.com
                                                        **Jennie Lee Anderson** (SBN 203586)
                                                        jennie@andrusanderson.com
                                                        ANDRUS ANDERSON LLP
                                                        155 Montgomery Street, Suite 900
                                                        San Francisco, CA 94104
                                                        Telephone: (415) 986-1400
                                                        Facsimile: (415) 986-1474

                                                        **Erik L. Bauer** (*pro hac vice*)
                                                        WSBA No. 14937
                                                        THE LAW OFFICE OF ERIK L. BAUER
                                                        215 Tacoma Avenue South
                                                        Tacoma, Washington 98402
                                                        T: 253-383-2000
                                                        F: 253-383-0154
                                                        E: erik@erikbauerlaw.com

                                                        **Kimberly L. Adams** (*pro hac vice*)
                                                        FL Bar No. 0014479
                                                        **Susanna L. Southworth**, PhD (*pro hac vice*)
                                                        LEVIN, PAPANTONIO
                                                        316 S. Baylen St. Suite 600
                                                        Pensacola, Florida 32502
                                                        T: 850-435-7000
                                                        F: 850-436-6153
                                                        E: kadams@levinlaw.com
                                                        E: ssouthworth@levinlaw.com

                                                        **Danielle Bianculli Pinter** (*pro hac vice*)
                                                        FL Bar No. 120441
                                                        **Benjamin W. Bull** (*pro hac vice*)
                                                        DC Bar No. 388206
                                                        NATIONAL CENTER ON SEXUAL
                                                        EXPLOITATION
                                                        440 First Street NW
                                                        Suite 840

SECOND AMENDED COMPLAINT - 45                               5:20-cv-00656-BLF

Washington, D.C. 20001
T: 352-266-7989
F: 202-393-1717
E: dpinter@ncoselaw.org/bbull@ncose.com

**Attorneys for Plaintiff**